# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| BWS PROPERTIES, LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 1:24-cv-00029 |
| | ) | |
| v. | ) | Judge Christopher H. Steger |
| | ) | |
| AIRGAS USA, LLC, | ) | Non-Jury |
| | ) | |
| *Defendant*. | ) | |

---

## PLAINTIFF'S MOTION IN LIMINE & FOR SANCTIONS

---

Plaintiff BWS Properties, LLC ("BWS") hereby submits its Motion in Limine and for Sanctions in accordance with Fed. R. Civ. P. 30(d)(2) and 37 and requests an Order prohibiting Defendant, Airgas USA, LLC ("Airgas"), from presenting evidence or testimony in its dispositive briefing, at hearings, and/or at trial that contradicts or supplements the testimony (or lack thereof) offered by its designated corporate representatives pursuant to Fed. R. Civ. P. 30(b)(6).[1] BWS also seeks an award of its attorneys' fees and expenses associated with this Motion.

## BACKGROUND

This case arose as a result of Airgas's failure to properly maintain and surrender certain property owned by BWS, located at 700 Manufacturers Road, Chattanooga, Tennessee (the

---

[1] In this briefing, we endeavor to provide the Court examples of instances in which the deponents were unprepared, but we have also attached excerpts from the relevant deposition transcripts. *See ChampionX, LLC v. Resonance Sys., Inc.*, No. 21-CV-288, 2024 WL 2224338, slip op. at *3 (E.D. Tenn. May 16, 2024) ("The party claiming that a corporate representative was unprepared 'must make at least an initial showing – with record citations – suggesting that the designee's preparation was inadequate.'") (quoting *Wicker v. Lawless*, 278 F. Supp. 3d 989, 1000 (S.D. Ohio 2017)) (citation omitted).

"Property"), in accordance with an Industrial Building Lease (the "Lease") executed by the parties.

On March 31, 2025, BWS served its draft 30(b)(6) notice for Airgas's review. Airgas's counsel suggested that the parties confer regarding the deposition topics. Following BWS's numerous attempts to do so, on April 14, 2025, Airgas finally confirmed its availability for depositions on April 23 and 24, discussed proposed changes to the noticed topics, and identified both Mr. Peter Van Slyke and Ms. Dawn Van Dyke as Airgas's representatives.[2] Airgas thereafter identified Mr. Tracey Harvey as its third representative and confirmed availability for his deposition on May 1, 2025. BWS then issued its second corporate deposition notice for Mr. Harvey's testimony.[3] Counsel also discussed and confirmed the topics each representative would address.

## LAW & ARGUMENT

### I.    FED. R. CIV. P. 30(b)(6) REQUIRES A PARTY TO PROPERLY PREPARE ITS CORPORATE REPRESENTATIVES TO TESTIFY.

Pursuant to Fed. R. Civ. P. 30(b)(6), BWS was required to provide Airgas with "reasonable notice" of and to identify with "reasonable particularity" the topics to be addressed during the noticed corporate deposition. *ChampionX, LLC v. Resonance Sys., Inc.*, No. 21-CV-288, 2024 WL 2224338, slip op. at *2 (E.D. Tenn. May 16, 2024) (internal quotations omitted) (quoting *St. Paul Reinsurance Co. v. Com. Fin. Corp.*, 198 F.R.D. 508, 514 (N.D. Iowa 2000)) (citation omitted).

In response, Airgas was required to "designate one or more officers, directors, or managing agents, or designate other persons who [could] testify on its behalf" and also "set out the matters on which each person designated w[ould] testify." Fed. R. Civ. P. 30(b)(6). The individuals identified by Airgas would then "testify [on Airgas's behalf] about information known **or**

---

[2] *See* **Ex. A**, Notice of 30(b)(6) Deposition.
[3] *See* **Ex. B**, Second Notice of 30(b)(6) Deposition.

**reasonably available to the organization**." Fed. R. Civ. P. 30(b)(6) (emphasis added). Airgas was responsible for making "a good-faith effort to identify **and prepare** its Rule 30(b)(6) witnesses." *Rivet v. State Farm Mut. Auto. Ins. Co.*, 316 F. App'x 440, 448 (6th Cir. 2009) (emphasis added). The good-faith effort standard is "an affirmative duty," *Consumer Fin. Prot. Bureau v. Borders & Borders, PLC* ("*CFPB*"), Civil No. 3:13-CV-1047-CRS, 2016 WL 9460471, at *4 (W.D. Ky. June 29, 2016) (citation omitted), that imposes upon the designee "'a duty to reasonably **obtain information from corporate documents, current or prior corporate employees, or any other sources reasonably available to the corporation**.'" *United States ex rel. Griffis v. EOD Tech., Inc.*, No. 10-CV-204, 2024 WL 4921518, slip op. at *3 (E.D. Tenn. May 10, 2024) (quoting *Schall v. Suzuki Motor of Am., Inc.*, No. 14-CV-00074, 2017 WL 4050319, at *5 (W.D. Ky. Sept. 13, 2017)) (citation omitted).

Preparing for a 30(b)(6) deposition under the foregoing standard should involve a "thorough review of all available information." *CFPB*, 2016 WL 9460471, at *4 (citation omitted). "'Absolute perfection is not required of a 30(b)(6) witness[,]'" but utter lack of preparation is entirely unacceptable. *ChampionX*, 2024 WL 2224338, slip op. at *2 (quoting *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 691 (S.D. Fla. 2012)) (citation omitted).

