# EXHIBIT D

```
1          IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF TENNESSEE
2                      AT CHATTANOOGA

3    -------------------------------------------------
                              )
4    BWS PROPERTIES, LLC,      )
                              )
5          Plaintiff,          )
                              ) 1:24-cv-00029
6      vs.                     ) Judge Christopher Steger
                              ) Non-Jury
7    AIRGAS USA, LLC,          )
                              )
8          Defendant.         )
     -------------------------------------------------
9                       Chattanooga, Tennessee
                          April 24, 2025
10

11          DEPOSITION OF PETER VAN SLYKE, JR

12   -------------------------------------------------

13   APPEARANCES:

14              FOR THE PLAINTIFF:

15              JESSICA M. WOLINSKY, ESQ.
                Miller & Martin PLLC
16              832 Georgia Ave,  Su 1200
                Chattanooga, TN 37402
17              (423) 756-6600
                jessica.wolinksy@millermartin.com
18

19
                FOR THE DEFENDANT:
20
                PETER C. ROBISON, ESQ.
21              Lewis Thomason
                424 Church Street, Su 2500
22              PO Box 198615
                Nashville, TN  37219
23              (615) 259-1366
                probison@lewisthomason.com
24

25
```

1   through the first part of this.  I'm mainly focused on

2   the latter portion, which are topics that BWS has

3   identified for the 30(b)(6) depositions, one of which is

4   yours today.  And I want to just walk through the topics

5   to confirm which topics you are prepared to testify to

6   today as a representative of Airgas.

7          First, if you'll take a look at 5, 6 and 7 on this

8   page.  If you wouldn't mind reading through those and

9   just letting me know when you've had a chance to do so.

10      A   Okay.  I've read through them.

11      Q   Are you prepared today to testify on Airgas's

12  behalf to 5, 6 and 7?

13      A   Yes.

14      Q   Can you tell me what you did to prepare to testify

15  on those three topics?  Again, not asking for any

16  communications with counsel, but wanting to know what you

17  did to prepare.

18          MR. ROBISON:  And, Jessica, I don't want to

19  jump in too much, but because Mr. Van Slyke's tenure at

20  the company was less than the entire period defined as

21  the tenancy period in these topics, he will have

22  testimony to these topics, and there may be additional

23  testimony from Mr. Harvey for a period of time

24  corresponding to prior to Mr. Van Slyke's employment.  I

25  just wanted to make that clear.

1           I don't know that it's going to matter, but
2  since he only joined the company in 2020 and the tenancy
3  period as defined in the notice topics goes back to '05,
4  I just wanted to make that clear.
5      Q   And I'll just go ahead and repeat my question
6  Mr. Van Slyke.  For 5, 6 and 7, are you prepared to
7  testify to those topics today?  And what did you do to
8  prepare for those?
9      A   Yes, I'm prepared to discuss these topics.  And I
10 haven't done anything one would call preparing for
11 answering these questions.
12     Q   Did you look at any documents in preparation -- or
13 look at any documents in preparing for today's deposition
14 relating to 5, 6 and 7?
15     A   No.
16     Q   And I'm not asking for any, again, communications
17 with counsel.  I will continue to repeat that.  But did
18 you meet with counsel in preparation for today's
19 deposition?
20     A   Did I physically meet with them?
21     Q   Whether in person or via Teams or Zoom, did you
22 have a meeting with counsel?
23     A   I talked to counsel, yes.
24     Q   Did you talk with anyone else, either at Airgas or
25 a third party, about 5, 6 and 7 in preparing for this

1  deposition?

2      A    No.

3      Q    We'll scroll down.  And the reason I'm skipping

4  some of these other ones is counsel has not indicated

5  that you were to be prepared on these other topics.  I'll

6  ask another question about that shortly, but I'm going to

7  skip those to expedite matters.

8          If you can please read through numbers 20 through

9  24.  Please take your time.  Once you've had time to do

10  so, please let me know.

11     A    Okay.  I've read through -- I think you said 21

12  through -- did you say 21 through 23?

13     Q    20 through 24.

14     A    Okay.  I've read them.

15     Q    Having reviewed numbers 20 through 24 in the

16  notice, are you prepared today to testify on Airgas's

17  behalf to those topics?

18     A    Yes.

19     Q    And what did you do to prepare to testify to those

20  topics?

21     A    Nothing.

22     Q    Did you look at any documents prior to today's

23  deposition and in preparation for today's deposition

24  relating to topics 20 through 24?

25     A    No.

1    Q   And did you speak with anyone, whether at Airgas

2    or a third party -- again, not asking about

3    communications with counsel -- in preparation for or

4    regarding topics 20 through 24 or facts relating thereto?

5    A   No.

6    Q   And lastly, if you'll please read through numbers

7    26 and 27.  Again, please take your time, but let me know

8    when you've had a chance to do so.

9    A   Okay.  I've read through them.

10   Q   And then for 26 and 27, are you prepared today to

11   testify on Airgas's behalf as to those topics?

12   A   Yes.

13   Q   And similar to before, did you review any

14   documents or speak to anyone, whether a third party or

15   within Airgas -- not asking for counsel communications --

16   in preparation for testifying to those two topics?

17   A   No.

18   Q   And in preparing for today's deposition, were

19   there any documents that you thought might be relevant

20   that you went searching for that you have not provided to

21   counsel?