In the present matter, BWS issued appropriate deposition notices, discussed the identified topics with Airgas's counsel in detail, and then confirmed that each deponent was prepared to testify to certain topics once more during the depositions.[4] Despite designating Dawn Van Dyke, Peter Van Slyke, and Tracy Harvey as witnesses and assigning them certain topics, Airgas failed

---

[4] *See* **Ex. C**, Excerpts of the April 23, 2025 30(b)(6) Deposition of Dawn Van Dyke ("Van Dyke Dep.") 14:12-15:3; **Ex. D**, Excerpts of the April 24, 2025 30(b)(6) Deposition of Peter Van Slyke ("Van Slyke Dep.") 15:5-11; 16:15-18; 17:10-12; **Ex. E**, Excerpts of the May 1, 2025 30(b)(6) Deposition of Tracey Harvey ("Harvey Dep.") 15:8-10, 15-24; 16:15-25.

to make any effort to actually prepare these corporate representatives to testify on its behalf.

## II. AIRGAS FAILED TO PROPERLY PREPARE ITS CORPORATE REPRESENTATIVES TO TESTIFY.[5]

Before addressing any substantive matters in each of the 30(b)(6) depositions, counsel for BWS listed the topics for which each representative had been designated and asked each representative to confirm they were prepared to testify to the identified topics.[6] Each representative confirmed they were prepared to testify on Airgas's behalf.[7] It quickly became apparent, however, that this was not the case. The deponents had not even attempted to obtain any corporate knowledge regarding the noticed topics but were instead relying solely on their personal, individual recollections or experience. This does not comply with the requisite standard.

Ms. Van Dyke confirmed that she only met with Airgas's counsel once—the day before the deposition—and her only preparation efforts were to "look[] back" at some documents and emails.[8] *See CFPB*, 2016 WL 9460471, at *4 (requiring a thorough review of all available information). Even then, however, Ms. Van Dyke only looked at "the [documents] that [she had personally] provided" which constituted "[l]ess than fifty percent" of the materials produced in response to BWS's discovery requests.[9]

At the beginning of Mr. Van Slyke's deposition the next day, Airgas's counsel explained that Mr. Van Slyke also would not be able to provide information throughout the relevant time

---

[5] A nearly identical Second Notice of 30(b)(6) Deposition was issued for the final deposition where Mr. Harvey served as Airgas's representative. The only change to the noticed topics was removal of the original Topic No. 1. The remaining topics were not altered, except the numbers associated therewith (*i.e.*, Topic No. 2 became Topic No. 1, etc.). The Topic Nos. referenced in this Motion are based upon the first Notice and adjusted accordingly for Mr. Harvey's testimony.

[6] *See* **Ex. C**, Van Dyke Dep. 14:3-15:3; **Ex. D**, Van Slyke Dep. 14:7-17:22; **Ex. E**, Harvey Dep. 15:8-16:25.

[7] *Id.*

[8] *See* **Ex. C**, Van Dyke Dep. 15:7-18.

[9] *Id.* at 19:19-21; 76:12-22.

period, because "he only joined the company in 2020 and the tenancy period as defined in the notice topics goes back to '05."[10] Mr. Van Slyke then testified that he did not look at any documents to prepare for the deposition, did not speak with anyone at Airgas, and "ha[d]n't done anything one would call preparing for answering these questions."[11] He further confirmed that he did not receive any instructions from Airgas's counsel to prepare for the deposition.[12]

In the deposition of Airgas's third and final corporate representative, Mr. Harvey confirmed that he did not receive the noticed topics until the day before the deposition,[13] and only looked at the noticed topics themselves, spoke with Mr. Van Slyke,[14] and reviewed "some pictures" in preparation for same.[15]

As outlined in further detail in Section IV below, Airgas failed to properly prepare its corporate representatives and, as a result, they failed to provide complete testimony on Airgas's behalf with respect to the vast majority of noticed topics.[16] In response to many (if not most) questions on the noticed topics posed by BWS's counsel regarding the properly noticed topics, Airgas's corporate representatives repeatedly testified that they did not know, had no idea, or could not recall, often because they were not directly involved or were not personally present during that time. Even after BWS explicitly flagged this lack of proper preparation during Mr. Van Slyke's deposition, and Airgas's counsel acknowledged the same by objecting,[17] Airgas did not remedy its

---

[10] *See* **Ex. D**, Van Slyke Dep. 14:18-15:4.

[11] *See id.* 15:9-17:22.

[12] *Id.* at 52:23-53:2.

[13] *See* **Ex. E**, Harvey Dep. 15:1-3.

[14] Airgas's counsel objected when BWS's counsel inquired into this conversation based on attorney-client privilege; thus, it is unknown what, if anything, Mr. Van Slyke offered. Regardless, as set forth herein, Mr. Van Slyke's knowledge was deficient.

[15] **Ex. E**, Harvey Dep. at 17:16-18.

[16] *See, generally*, **Ex. C**, Van Dyke Dep.; **Ex. D**, Van Slyke Dep.; **Ex. E**, Harvey Dep.

[17] *See* **Ex. D**, Van Slyke Dep. 54:9-55:20,

deficiencies during Mr. Harvey's subsequent deposition.[18]

## III. AIRGAS SHOULD NOT BE PERMITTED TO PRESENT EVIDENCE OR TESTIMONY THAT IT FAILED TO PROVIDE DURING ITS 30(b)(6) DEPOSITIONS.

Pursuant to Fed. R. Civ. P. 37(d)(3), the Court may impose sanctions when a party designated under Rule 30(b)(6) fails to appear, which includes the failure to produce a **prepared** witness. *CFPB*, 2016 WL 9460471, at *5. Absolute perfection is not required, but "producing an unprepared witness is [considered] tantamount to a failure to appear." *Wicker v. Lawless*, 278 F. Supp. 3d 989, 1000 (S.D. Ohio 2017). Although Airgas's corporate representatives were physically present during their depositions, they were unable to testify to many of the topics identified in the Notice of 30(b)(6) Deposition.