22   A   No.

23   Q   Just to confirm, are you aware and do you

24   understand that today's deposition is in relation to a

25   lawsuit regarding Airgas's lease of certain property

1    located at 700 Manufacturers Road in Chattanooga,

2    Tennessee?

3        A    Yes.

4        Q    And if I refer to the property at 700

5    Manufacturers Road as "the property," will you understand

6    that I'm referring to that specific property?

7        A    Yes.

8        Q    Can you describe for me, please, Airgas's business

9    at the property from June 1, 2022 through June 1, 2023?

10       A    Airgas operated what we call a retail branch at

11   the property.  Would you like for me to go into detail?

12       Q    Yes, please.

13       A    So, the retail business would consist of most --

14   the most important part would be the delivery of assets

15   in the form of cylinders on Airgas trucks to various

16   customers throughout the greater Chattanooga area.  Also,

17   on the property we had a showroom where customers could

18   come in and purchase welding and safety materials, more

19   often than not for contractor work on job sites.

20       Q    And can you tell me about -- and if it's not

21   different from what you just described, you can say that

22   as well.  But prior to June 1, 2022, back to January of

23   2005, what was Airgas's business on the property?

24       A    I cannot definitively tell you what the business

25   was prior to July 12 of 2021.  I can assume that it was

1  exactly as I've explained to you it was from the time of

2  my employment to now, but I don't have any -- I wasn't

3  there, so I can't tell you definitively.

4      Q   Just to confirm, from July 12, 2021 until June 1,

5  2023, what was Airgas's business on the property?

6      A   Retail sales and, of course, like I said, the

7  delivery -- I guess it isn't retail, this is business to

8  business.  Delivery of compressed gas cylinders to

9  various customers throughout the greater Chattanooga

10 area.

11     Q   And I'm going to show you what we're going to mark

12 as Exhibit 2.

13         (Exhibit 2 will be marked.)

14     Q   Did you see a map pop up on the screen?

15     A   I do.

16     Q   And again, if there's any part that you can't see

17 or need me to zoom in on, please let me know.  I'm happy

18 to do so.

19         Can you walk me through, please, in order, 1, 2,

20 3, and 4, what business Airgas conducted in each of the

21 buildings on this map?

22     A   Building 1 is the main building.  That is where

23 the retail showroom was, various sales offices, and what

24 we call the warehouse.  Building 2, I believe that is

25 what we call the welding repair facility.  And building

1    3, I think it was just a storage shed, as memory serves

2    me.  And building 4 is what we refer to as the gas house.

3        Q    And for building 1, can you tell me the employees

4    between June 1, 2022 and June 1, 2023 that would've

5    worked in that building, including their job titles?

6        A    I'll do my best.  Some people -- drivers did have

7    access to that building, and I may not be able to

8    remember all of them.  But, myself; Corley Johnson,

9    branch manager; Bradley Jackson, assistant branch

10   manager; Joseph Holland, inside sales I believe was his

11   title; Brian Gilliand, also inside sales; Tracy Harvey,

12   outside sales; David Millians, outside sales; Dillon

13   Alexander, outside sales.  And the drivers, there was a

14   driver named Mike Brown, there was a driver named David

15   LeQuire, and I cannot remember the other two drivers that

16   had access to the building.

17       Q    And other than the people that you just identified

18   for building 1, prior to June 1 of 2022 back until the

19   start of your employment, July 12, 2021, were there any

20   other individuals that were employed by Airgas and worked

21   in building 1, again that you've not already listed?

22       A    I don't think so, no.

23       Q    And just to confirm, you're not aware of who may

24   or may not have been employed in building 1 prior to the

25   start of your employment July 12, 2021?

1     A    That is correct.

2     Q    For building 2, can you please identify the

3  employees of Airgas that worked in that building,

4  including their job title?

5     A    The only person that I can remember being

6  associated with building 2 was a guy named Steve Benton,

7  and he was the welding repair specialist.

8     Q    Although that may be a little self-explanatory,

9  can you go ahead and explain to me what exactly it is

10  that Mr. Benton did?

11     A    To my knowledge, customers would send welding

12  machines to him that were not performing correctly, and

13  he would fix them and make them perform correctly again.

14     Q    And when you say "customers," are these

15  individuals, businesses, internal Airgas individuals?

16     A    Primarily business customers of Airgas, and

17  individuals also sent their machines in for repair.

18     Q    And just for my understanding, so if there was an

19  individual who lived, you know, two doors down from the

20  location, could they bring their equipment in to get it

21  repaired?

22     A    Yes.

23     Q    And then I believe, as you had mentioned, building

24  3 was primarily used for storage.  Just to confirm, was

25  there anyone, as far as you're aware, that worked inside

1   building 3?

2       A    Not that I'm aware of.

3       Q    So in building 4, which of Airgas's employees

4   worked in building 4, including their job title, from

5   June 1, 2022 until June 1, 2023?

6       A    So, virtually any of the employees that worked or

7   were associated with building 1 had access to building 4.

8   The primary people that would have used building 4

9   would've been inside sales and route drivers.

10      Q    And can you describe for me the job duties and

11  responsibilities of individuals employed in outside sales

12  for Airgas?

13      A    Outside sales primary responsibility is to

14  maintain business relationships with current business

15  customers, and, of course, attempt to grow the revenue

16  generated from those relationships in the form of sales.

17      Q    And can you describe the job duties and

18  responsibilities of individuals employed in Airgas's

19  inside sales at the property?