District courts "enjoy broad discretion in determining whether to impose discovery sanctions, such as excluding certain evidence." *Williams v. City of Chattanooga*, No. 1:16-CV-477, 2018 WL 11463529, at *1 (E.D. Tenn. Feb. 1, 2018) (citing *Crawford-El v. Britton*, 523 U.S. 574 (1998)). "[T]he court may refuse to allow [Airgas] to support or oppose designated claims or defenses, prohibit [Airgas] from introducing designated matters into evidence, or require [Airgas] to pay all reasonable costs and attorney fees." *Nacco Materials Handling Grp., Inc. v. Lilly Co.*, 278 F.R.D. 395, 401 (W.D. Tenn. 2011)).

In light of Airgas's egregious and repeated failure to properly prepare its corporate representatives, BWS requests that Airgas be barred from presenting evidence or testimony during subsequent dispositive motions, hearings, or trial. Airgas should not be permitted to present evidence that, during its corporate depositions, it failed or refused to provide or could not recall.

---

[18] In accordance with the Court's judicial preferences and prior to filing this Motion, BWS notified Airgas's counsel of the deficiencies in its corporate representatives' testimony. *See id*. Such deficiencies continued in Mr. Harvey's subsequent deposition and have not been cured to date.

In short, if Airgas, through its corporate representatives, testified that it "did not know" or "could not recall" certain information (or provided similarly non-responsive testimony), it should not be permitted to suddenly know and present evidence or testimony regarding this same information during the remainder of this litigation.

By way of example:[19]

- Because Airgas designated Ms. Van Dyke to testify on its behalf regarding Airgas's move-out instructions, and she failed to identify or provide any information regarding the same, Airgas should not be permitted to present evidence or testimony regarding its move-out instructions.[20]

- Because Airgas designated Mr. Van Slyke and Mr. Harvey to testify on its behalf regarding the individuals and entities retained by Airgas to conduct cleaning, maintenance, and repairs, but they could not provide any information regarding who these individuals or entities were or what they were hired to do, Airgas should not be permitted to present evidence regarding who they retained for cleaning, maintenance, and repairs or what tasks these individuals or entities performed.[21]

- Because Airgas designated Mr. Harvey to testify on its behalf regarding repairs and maintenance performed on the Property, Airgas's testimony regarding the same should be limited to the few repair or maintenance tasks regarding which Mr. Harvey actually testified.[22]

- Because Airgas designated Mr. Van Slyke to testify on its behalf regarding Airgas's internal assessments or estimates of the damage to the Property, and he could not provide any testimony regarding the same, Airgas should not be permitted to present any evidence or testimony regarding the same.[23]

For Airgas to testify during depositions that it lacks knowledge or has no information regarding a certain topic but then change course and provide this purportedly non-existent

---

[19] As set forth in Section IV, the topics regarding which Airgas was not prepared to offer any testimony are numerous. The remedies requested by BWS are comprehensive of all matters regarding which Airgas did not provide testimony; thus, the following examples are provided for purposes of illustration and not as a comprehensive list.

[20] *See* Section IV.H, *infra.*

[21] *See* Section IV.E, *infra.*

[22] *See* Sections IV.J, IV.K, *infra.*

[23] *See* Section IV.S, *infra.*

information during dispositive motions or at trial would effectively amount to trial by ambush. "One of the primary objectives of the discovery provisions embodied by the Federal Rules of Civil Procedure is elimination of surprise in civil trials." *Erskine v. Consol. Rail Corp.*, 814 F.2d 266, 272 (6th Cir. 1987) (citations omitted). "[T]rial by ambush is not contemplated by the Federal Rules of Civil Procedure." *Id.* (citations omitted).

Airgas did not prepare its representatives properly in accordance with the Federal Rules of Civil Procedure. Instead, Airgas presented only limited, incomplete information to BWS during its corporate depositions. In fairness, Airgas's evidence should be limited in this same way for the remainder of this litigation.

## IV. REPRESENTATIVE EXAMPLES OF AIRGAS'S FAILURE TO PROVIDE TESTIMONY ON NOTICED TOPICS.

### A. Topic 2: Physical Condition of the Property.

Airgas designated Mr. Harvey to testify regarding the physical condition of the Property during the Tenancy Period.[24] As defined in the Notice of 30(b)(6) Deposition and Second Notice of 30(b)(6) Deposition, the "Tenancy Period" was from January 1, 2005, to June 1, 2023.[25]

When asked about the condition of building 1, Mr. Harvey testified that it was generally "very industrial" and was thereafter able to recall certain aspects of its condition over time.[26] However, when asked to provide certain details, he was unable to address various aspects of building 1 in 2005.[27] Mr. Harvey responded, instead, that counsel was "pushing [him] for a lot of information," it was a "long way back," he did not "have any idea" because "[t]hat was 20, you

---

[24] *See* **Ex. E**, Harvey Dep. 15:8-10.
[25] This definition is applicable throughout when referencing the "Tenancy Period." *See* Exs. A and B.
[26] *See* **Ex. E**, Harvey Dep. 25:10-24.
[27] *Id.* at 26:15-24, 27:15-18, 27:19-25, 28:22-29:6.

know, 20 years ago," and "I don't know."[28]

Mr. Harvey was able to provide some information regarding building 2 in 2005 but, again, could not provide various details regarding its condition. He simply described it as a "repair shop" or "typical garage" so "[i]t's not the cleanest thing in the world" and responded that he did not know about the condition of the ceiling or damage to the building. [29]

For building 4, Mr. Harvey could not recall when certain aspects were changed and/or damaged. Instead, he responded that "we're going back 20 years," "I don't know," and "that wasn't anything that had to do with me." [30]

Finally, for the Tenancy Period, when asked about other damage to the Property, Mr. Harvey responded that there was none that "[he was] **aware** of."[31]

Importantly, Mr. Harvey did not make any attempt to obtain information outside of his personal knowledge from individuals other than Mr. Van Slyke (who possessed limited information as detailed herein) or from documentation other than "some pictures."[32]

### B. Topic 3: Relationship Between BWS and Airgas.

Airgas designated Ms. Van Dyke to testify regarding the relationship between BWS and Airgas during the Tenancy Period.[33] However, Ms. Van Dyke testified that "[p]rior to 2013, [she] ha[d] no knowledge" of the relationship between Airgas and BWS or the rental payments Airgas made for use of the Property.[34] This left eight years – 2005 through 2012 – completely unaddressed.