20      A    Yes.  So, inside sales personnel are responsible

21  for answering the phone, taking customer orders, calling

22  customers to follow up on quotes if they requested

23  pricing.  Inside sales also assists the drivers, and

24  inside sales -- some inside sales personnel also are

25  responsible for what we call routing the trucks.  In

1   other words, telling the drivers where they're going to

2   go on any given day.

3       Q   And then, it might be self-explanatory, but just

4   to confirm, can you tell me the job duties and

5   responsibilities of Airgas's route drivers at the

6   property?

7       A   The route drivers responsibility is to, of course,

8   drive products that we sell, primarily in the form of

9   compressed gas and liquid gas cylinders, on the back of

10  the trucks and deliver them to various customers

11  throughout, in this case greater Chattanooga.  They do

12  also deliver what we call hard goods, which could be

13  things like welding wire.  Any kind of heavy items that

14  can't be -- that need to be delivered by a big truck,

15  they also do that.  That's what they do.

16      Q   And are you aware of either a report or database

17  or files that would be able to assist us in understanding

18  who was employed by Airgas at the property prior to July

19  12, 2021?

20      A   I am not aware of such report, no.

21      Q   Any records or database where we could request

22  that information?

23      A   Not that I'm aware of.  I'm not saying it doesn't

24  exist, I'm just saying I don't know where it would be.

25      Q   Was there an employee on the property employed by

1    Airgas that was responsible for attaining and

2    coordinating an individual or entity to clean the inside

3    of buildings 1, 2 and 4 during June 1, 2022 through June

4    1, 2023?

5        A    There was an individual responsibile for building

6    1.  I cannot speak to anything along those lines for

7    building 2 or building 4.

8                MS. WOLINSKY:  Can we go off the record for a

9    minute?

10               (9:46 to 9:50 off the record.)

11   BY MS. WOLINSKY:

12       Q    I'm going to just re-ask one of the questions that

13   I asked in the midst of a coughing fit.

14           Can you tell me again, was there an entity or an

15   individual that was employed by Airgas specifically

16   responsible for retaining and coordinating with someone

17   to clean the inside of building 1?

18       A    Building 1, yes.

19       Q    Who is the Airgas employee that was tasked with

20   that responsibility?

21       A    His name was Corley Johnson.

22       Q    And then between June 1, 2022 until June 1, 2023,

23   who was the company or the individual retained by Airgas

24   to clean building 1?

25       A    I do not remember who the company was.

1    Q    What was the budget given to Airgas for cleaning

2    building 1 on the property from June 1, 2022 through June

3    1, 2023?

4    A    I don't believe there was any budgeted numbers.

5    We -- when I say "we," I mean Corley Johnson and myself,

6    had discretionary spending on lawn care services and

7    cleaning services.

8    Q    And can you explain for me what you mean by

9    discretionary spending?

10    A    We could hire a company to come in and clean the

11    building and take care of the landscaping.  And it

12    wasn't -- we didn't have to get it -- however much it

13    cost, we didn't have to get it approved by another

14    entity.

15    Q    Could that discretionary budget have been used for

16    something else instead of cleaning and outdoor care?

17    A    Probably not.  I would need to know what that

18    something else would be, but probably not.

19    Q    And what cleaning parameters were provided to --

20    strike that.  Was the employees in building 1,

21    specifically Mr. Johnson and yourself, were you given any

22    instructions on how building 1 should be cleaned or to

23    what standard it should be cleaned?

24    A    I wasn't.  I cannot speak for Corley Johnson.

25    Q    And then when was the last time that the inside of

1    A    I am not.

2    Q    Who got to -- or who decided how to use that

3    discretionary budget for the property?

4    A    Typically it's the branch manager.

5    Q    Just to confirm, that's Mr. Johnson?

6    A    Correct.

7    Q    Was there an Airgas employee that was responsible

8    for retaining and coordinating someone, whether an

9    individual or entity, to perform maintenance tasks at the

10   property from June 1, 2022 through June 1, 2023?

11   A    Not that I was aware of, no.

12   Q    Did Airgas retain any individual or entity to

13   perform maintenance tasks at the property during that

14   same time period?

15   A    Not that I recall, no.

16   Q    And then, was there an Airgas employee that was

17   responsible for actually performing maintenance tasks at

18   the property during that time period?

19   A    No.

20   Q    Prior to the June 1, 2022 date, dating back to

21   2005, are you aware of Airgas retaining any individual or

22   entity to perform maintenance tasks at the property,

23   whether inside or outside?

24   A    I can only tell you that I heard people talk of

25   events in the past where some maintenance was called in

1    to do work on the property, but I did not see it myself.

2        Q    And can you just tell me what you're aware of

3    based on that, those communications?

4        A    Apparently there was a hailstorm.  I don't know

5    the year.  Way before my time there.  And it caused

6    significant damage to the property, and Airgas had to --

7    again, I don't know details, but I believe they basically

8    redid the entire showroom and the office areas, the

9    inside sales office areas.  That's really all I know

10   about it.

11       Q    And who was it that told you about that?

12       A    Well, more than one person actually, but the

13   primary source of that information was Tracy Harvey.

14       Q    And if you recall, who else other than Tracy

15   Harvey happened to talk about that or mentioned it to

16   you?

17       A    Bradley Jackson, Corley Johnson, David Millians.

18   Those are the individuals I recall.

19       Q    Was Airgas given a budget for maintenance at the

20   property for June 1, 2022 through June 1, 2023?