---

[28] *Id*.
[29] *Id*. at 34:24-35:9.
[30] *Id*. at 39:2-7, 39:12-20, 39:25-40:8.
[31] *Id.* at 36:7-10, 36:17-23, 37:3-5 (emphasis added).
[32] *Id*. at 17:1-5, 16-18.
[33] *See* **Ex. C**, Van Dyke Dep. 14:3-15:3.
[34] *Id*. at 35:1-7.

However, even for the years for which Ms. Van Dyke purportedly possessed knowledge, she was not prepared to testify as to key facets of the parties' relationship. Ms. Van Dyke could not testify as to when Airgas first occupied the Property, the dates for the final lease between the parties, and whether the rental payments during the final lease period were made to BWS via check because she was "not completely sure if [BWS] was set up on direct deposit or not."[35]

C.    **Topic 5: Airgas's Business Operations on the Property.**

Airgas designated Mr. Van Slyke to testify regarding Airgas's business on the Property during the Tenancy Period.[36] Mr. Van Slyke confirmed he was prepared to testify regarding this topic but noted that he "**ha[d]n't done anything one would call preparing for answering th[is] question**," did not look at any documents, and did not meet or discuss this topic with anyone at Airgas.[37] Mr. Van Slyke was able to offer some insight into Airgas's business but further testified that he could not "definitively tell you what [Airgas's] business was prior to July 12 of 2021" because he "wasn't there, so [he couldn't] tell you definitively."[38] This left approximately sixteen years unaddressed.

D.    **Topic 6: Airgas Employees, Representatives, or Agents on the Property.**

Airgas designated both Mr. Van Slyke and Mr. Harvey to testify regarding individuals that worked or were present on the Property during the Tenancy Period.[39]

Mr. Van Slyke confirmed he was prepared to testify regarding this topic but noted that he "ha[d]n't done anything one would call preparing for answering th[is] question," did not look at any documents, and did not meet or discuss this topic with anyone at Airgas.[40] Mr. Van Slyke also

---

[35] *Id*. at 27:4-17; 36:8-10.
[36] *See* **Ex. D**, Van Slyke Dep. 15:5-11.
[37] *Id*. at 15:9-16:2 (emphasis added).
[38] *Id*. at 18:20-19:3.
[39] *Id*. at 15:15-20; *see also* **Ex. E**, Harvey Dep. 15:15-24.
[40] *See* **Ex. D**, Van Slyke Dep. 15:9-16:2.

testified that he **could not provide any responsive information prior to the beginning of his own, personal employment with Airgas**, *i.e.*, before July 12, 2021.[41] This once again left approximately sixteen years unaddressed.

Mr. Van Slyke's testimony for the period of time after he began working for Airgas was not much more comprehensive. When asked about the employees that worked in each of the buildings on the Property, Mr. Van Slyke was unable to testify with any confidence as to who exactly worked in each of the buildings. He offered to "do [his] best" but explained that he "may not be able to remember all of them."[42] Ultimately, his testimony was based entirely on what he could remember or what he knew personally.[43]

When Mr. Harvey was asked if he was prepared to testify on Airgas's behalf regarding this topic, he responded, "I won't be able to do all Airgas employees and representatives, because I don't - - that was a long time ago and I will not remember all of those, but I will do my best on that."[44] When asked to clarify his response, Mr. Harvey further responded that he was prepared to testify "[t]o the best of [his] ability."[45] Mr. Harvey guessed but ultimately had "no idea" what records or documents would reflect who was employed by Airgas at the Property during the Tenancy Period.[46]

E.     **Topic 7: Responsibility for Maintenance, Cleaning & Repairs.**

Airgas designated Mr. Van Slyke and Mr. Harvey to testify regarding the individuals

---

[41] *Id*. at 20:23-21:1.
[42] *Id*. at 20:3-16; *see also, id.* at 21:5-7 (prefacing that the "only person that [he could] remember . . .").
[43] *Id*. at 21:2-7, 21:23-22:2.
[44] *See* **Ex. E**, Harvey Dep. 15:15-20.
[45] *Id*. at 15:21-24.
[46] *Id*. at 20:8-15.

responsible for maintaining, cleaning, and/or repairing the Property during the Tenancy Period.[47]

Mr. Van Slyke confirmed he was prepared to testify regarding this topic but noted that he "ha[d]n't done anything one would call preparing for answering th[is] question," did not look at any documents, and did not meet or discuss this topic with anyone at Airgas.[48] Mr. Van Slyke subsequently testified that "[t]here was an individual responsible for building 1" but he "[could not] speak to anything along those lines for building 2 or building 4."[49] He "d[id] not remember who the company was" between June 1, 2022, and June 1, 2023, that was responsible for cleaning building 1.[50] Mr. Van Slyke also could not speak to what, if any, cleaning parameters were given regarding building 1.[51] When asked if there was an Airgas employee responsible for retaining someone to perform maintenance tasks, Mr. Van Slyke responded, "Not that I recall no."[52]

When Mr. Harvey was asked if he was prepared to testify on Airgas's behalf for this topic, he responded, "I won't be able to do all Airgas employees and representatives, because I don't - - that was a long time ago and I will not remember all of those, but I will do my best on that."[53] When asked to clarify his response, Mr. Harvey further responded that he was prepared to testify "[t]o the best of [his] ability."[54] Mr. Harvey guessed but ultimately had "no idea" what records or documents would reflect which individual or entities were retained by Airgas to handle these tasks during the Tenancy Period.[55] Mr. Harvey was, however, able to identify the Store Manager as the individual that would have retained individuals and/or entities to assist in cleaning and maintaining