21       A    Not a formal budget, no.  I would say if there

22   was -- well, no.  I'm just going to say no.

23       Q    If there were repairs that needed to be done on

24   the property, where would money for that come from?

25       A    So, the branch manager has what we call a P card,

1   a purchasing card.  And he -- assuming it was under a

2   certain dollar amount, he could put it on his P card.

3   For repairs that were more significant in cost, to be

4   honest with you, I'm not sure who approved that.  I don't

5   think we ever -- we never had anything like that, so I

6   never considered it.

7       Q   What's the max amount that could've been put on

8   the P card for one maintenance project?

9       A   I'm not sure of that exactly.  I believe the limit

10  on the card itself is 5' or $10,000.

11      Q   And once money is put on that P card, where does

12  the money come from to pay off that amount on the P card?

13      A   The branch's P&L statements.

14      Q   During the June 1, 2022 through June 1, 2023 time

15  period, did Airgas damage any part of building 1?

16      A   Could you tell me those time frames again, please?

17      Q   Absolutely.  June 1, 2022 through June 1, 2023.

18      A   No.

19      Q   Are you aware of repairs needing to be made in

20  building 1 between June 1, 2022 and June 1, 2023?

21      A   There was -- inside the building there were -- the

22  drop ceiling had collapsed in some of the offices.  Those

23  are the only repairs that I was aware of that probably

24  needed to be addressed.

25      Q   Were there garage doors that needed to be repaired

1   in building 1 between June 1, 2022 and June 1, 2023?

2      A    I was not aware of any garage doors that needed to

3   be repaired.

4      Q    Were there regular individual people doors that

5   needed to be repaired on building 1 between June 1, 2022

6   and June 1, 2023?

7      A    Not that I was aware of, no.

8      Q    Was the VCT flooring in building 1, which I

9   believe is primarily in the offices, was that VCT in need

10  of maintenance or repair between June 1, 2022 and June 1,

11  2023?

12     A    Not to myself.  I didn't think it was, no.  Now, I

13  never spent a great deal of time contemplating that

14  either though.

15     Q    Prior to June 1, 2022, are you aware of Airgas --

16  actually strike that.  Between January 2005 and June 1,

17  2022, did Airgas cause damage to any part of the

18  property, whether buildings 1, 2, 3, 4, or the outside of

19  the property?

20     A    Again, I can only speak on the date of July 12,

21  2021 through the last date you mentioned.  And in that

22  time, no, not that I was aware of.

23     Q    Let's talk a little bit about -- we've briefly

24  mentioned it, Airgas leaving the property as of

25  effective, I believe, June 1, 2023, the lease terminating

1    May 31, 2023, as I represent to you.  If you have any

2    questions about that, please let me know.  But to

3    expedite things, let's talk a little bit about that

4    termination and departure from the property.

5         Were the employees and individuals who worked at

6    the property given a budget for moving off of the

7    property?

8    A    Not a formal budget.  Not a formal budget, no.

9    Q    Can you explain what you mean by it wasn't a

10   formal budget?

11   A    We spent money similar to the way I described any

12   repairs that needed to be made.  We rented dumpsters and

13   trucks with P cards, at least as far as I'm aware.  The

14   branch manager did all that.  I believe he used his P

15   card for all of it, at the branch's expense.

16        Personnel, Airgas personnel were paid, obviously,

17   for their additional time, just like it would be regular

18   overtime.

19   Q    Did Airgas hire a moving company to assist with

20   moving off of the property?

21   A    No, they did not.

22   Q    Why not.

23   A    Well, I can't speak to the thoughts of my boss's

24   bosses, but I believe they thought that we could -- it

25   was something that Airgas personnel, with rented

1  equipment, could easily handle on their own.

2     Q   Was there a budget for making any repairs to the

3  property resulting from or prior to vacating the

4  property?

5           MR. ROBISON:  Object to form.

6     A   If there was, it was not -- up to this point I've

7  talked -- basically what I've been trying to say was the

8  branch spent money as it needed to on repairs.  If there

9  was a budget for this, it would've been from what we call

10 our division chiefs.  And I believe -- yes, I think there

11 was.

12    Q   And when you say from your division chiefs, can

13 you explain what you mean by that?

14    A   Well, it was out -- when we vacated the

15 property -- when I say "we," I mean the branch, myself

16 and all the teammates of the branch, the stuff that

17 transpired after that tended to be handled by the

18 division and not the branch.  Or excuse me.  Not the

19 division.  That's not the right nomenclature.  It

20 would've been the region.  Not the division, the region.

21    Q   So just to make sure I'm understanding.  So

22 there's a point in time at which it changes from the

23 local to more of a regional control?

24    A   That's the way I understood the process, yes.

25    Q   And then we've talked about this a little bit, but

1  just to confirm, was there a budget provided for cleaning

2  the property after Airgas vacated the property?

3      A    No, there was not.

4      Q    Did Airgas retain anyone to either clean or make

5  repairs at the property after -- when Airgas had vacated

6  the property?

7      A    To my knowledge, no.

8      Q    Which Airgas employee was responsible for ensuring

9  that utilities to the property were either turned off or

10 transferred back to BWS?

11     A    To be perfectly honest, I'm not sure.  It was

12 either myself or Corley Johnson, the branch manager.

13     Q    And maybe let me ask it a little bit different

14 way.

15          Who actually turned off or transferred the

16 utilities that went to the property upon Airgas vacating

17 the property?