---

[47] *See* **Ex. D**, Van Slyke Dep. 15:5-9; **Ex. E**, Harvey Dep. 15:15-24.
[48] *See* **Ex. D**, Van Slyke Dep. 15:9-16:2.
[49] *Id*. at 23:25-24:7.
[50] *Id*. at 24:22-25.
[51] *Id*. at 25:19-24.
[52] *Id*. at 30:12-15.
[53] *See* **Ex. E**, Harvey Dep. 15:15-20.
[54] *Id*. at 15:21-24.
[55] *Id*. at 20:8-15.

the Property.[56]

**F.    Topics 8-10: Communications Regarding the Lease, the Property, or this Litigation.**

Airgas designated Ms. Van Dyke to testify regarding communications by or between the parties that addressed the Lease, the Property, and/or this lawsuit.[57] Although Ms. Van Dyke suggested at times that certain conversations may have taken place, she could not confirm such conversations occurred or testify as to their content because she was "not aware of anything outside of [her] own conversations."[58] Ultimately, Ms. Van Dyke could not even remember her own communications with BWS regarding the final lease.[59]

When asked whether there were internal discussions regarding who would assist with moving Airgas from the Property or how it would be accomplished, Ms. Van Dyke responded that the conversations were not with her, and she did not know who would have been involved in the same.[60] She was also unaware who else at Airgas communicated with employees at the Property about moving or if Airgas communicated with any third parties about the Property or the Lease.[61]

**G.    Topic 11: Payment of Insurance, Taxes, and/or Utilities.**

Airgas designated Ms. Van Dyke to testify regarding Airgas's payment (or failure to pay) insurance, taxes, and utilities related to the Property.[62]

Although Ms. Van Dyke was the sole witness designated to testify regarding this topic, she was not prepared to testify to many of the details surrounding Airgas's payments. This included the turnaround period for insurance and property tax reimbursement, the individual responsible for

---

[56] *Id*. at 43:11-19, 45:10-20, 46:4-7, 47:15-19.
[57] *See* **Ex. C**, Van Dyke Dep. 14:3-15:3.
[58] *Id.* at 61:23-25, 75:6-13 (emphasis added).
[59] *Id.* at 62:1-22.
[60] *Id.* at 52:1-9.
[61] *Id.* at 52:19-22, 62:9-12.
[62] *Id*. at 14:3-15:3.

issuing the reimbursement, the individual responsible for paying utilities, and the timing of utility payments, including whether payments were timely made.[63]

When specifically asked why Airgas had not reimbursed BWS for outstanding tax and insurance payments, Ms. Van Dyke could not testify to what she did with emails on this topic even though they were addressed to her and produced by Airgas.[64] Ms. Van Dyke was also unable to testify as to when and why Airgas began reimbursing BWS for insurance costs instead of paying for insurance directly.[65]

**H.     Topics 12-13: Lease Termination & Vacating the Property.**

Airgas designated Ms. Van Dyke to testify regarding the reason(s) Airgas terminated the Lease and the corresponding procedures for both terminating the Lease and vacating the Property.[66]

When asked "[w]hat was being discussed . . . . regard[ing] the property and potentially moving to another property," Ms. Van Dyke could only respond that she "wasn't involved in those discussions so - - I believe, though, they were looking at our owned property to see if that would - - if that would be an option."[67] Ms. Van Dyke was also unable to testify as to whether the decision to move was communicated to other Airgas employees at the time the decision was made and/or whether logistics were discussed with employees at the Property:

> Q.     Were there discussions about the people that would help with that move or how that would be accomplished?
>
> A.     **Not with me.**
>
> Q.     Do you know who would have had those conversations with someone at the

---

[63] *Id.* at 37:22-25, 39:22-40:2, 42:24-43:11.
[64] *Id.* at 41:25-42:13.
[65] *Id.* at 38:18-23.
[66] *Id.* at 14:3-15:3.
[67] *Id.* at 45:21-46:2.

property?

A.     **I do not.**

Q.     Are you aware of any conversations happening with someone in upper management at Airgas and then someone at the property about how they should move out of the property into Airgas's new location?

A.     **I - - I don't know.**

. . . .

Q.     Are you aware of anyone else - - or who else at Airgas communicated with Airgas employees at the property about how the move-out was going?

A.     **I'm not sure.**[68]

Additionally, despite preparing the termination notice Airgas sent to BWS, Ms. Van Dyke could not provide an estimate as to how much time passed between Airgas's decision to terminate the lease and issuance of the notice letter.[69] Ms. Van Dyke was able to recall that the Area Vice President might have been involved in communications regarding termination of the lease but could not testify as to who the Area Vice President was at the time.[70]

I.     **Topic 14: 2012 Hailstorm Damage & Repairs.**

Airgas designated Mr. Harvey to testify to the damage and repairs following a hailstorm that impacted the Property in 2012.[71] However, Mr. Harvey was not prepared to testify as to when the hailstorm occurred, who was responsible for making and paying for the hailstorm repairs, who completed the repairs, or what documents evidenced this information.[72]

J.     **Topic 15: Property Repairs & Maintenance.**

Airgas designated Mr. Harvey to testify regarding Property repairs and maintenance during

---

[68] *Id*. at 46:17-21, 51:23-52:9, 52:19-22.
[69] *Id*. at 48:21-25.
[70] *Id*. at 49:25-50:14.
[71] *See* **Ex. E**, Harvey Dep. 16:15-19.
[72] *Id*. at 29:7-11, 30:10-31:12.

the relevant time period.[73] Mr. Harvey possessed only limited relevant knowledge and was largely unaware what, if any, repairs were performed at the Property during the final lease period because he had "already moved [his] office to Charleston" and was "only in [the Chattanooga] store once, maybe twice a week."[74]