18     A    No one.

19     Q    There was no one at Airgas that coordinated or

20 ensured that the utilities were turned off or

21 transferred?

22     A    I believe an attempt was made.  I believe an

23 attempt was made, but as memory serves me it was not

24 transferred until sometime after Airgas had vacated the

25 property.

1    Q    And was that done by Airgas or was that done by

2    someone else?

3    A    I believe it was done by Airgas.

4    Q    At what point after Airgas had vacated the

5    property did they coordinate or have transferred or

6    turned off the electric to the property?

7    A    I'm not aware.  I don't know when the electric was

8    done.

9    Q    And then at what point was the water either turned

10   off or transferred at the property?

11   A    I'm not aware of that time.

12   Q    And then the same question but relating to gas

13   that goes to the property.

14   A    So the gas, I know that that was a bit of a

15   process, and I did get involved in that personally.  And

16   it seems, if memory serves me correct, it was a couple of

17   weeks after we vacated the property that it was finally

18   transferred to BWS.

19   Q    We'll show you what we'll mark as Exhibit 3.

20                (Exhibit 3 will be marked.)

21   Q    Are you able to see the text messages on the

22   screen?

23   A    I can see them, yes.

24   Q    Are these text messages between yourself and a

25   representative of BWS Properties?

1     A    Yes, they are.

2     Q    And who is that representative that you spoke

3  with?

4     A    Ms. Jenny Nevans.

5     Q    And is this relating to changing over the gas at

6  the property?

7     A    It is.

8     Q    And what is the date on the first text in this

9  text string?

10    A    Does that say 11/28/2023?

11    Q    Yes.  And I'll read it to you.  It says, "Hi,

12 Jenny.  Did you have any luck with the gas company"; is

13 that correct?

14    A    Yes, it is.

15    Q    And so how long after Airgas had vacated the

16 property are you checking in on the gas at the property?

17    A    I never checked in on the gas until I was pulled

18 into this discussion right here from other personnel at

19 Airgas.

20    Q    Let me pull up one.  You mentioned -- I'm actually

21 not going to pull that one up.  You mentioned other --

22 that there were other communications and you were pulled

23 in at a later point.  Tell me about the process of you

24 getting pulled into that conversation and the

25 circumstances that resulted in you being pulled in to

1  coordinate gas?

2      A   As my memory serves, I believe Corley Johnson told

3  me that we had attempted -- "we" being Airgas, had

4  attempted to have the gas transferred to BWS on at least

5  one occasion, perhaps two, and the gas company showed up

6  and they could not get into the property to do whatever

7  they needed to do to make that happen.  Therefore, I

8  reached out to Ms. Nevans and asked -- to try to

9  coordinate a time where she could be there and the gas

10  company could be there so she could allow them on the

11  property to do the transfer.

12      Q   And how did you become aware of at least the

13  potential that for some reason the property wasn't opened

14  for the gas company to access it?

15      A   I believe when the gas company reported back to us

16  that they had attempted to switch ownership of the gas

17  from Airgas to BWS and they could not gain access to the

18  property and let us know that.

19      Q   And just to confirm, who was it that in the end

20  met the gas company at the property to have the gas

21  switched over?

22      A   As far as I know, Ms. Nevans.

23      Q   Why did it take as long as it did for Airgas to

24  realize that the gas -- they had not changed the gas over

25  or turned it off?

1              MR. ROBISON:  Object to form.

2              THE WITNESS:  Shall I proceed?

3              MR. ROBISON:  Go ahead.

4      Q    Yes.

5      A    I don't know.  I believe that the utilities of the

6   property were dealt with by a different department within

7   Airgas.  I could be wrong about this.  And I believe

8   nobody, at least locally, thought about it until we were

9   notified by a different department from Airgas that we

10  were still being charged for the gas, even though we had

11  vacated the property.

12     Q    Was a final walk-through of the property performed

13  after Airgas had terminated the lease and had purportedly

14  finished moving from the property?

15     A    There was.

16     Q    And when did that walk-through occur?

17     A    I do not remember a specific date.  A few days

18  perhaps or a week after we vacated -- after Airgas

19  vacated the property.

20     Q    And who was present for that walk-through?

21     A    Myself and Ms. Jenny Nevans.

22     Q    And can you describe for me what happened and the

23  communications that occurred during that walk-through?

24     A    Sure.  When I got there Ms. Nevans was already

25  there.  She was in the showroom, as I recall.  And we

1   exchanged pleasantries, and we began walking the

2   property, discussing the status of the property, and

3   Ms. Nevans made observations about things that she did

4   not think were maintained properly. And I, you know, I

5   acknowledged her complaints. I took several pictures of

6   things that Ms. Nevans had brought up during the

7   walk-through, and I provided those pictures to the

8   regional personnel that I mentioned earlier. This is --

9   by now we're kind of, the local team is kind of done.

10  And that's pretty much it, that I recall.

11      Q   And you mentioned sending those pictures to

12  regional personnel. Can you identify specifically who

13  those regional personnel were that received those photos?

14      A   I believe I sent them to Dawn Van Dyke. And I

15  could've sent them to others as well, but do not -- I

16  can't tell you that definitively.

17      Q   And have those pictures been provided to counsel

18  for production?

19      A   Oh, absolutely.

20      Q   And again, not asking for any attorney

21  communications.

22          Can you describe for me -- and you mentioned it

23  briefly, but can you describe for me in more detail what

24  you saw on the property while walking around, starting

25  with building 1?