As to specific repairs and maintenance before the final lease period, he was not prepared to testify as to whether Airgas periodically resealed or waxed the VCT floors, repaired any of the ceiling lights in building 1, removed or painted over the Airgas signage, and removed all of its property before vacating.[75] Mr. Harvey specifically testified he did not know if Airgas had painted over or removed its signs because he "ha[d]n't been by the [Property] in a long time, so [he] d[id]n't know."[76] As to whether Airgas has made any repairs generally between May 1, 2023, and the present, Mr. Harvey stated "Not that I know of" and "Not that I'm aware of."[77]

Mr. Harvey also was not prepared to testify as to the individuals or companies utilized by Airgas to repair or maintain the Property, the last time their services were provided prior to Airgas vacating the Property, or if any parameters were provided for repairs or maintenance performed on the Property.[78]

### K.     Topic 17: Property Maintenance June 1, 2022- June 1, 2023.

Airgas designated Mr. Harvey to testify regarding the specific entities and/or individuals retained to assist with maintaining the Property.[79] However, he was not prepared to testify as to the individuals and/or entities utilized by Airgas to repair or maintain the Property or even the last

---

[73] *Id.* at 16:15-19.
[74] *Id.* at 48:4-12.
[75] *Id.* at 68:1-6, 71:15-22, 72:5-13, 73:2-4, 86:21-87:3, 92:7-10, 101:18-21, 111:5-18, 113:11-17.
[76] *Id.* at 113:11-17.
[77] *Id.* at 123:18-25.
[78] *Id.* at 44:1-18, 44:25-45:3, 45:21-46:4, 46:13-18, 66:4-14.
[79] *Id.* at 16:15-19.

time their services were provided:

> Q.     How often did [the cleaner] come in to clean buildings 1, 2 and 4?
>
> A.     I honestly don't know that . . . . But I don't know what their schedule was.
>
> . . . .
>
> Q.     When was the last time that she came and cleaned 1, 2 and 4 before vacating the property.
>
> A.     I have no idea.
>
> Q.     What instructions or guidelines were given to her for cleaning, ensuring proper cleaning of buildings 1, 2 and 4?
>
> A.     I have no idea. That would've been the store manager's responsibility.
>
> . . . .
>
> Q.     Was she the same individual or entity used for cleaning from 2005 to 2022?
>
> A.     I have no idea. I can't imagine it was, but I have no idea.[80]
>
> . . . .
>
> Q.     Thank you. Was there anyone retained by Airgas in the 2005 to 2022 time frame to clean the outsides of buildings 1, 2 and 4?
>
> A.     I do not know.[81]
>
> . . . .
>
> Q.     How often did [Outdoor Inc.] come to tend to the grounds at the property?
>
> A.     . . . . I don't know for a fact because I didn't have anything to do with that.
>
> . . . .
>
> Q.     When was the last time that they came to tend to the grounds or landscaping at the property before Airgas vacated the property?
>
> A.     I do not know the answer to that.[82]

---

[80] *Id*. 44:1-18, 44:25-45:3.
[81] *Id*. at 45:25-46:3.
[82] *Id*. at 46:13-18.

. . . .

Q.  Did Airgas periodically pressure-wash the outside of that building?

A.  I don't know if they pressure-washed it. It was pressure-washed when it was painted, when all the buildings were painted. But I mean, I have seen people spray that off with a hose before, you know.

Q.  When do you think the last was you saw - - or someone hosed off the outside of that building?

A.  I mean, I don't honestly know. It's been a long time. I don't know.[83]

Mr. Harvey was not even sure whether any parameters or guidelines were provided to the cleaning and landscaping companies for care of the Property.[84]

**L.    Topic 18: Property Damage Caused by Airgas.**

Airgas designated Mr. Harvey to testify regarding damage caused to the Property by Airgas during the noted period.[85]

During the deposition, BWS's counsel displayed photographs of the Property and asked Mr. Harvey about certain significant damage depicted throughout. Mr. Harvey could not testify as to when certain windows were broken and if Airgas attempted to fix them, when ceiling damage occurred, when certain wiring was installed on the Property and whether they were definitively removed.[86] As further evidence of the deficiencies in certain of Mr. Harvey's testimony, he testified, in part, as follows:

Q.  Do you know what caused [the damage to the bay door]?

A.  I have no idea. I mean, it looks like it was damaged, but I have no idea.[87]

. . . .

---

[83] *Id.* at 66:4-14.
[84] *Id.* at 44:14-18, 45:21-24.
[85] *Id.* at 16:15-19.
[86] *Id.* at 61:10-12, 65:5-18, 67:17-20, 71:1-11, 79:9-12, 82:23-83:5, 84:20-85:1, 91:8-17.
[87] *Id.* at 74:7-9.

Q.     And do you see the discoloration on the ceiling in this picture?

A.     Yes, ma'am.

Q.     What caused that?

A.     I'm assuming a leak from the roof.[88]

. . . .

Q.     During Airgas's tenure on the property, was it aware of a forklift or other type of equipment, other than what you had mentioned, hitting building 2 earlier, either running into or hitting in any way building 1?

O.     Object to form. You can answer.

A.     I mean, I'm not in a specific time. I mean, it's an industrial situation. Things get bumped into . . .[89]

. . . .

Q.     Describe for me what you see up here in the upper right-hand corner of this photo.

A.     It looks like insulation that has fallen from a water leak.

Q.     When did that occur?

A.     I have no idea.[90]

. . . .

Q.     Can you generally describe for me what you see in this picture?

A.     Concrete that is degraded. I don't know why it degraded, but definitely concrete that's degraded in that corner. It looks like mold to me.[91]

. . . .