1    A    I mentioned earlier that some of the drop ceiling

2    tiles were collapsed.  In other words, kind of falling.

3    They weren't flat anymore, they were falling.

4         When we got out into the warehouse, Ms. Nevans

5    noticed some things that she was not satisfied with.  I

6    cannot remember exactly what they were.  I remember

7    spending a decent amount of time in the warehouse.  And

8    then we were doing the walk around the property from the

9    outside, there was a lot of concern about certain parts

10   of the pavement or the asphalt on the property, which I

11   took several pictures of for documentation.  And we also

12   looked at the weld repair center, and Ms. Nevans had some

13   concerns about that as well.

14   Q    What were the concerns -- I'm sorry.  Continue.

15   A    I don't remember specifically.

16   Q    Did you walk through building 4?

17   A    Building 4, that would've been -- is that the gas

18   house, I think?

19   Q    Yes, sir.

20   A    Yes.  Yes.  That's right.  We did go through the

21   gas house as well, correct.  And Ms. Nevans pointed out

22   some things that she felt needed to have some attention

23   put to them in the gas house as well.

24   Q    And what were those items?

25   A    I remember broken windows, maybe some chunks taken

1   out of the concrete floor.  That's all I can really

2   remember.

3       Q   Other than Ms. Nevans mentioning those, the items

4   that you've identified, what other conversations did you

5   have with Ms. Nevans while completing the walk-through?

6       A   I don't remember.

7       Q   Did you provide anything to Ms. Nevans during the

8   walk-through?

9       A   I gave Ms. Nevans, as I recall, two keys.  And I

10  think we also produced -- or I produced a final

11  walk-through sheet, that I gave Ms. Nevans a copy of.

12      Q   I'm going to show you what we're going to mark as

13  Exhibit 4.

14              (Exhibit 4 will be marked.)

15      Q   Do you see a document on your screen?

16      A   I do.

17      Q   What is the date of this letter?

18      A   May 31, 2023.

19      Q   And would that have been on or around the date

20  that the walk-through took place?

21      A   It would've, yes.

22      Q   And is this the letter that you -- or the form you

23  mentioned a moment ago that you provided to Ms. Nevans

24  during the walk-through?

25      A   I believe it is, yes.

1    Q   And if you need to take a moment to review, please

2   do so.

3    A   Could you possibly zoom in a little bit on it?

4    Q   Of course.  I can zoom in more if you need me to.

5    A   No, this ought to be good.  Thank you.

6        Okay.  Yes.  I remember this document, yes.

7    Q   Who drafted this document?

8    A   I do not know.  It was provided to me by somebody,

9   and I cannot remember who, from the regional offices.  It

10  could've been Dawn Van Dyke, but I'm not sure.

11   Q   I don't believe I've asked this.  What is

12  Dawn Van Dyke's position with Airgas?

13   A   I believe Dawn manages leased properties from the

14  Airgas perspective.  I don't really know.  I've never

15  talked to her about her job responsibilities.  I just

16  know that during all this process of vacating the

17  property, I talked to her more than once on the phone and

18  maybe had a Zoom call with her at one point.

19   Q   Is this letter signed?

20   A   It is not.

21   Q   Are you aware of a copy or -- strike that.  Is

22  there a copy of this letter that you signed?

23   A   I don't think so.

24   Q   And what was the conversation that you had, if

25  any, with Ms. Nevans when you provided this letter to

1  her?

2  A   As I recall, I said this is the final walk-through

3  letter.  And I do believe I said something about that I

4  wasn't going to sign it and left it to her discretion if

5  she wanted to or not.

6  Q   And did Ms. Nevans ever sign the letter?

7  A   I don't believe so.

8  Q   Did you leave a copy of the letter with Ms. Nevans

9  or did you present it to her and then --

10  A   No.  I'm sure I left a copy with her.

11  Q   Did you inform anyone in Airgas's regional

12  management that neither yourself or Ms. Nevans had signed

13  the letter?

14  A   I think I did.

15  Q   Who did you tell?

16  A   Maybe Chris Hopwood, the region president.

17  Q   And can you tell me about that conversation?

18  A   I don't remember any details, other than informing

19  Chris that I had done the walk-through and that this

20  document was not signed.

21  Q   Did you tell him why it was not signed?

22  A   Probably, but I do not remember any details of

23  that.

24         MS. WOLINSKY:  Let's go ahead and take

25  another quick break.

1                    (Recess from 10:27 to 10:40.)

2     BY MS. WOLINSKY:

3         Q    I'm going to re-share my screen, going back to

4     Exhibit 4, which is where we had left off.  If you look

5     in the first paragraph of this letter, in the second

6     sentence, and it reads "Tenant is surrendering the leased

7     premises in accordance with paragraph 20 of the lease."

8              I'm not asking you to tell me about the lease

9     itself or to interpret any of those terms.  But did

10    anyone at Airgas talk with you about how to or give

11    instructions about how to leave the property and

12    surrender the property so that it would be in accordance

13    with the lease or other requirements?

14        A    Not to me, no.

15        Q    Are you aware of them doing that with anyone?

16        A    I don't think so, no.

17        Q    I'm going to stop sharing my screen for the

18    moment.

19             What facts do you believe support, on Airgas's

20    behalf, that Airgas properly surrendered possession of

21    the property as of June 1, 2023?