Q.     When did the pavement begin to look like that gravel texture or appearance we just talked about?

A.     I do not know an exact date of that. I mean - - I just don't I don't pay that

---

[88] *Id*. at 77:3-7.
[89] *Id*. at 78:5-12.
[90] *Id*. at 81:4-9.
[91] *Id*. at 83:20-24.

much attention to the parking lot.[92]

. . . .

Q.      And when did it begin to look like gravel instead of just cracked concrete?

A.      I don't have any idea of the time frame of that.[93]

And, when asked about water and gas going to building 4, Mr. Harvey did not know or could not recall when it was turned off, if it was ever turned back on, and if these services actually worked.[94]

**M.      Topic 19: 2005 Pavement of Driveway & Parking Lot.**

Airgas designated Mr. Harvey to testify about paving on the Property that occurred in 2005.[95] However, when asked, Mr. Harvey could only confirm that paving had been done, but did not know who paid for the paving work, when the paving occurred, the number of times the Property was paved, and was unaware of any documents Airgas had relating to any paving done on the Property.[96]

**N.      Topic 20: Termination of Property Utilities.**

Airgas designated Mr. Van Slyke to testify regarding the termination and discontinuation of utilities at the Property.[97] However, when asked what he did to prepare to testify regarding this topic, Mr. Van Slyke responded, "Nothing."[98]

Despite being the only person designated to testify to this topic, Mr. Van Slyke did not know or was unsure when Airgas transferred back or turned off utilities at the Property:

Q.      Which Airgas employee was responsible for ensuring that utilities to the

---

[92] *Id.* at 85:17-22.
[93] *Id.* at 93:5-7.
[94] *Id.* at 103:12-22, 104:16-24.
[95] *Id.* at 16:15-19.
[96] *Id.* at 41:3-42:1.
[97] *See* **Ex. D**, Van Slyke Dep. 16:8-18.
[98] *Id.* at 16:19-17:5.

property were either turned off or transferred back to BWS?

A. **To be perfectly honest, I'm not sure**. It was either myself or Corley Johnson, the branch manager.

. . . .

Q. There was no one at Airgas that coordinated or ensured that the utilities were turned off or transferred?

A. **I believe** an attempt was made. **I believe** an attempt was made, **but as memory serves me** it was not transferred until sometime after Airgas had vacated the property.

Q, And was that done by Airgas or was that done by someone else?

A. **I believe** it was done by Airgas.

Q. At what point after Airgas had vacated the property did they coordinate or have transferred or turned off the electric to the property?

A. **I'm not aware of that time**.

Q. And then at what point was the water either turned off or transferred at the property?

A. **I'm not aware of that time**.

Q. And then the same question but relating to gas that goes to the property.

A. So the gas, I know that that was a bit of a process, and I did get involved in that personally. And it seems, **if memory serves me correct**, it was a couple of weeks after we vacated the property that it finally transferred to BWS.[99]

Mr. Van Slyke also did not know why it took Airgas as long as it did to change over or turn off the gas.[100]

**O. Topic 22: May 2023 Walkthrough & Surrender Letter.**

Airgas designated Mr. Van Slyke to testify regarding the final Property walkthrough and

---

[99] *Id.* at 36:8-37:18 (emphasis added).
[100] *Id.* at 39:23-40:11.

the surrender letter he delivered to BWS.[101] However, when asked what he did to prepare to testify regarding this topic, Mr. Van Slyke responded, "Nothing."[102]

Mr. Van Slyke was not prepared to testify to when the walkthrough occurred, describe the issues identified in each building, or identify to whom he provided the pictures he took of the Property.[103] Although Mr. Van Slyke confirmed that he provided a letter to BWS at the conclusion of the walkthrough, he did not know who drafted the letter or his/her position and could not describe with certainty what he or Airgas did with the letter.[104] He also could not testify to certain conversations he had with Ms. Nevans during the walkthrough.[105]

### P.    Topic 23: Kevin Cruz Walkthrough & Damage Assessment.

Airgas designated Mr. Van Slyke and Mr. Harvey to testify regarding the Property walkthrough and damage assessment performed by Airgas-hired handyman, Kevin Cruz.[106]

When Mr. Van Slyke was asked what he did to prepare to testify on this topic, Mr. Van Slyke responded, "Nothing."[107] Mr. Van Slyke confirmed that Airgas hired a handyman to walk through the Property, but he had to "tak[e] a guess" as to when it occurred and could not provide specific information regarding the walkthrough.[108]

Mr. Harvey actually accompanied Mr. Cruz during the walkthrough but testified that he never saw the repair estimate provided by Mr. Cruz and did not know how the estimate was delivered to Airgas.[109] Mr. Harvey was subsequently shown a copy of the list at issue and

---

[101] *Id*. at 16:8-18.
[102] *Id*. at 16:19-17:5.
[103] *Id*. at 40:16-19, 41:11-16, 42:15, 43:1-6.
[104] *Id*. at 44:7-45:23.
[105] *Id*. at 43:3-6.
[106] *See* **Ex. D**, Van Slyke Dep. 16:8-18; **Ex. E**, Harvey Dep. 16:23-25.
[107] *See* **Ex. D**, Van Slyke Dep. 16:19-17:5.
[108] *Id*. at 48:21-25, 50:20-51:23.
[109] *See* **Ex. E**, Harvey Dep. 56:7-20.

confirmed, "[i]f [he] remember[ed] correctly," it was the typed version of a handwritten list provided by BWS for Mr. Cruz to reference.[110] Although Mr. Harvey recalled certain observations from the walk through, he could not testify as to any significant details.[111] When asked if Mr. Cruz ever made any of the repairs on the list, Mr. Harvey could only respond "Not that I know of."[112]

**Q.      Topic 24: Facts Allegedly Evidencing Proper Surrender.**

Airgas designated Mr. Van Slyke to testify regarding facts supporting Airgas's contention that it surrendered possession of the Property and was not a holdover tenant.[113] However, when asked what he did to prepare to testify regarding this topic, Mr. Van Slyke responded, "Nothing."[114]