22        A    My understanding of the property is that, the

23    state it was in when we vacated it was pretty much the

24    same as the state it had been for years and years and

25    years, going all the way back to before Airgas owned it.

1    That's what I've been told by people that were around the

2    property far longer than I ever was.

3        Q    And who was it specifically that told you that?

4        A    Tracy Harvey would be the primary individual who I

5    would refer to.

6        Q    Since he's the primary, who were the others that

7    you spoke with?

8        A    David Millians, Corley Johnson, Bradley Jackson.

9        Q    And you referenced generally that they had said or

10   referenced that it was like that for years and years and

11   years back before Airgas I think you maybe said owned it.

12   But dating how far back were they saying that that's what

13   the property looked like?

14       A    Well, I mean, so I don't want to necessarily speak

15   for anybody.  But the words I heard were that the

16   building had been there since the 1940s, it was never a

17   beautiful building, at least up until the '80s when some

18   of my colleagues had a relationship with the building.

19   And the way that they made it sound to me, it's an

20   industrial site, it's always looked like an industrial

21   site.

22       Q    And were they talking about all the buildings?

23   Just some of the buildings?

24       A    That's a good question.  Probably mostly building

25   1.

1    Q    And was there any reference in that to the repairs

2  and renovations done following the 2012 hailstorm?

3    A    Could you repeat that, please?

4    Q    Yes.  You had said that they were potentially

5  referencing, more likely referencing mostly building 1.

6  Was that including the fact that the building had repairs

7  to it following a hailstorm that I'll represent to you

8  took place in or about 2012?

9    A    I suppose, yeah.

10    Q    So after the walk-through that we talked about

11  that you conducted with Ms. Nevans of the property once

12  Airgas had left, was there a subsequent walk-through that

13  Airgas conducted with an external individual?

14    A    There was.  Tracy Harvey and a general -- I'm

15  going to call it a general contractor, I guess that's

16  what he is -- I was told met Ms. Nevans at the property

17  and did a walk-through with Mr. Kevin Cruz in tow to

18  potentially offer repairs to, primarily building 1, but I

19  was not there so I can't tell you what all they looked

20  at.

21    Q    And when or about when was that walk-through

22  conducted?

23    A    I'm just taking a guess.  Six weeks to eight weeks

24  after Airgas vacated the property.  Could've been longer.

25  Could've been more like 10 weeks, 12 weeks.

1    Q    And did Mr. Cruz, Kevin Cruz, provide an

2    assessment of or quote for repairing aspects of the

3    property?

4    A    He most certainly did, yes.

5    Q    What do you recall about that?

6    A    I saw the proposal, and there were several line

7    items listed.  Most of the stuff that I talked about here

8    today, things like repairing some drywall, repairing the

9    ceiling tiles.  For some reason those two stick out.

10   There was much more.  Maybe some general plumbing.  A

11   menagerie of things, not to include anything -- I do know

12   that it was not including any asphalt repairs.

13   Q    I'm going to show you what we're going to mark as

14   Exhibit 5.

15              (Exhibit 5 will be marked.)

16   Q    Did you see an email pop up on the screen?

17   A    Yes.

18   Q    This has a couple pages to it.  I want to make

19   sure you're able to see it, so I'm going to just slowly

20   scroll through.  Let me know if you need to see anything

21   for a longer period or if there's anything you would like

22   to go back to.

23   A    If you wouldn't mind zooming a little bit, that

24   would be nice.

25   Q    Absolutely.

1    A    Thank you.

2    Q    And just let me know when you're ready for me to

3  scroll down.

4    A    I'm ready.  Are you waiting for me?

5    Q    Yes.

6    A    I'm sorry.  I'm ready.  You can proceed.

7    Q    There's just a little bit left at the bottom that

8  I'll scroll down to when you're ready.

9    A    Okay.

10    Q    And the rest is just his signature.  Is this the

11  quote or assessment of costs provided by Kevin Cruz that

12  you referenced a moment ago?

13    A    I believe it is, yes.

14    Q    And it's dated October 19, 2023.  Do you see that

15  line?

16    A    I do.

17    Q    Would it be that the walk-through was conducted in

18  or around October of 2023?

19    A    Yes.

20    Q    And now having seen this email, what else do you

21  recall about or do you know about the walk-through with

22  Mr. Cruz and the quote or assessment that was provided to

23  Airgas?

24    A    Well, I mean, as you can tell from the email, once

25  I got the information I forwarded it to regional

1  officers.  And that's -- I mean, I don't -- I can't think

2  of anything else worth saying about it.

3      Q    Tell me about the conversations that you had with

4  others at Airgas regarding the quote you received from

5  Mr. Cruz?

6      A    Well, I don't, I don't really remember any

7  conversations after I submitted this.

8      Q    Did anyone else have meetings regarding or discuss

9  this quote with anyone else within Airgas or within at?

10     A    Not locally.  Not anybody that was part of my

11 team.

12     Q    Was this quote provided to Ms. Nevans?

13     A    If it was, it was not provided to Ms. Nevans by

14 me.

15     Q    Did Airgas do anything else with this description

16 and quote provided by Mr. Cruz, other than review the

17 email?

18     A    Your question was did Airgas?

19     Q    Did Airgas do anything else with this quote and

20 scope of work provided by Mr. Cruz, other than read the

21 email?

22     A    I do not know.  After I submitted it to my bosses,

23 that's kind of the last I heard of it.

24     Q    Did Airgas create any other internal assessment or

25 evaluation of the condition of or damage to the property

1   after June 1, 2022?