Mr. Van Slyke testified that he could not speak to upper management's reasoning for vacating the Property or Airgas's efforts to vacate.[115] When specifically asked what facts supported that Airgas properly surrendered possession of the Property, he could only provide his "understanding of the property . . ." based on generalized comments by others and stated that he did not "want to necessarily speak for anybody."[116]

**R.      Topic 25: Airgas Pleadings & Discovery Responses.**

Airgas designated Ms. Van Dyke to testify regarding Airgas's answer, initial disclosures, discovery responses, and document production. *See* Van Dyke Dep. at 14:3-15:3. However, when asked if she had "reviewed all of the documents that Airgas has produced to date," Ms. Van Dyke responded she had only reviewed "the [documents] that [she] provided." *Id*. at 19:19-21. She did

---

[110] *Id*. at 58:7-21.
[111] *Id*. 57:14-58:1.
[112] *Id*. at 60:1-3.
[113] *See* **Ex. D**, Van Slyke Dep. 16:8-18.
[114] *Id*. at 16:19-17:5.
[115] *Id*. at 34:19-35:1; *see also id.* at 37:4-18, 39:23-40:5.
[116] *Id*. at 46:19-22, 47:9-15.

not know how many pages Airgas had produced or who else had assisted in gathering documents. *Id*. at 20:1-7. When asked about Airgas's Answer to the Complaint, Ms. Van Dyke confirmed that before the deposition, she had not gone back to review it. *Id*. at 77:2-6.

### S.     Topic 26: Internal Assessments of Property Condition or Damage.

Airgas designated Mr. Van Slyke to testify regarding its internal assessments and evaluations of the condition of or damage to the Property during the final lease period and after.[117] However, when asked what he did to prepare to testify regarding this topic, Mr. Van Slyke again responded that he did not review any documents or speak to anyone at Airgas in preparation for the deposition.[118] As such, when asked whether Airgas created any other internal assessment or evaluation of the Property's condition or damage thereto after June 1, 2022, Mr. Van Slyke responded that he did not know.[119]

### T.     Topic 27: Repair Cost Estimates or Calculations.

Airgas designated Mr. Van Slyke to testify regarding its efforts to determine or calculate the cost of or to obtain quotes estimating the cost of repairing the Property.[120] However, when asked what he did to prepare to testify regarding this topic, Mr. Van Slyke again responded that he did not review any documents or speak to anyone at Airgas in preparation for the deposition.[121] As such, when asked if Airgas had made any effort to obtain quotes from third parties to estimate the cost of repairing the Property, Mr. Van Slyke responded, "Not to **my knowledge**."[122]

### U.     Topic 28: Document Preservation & Collection Efforts.

Airgas designated Ms. Van Dyke to testify regarding Airgas's document preservation and

---

[117] *See* **Ex. D**, Van Slyke Dep. at 16:10-12.
[118] *Id*. at 16:19-17:5.
[119] *Id*. at 51:24-52:2.
[120] *Id*. at 16:10-12.
[121] *Id*. at 16:19-17:5.
[122] *Id*. at 52:3-7 (emphasis added).

collection efforts, including its document search and review methodologies.[123] However, Ms. Van Dyke could only provide insight as to the location of and process for collecting her own documents, and could not further opine as to Airgas's document preservation and collection strategy.[124] Specifically, Ms. Van Dyke testified she did not coordinate with others at Airgas to collect responsive documents for production, only collected the documents on her computer, did not know who else assisted in gathering documents for production, and did not know what preservation or collection steps were taken by Airgas.[125]

## CONCLUSION

Pursuant to Fed. R. Civ. P. 30(b)(6), it was Airgas's responsibility to produce corporate representatives who were properly prepared to testify on its behalf regarding each of the topics noticed by BWS. Airgas had ample opportunity to properly prepare; however, during these depositions, it was readily apparent that Airgas's representatives did not possess and had not even attempted to obtain any corporate knowledge regarding the noticed topics and were not prepared to fully, completely, or reliably testify on Airgas's behalf.

BWS therefore respectfully requests, as set forth in Section III, *supra*, that this Court prohibit Airgas from offering any testimony or evidence in its dispositive briefing, during hearings, and/or in the trial of this matter that contradicts or supplements the testimony offered by its 30(b)(6) representatives. BWS also respectfully requests an award of BWS's attorneys' fees and costs associated with the preparation of this Motion, as well as any other relief the Court deems just and proper.

---

[123] *See* **Ex. C**, Van Dyke Dep. 14:3-15:3.
[124] *Id.* at 18:14-24; 19:12-18; 20:8-15.
[125] *Id.* at 19:12-18, 20:2-7, 20:16-20 (emphasis added).

Respectfully submitted,

**MILLER & MARTIN PLLC**

By: /s/          *Lynzi J. Archibald*
Lynzi J. Archibald, TN BPR No. 30063
Jessica M. Wolinsky, TN BPR No. 039785
832 Georgia Ave., Suite 1200
Chattanooga, TN 37402
Phone: (423) 756-6600
Fax: (423) 785-8480
lynzi.archibald@millermartin.com
jessica.wolinsky@millermartin.com

*Counsel for Plaintiff BWS Properties, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certify that an exact copy of this pleading has been served upon counsel for all parties in this action, or upon said parties themselves as required by law, by delivering a copy thereof, via email and/or by depositing a copy of the same in the United States Mail, with sufficient postage affixed thereto, to ensure delivery to the following:

Mary Beth Haltom White, Esq.
Peter C. Robison, Esq.
424 Church Street, Suite 2500
P.O. Box 198615
Nashville, TN 37219

This 18th day of July 2025.

**MILLER & MARTIN PLLC**

By: /s/          *Lynzi J. Archibald*