2     A   I don't know.

3     Q   Since June 1, 2022, has Airgas made any effort to

4   obtain quotes from third parties, other than Mr. Cruz, to

5   estimate the cost of repairing any aspect of the

6   property?

7     A   Not to my knowledge.

8     Q   Just a couple clarifying questions from earlier

9   after some additional thought. Just to clarify, who did

10   you report to in the 2022 to 2023 time frame?

11     A   Before I reported to Jeff Mann I reported to Clay

12   Merrick.

13     Q   And did Mr. Merrick have any input into or provide

14   any instruction to anyone on the property with Airgas

15   about terminating the lease or vacating the property?

16     A   Not that I recall, no.

17     Q   Other than the topics that we ran through at the

18   beginning of the deposition to confirm, are there any

19   other topics that you were prepared by counsel to testify

20   to today? Again, not asking for any specific

21   attorney-client communications.

22     A   No.

23     Q   Not wanting to know what any instructions were or

24   what communications there were. Did your counsel give

25   any instructions on how you should prepare for this

1    deposition?

2        A    No.

3        Q    Again, same clarifying.  Don't want to know what

4    you talked about, but did counsel review the topics with

5    you and inform you what the topics were for which you

6    were going to be designated to testify today on behalf of

7    Airgas?

8        A    Yes.

9        Q    And did you follow any instructions that your

10   counsel gave you regarding preparation for or which

11   topics you were to testify to?

12       A    Could you say that again, please?

13       Q    Yes.  Did you follow any of the instructions, if

14   given, by counsel regarding preparing for today's

15   deposition and educating yourself on the topics that were

16   identified?

17            MR. ROBISON:  I probably do have an objection

18   there if it gets into communications between the deponent

19   and counsel.

20       Q    Just a yes or no on that.

21       A    No.

22            MR. ROBISON:  Same objection.

23            MS. WOLINSKY:  If you'll just bear with me,

24   I'm going to read through something real quick.  This

25   will be the last thing that I have on the record, unless,

1  of course, Peter, meaning Mr. Robinson -- Robison -- I
2  think I need to ask for clarification.  How do you
3  pronounce your last name?

4          MR. ROBISON:  I say it "Raw-bi-son."

5          MS. WOLINSKY:  "Raw-bi-son."  Okay.  I feel
6  very bad, because people mispronounce mine all the time.

7          And if you'll just bear with me and let me
8  finish reading this, and then we can proceed onward.

9          Before we conclude, on behalf of BWS, I just
10  want to state on the record that after receiving the
11  testimony of two witnesses who were designated
12  specifically as corporate representatives for Airgas with
13  respect to the majority of our 30(b)(6) notice topics, it
14  has become clear to us that the witnesses were not
15  properly prepared to testify on those topics for which
16  they were specifically designated in accordance with the
17  Federal Rules of Civil Procedure.

18          Specifically, Airgas does not appear to have
19  attempted to gather information or otherwise adequately
20  prepare the witnesses so that they could address the
21  notice topics on Airgas's behalf.  Instead, the
22  designated representatives have repeatedly limited their
23  testimony to their own existing personal and individual
24  knowledge, and have testified that they have no knowledge
25  regarding the notice topics or portions thereof unless

1   relating to their personal individual knowledge.

2           These topics were noticed on April 8, 2025.

3   And through counsel for the parties -- and though counsel

4   for the parties met and conferred regarding the same on

5   April 14th, Airgas asserted no objection to the scope or

6   time frame of the topics at issue here, other than what

7   was discussed and clarified regarding privileged

8   information, which we did not want anyways.

9           Plaintiff therefore prepared for these

10  depositions under the assumption that the corporate

11  representatives would be properly prepared and able to

12  fully answer questions regarding the notice topics.  In

13  accordance with the Federal Rules of Civil Procedure,

14  plaintiff therefore reserves the right to request that

15  the court compel Airgas to promptly produce witnesses

16  prepared to fully and completely testify on behalf of

17  Airgas with respect to the notice topics, or plaintiff

18  costs related to the 30(b)(6) depositions that have

19  already occurred, and order any other relief which the

20  court deems just and proper.

21          And with that --

22          MR. ROBISON:  And on behalf of Airgas, Airgas

23  objects to the lengthy recitation made my counsel for BWS

24  just now, and including some of the representations or

25  characterizations of testimony given by the witnesses and

1                    REPORTER'S CERTIFICATE

2    STATE OF TENNESSEE:

3    COUNTY OF HAMILTON:

4              I, Sheila D. Wilson, Licensed Court Reporter
     #268 and Notary Public, in and for the State of
5    Tennessee, do hereby certify that the deposition of Peter
     Van Slyke, Jr., was reported by me, and that the
6    foregoing 56 pages of the transcript is a true and
     accurate record to the best of my knowledge, skills, and
7    ability.
               I further certify that I am not related to
8    nor an employee of counsel or any of the parties to the
     action, nor am I in any way financially interested in the
9    outcome of this case.
               I further certify that I am duly licensed by
10   the Tennessee Board of Court Reporting, as evidenced by
     the LCR number and expiration date following my name
11   below.
               In witness whereof, I have hereunto set my
12   hand this 26th day of May 2025?

13

14

15

16

17

18

19
     _____
     Sheila D. Wilson, LCR #268
20   Expiration date: 6/30/2026.
     Notary Public Commission
21   Expires: 1/17/2027.

22

23

24

25