IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| BWS PROPERTIES, LLC, | ) | NO. 1:24-CV-29-KAC-CHS |
| | ) | |
| Plaintiff, | ) | JUDGE KATHERINE A. CRYTZER |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| AIRGAS USA, LLC, | ) | CHRISTOPHER H. STEGER |
| | ) | |
| Defendant. | ) | JURY DEMAND |

## DEFENDANT AIRGAS USA, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF BWS PROPERTIES, LLC'S EXPERT WITNESS NICHOLAS CORNELISON

Defendant Airgas USA, LLC ("Defendant" or "Airgas") files this Memorandum of Law in support of its Motion to Exclude certain of the expert opinions offered by Mr. Nicholas Cornelison on behalf of Plaintiff BWS Properties, LLC ("BWS" or "Plaintiff") in his report dated May 9, 2025 (attached as <u>Exhibit A</u>) that extend beyond pricing of items that he has actually reviewed and for which he has a reliable basis. These opinions concern the costs for certain scopes of work on the property located at 700 Manufacturers Road in Chattanooga, Tennessee (the "Property") that is the subject of this lawsuit. As argued more fully below, several of Mr. Cornelison's opinions lack sufficient factual basis and should be excluded under existing Supreme Court and Sixth Circuit case law.

### FACTS AND PROCEDURAL HISTORY

This case arises from disputes over the condition of the Property after Airgas surrendered the Property on May 31, 2023. BWS filed suit under a theory of breach of contract, and alleged various damages to the Property. In support of their claimed damages, BWS had previously provided two budgets created by T.U. Parks Construction, Co. ("Parks Construction") in June 2023 that listed the cost of various scopes of work apparently requested by BWS. The total of the

work budgeted by Parks Construction was $534,584.36. A copy of those two budgets is attached as Exhibit B.[1]

However, when the time for expert disclosures came, BWS did not disclose expert opinions of any person from Parks Construction, but instead disclosed the opinion of Mr. Nicholas "Nic" Cornelison of P&C Construction, as contained in this three-page report attached as Exhibit A ("Cornelison Report").

First, Mr. Cornelison opined that $7,388.50 expended by BWS in 2023 and 2024 for various repairs was accurate, fair, and reasonable based on the known scopes of work." Cornelison Report p. 2. As identified by Mr. Cornelison, this work was performed by four companies: Access Garage Doors, Scenic Breezeway, A. Barnes Fence Co., and Oasis Heating & Air. However, in his deposition, Mr. Cornelison admitted that he had not actually reviewed the invoices for the scopes of work, and did not actually know what the scopes of work included. Exhibit C, Excerpts from the Deposition of Nicholas Cornelison ("Cornelison Depo.") pp. 157:12-159:18.

Mr. Cornelison then referenced the budgets created by Parks Construction and opined that the $534,584.36 price tag for such work was "accurate, fair, and reasonable based on the known scopes of work." Cornelison Report p. 2. Mr. Cornelison did not speak to anyone from T.U. Parks Construction about those scopes of work, and only had one conversation with one person from that company—Arch Willingham—about work not included in the budgets, as described more fully below. Mr. Cornelison never spoke with anyone from Parks Construction about the scope of work included in the budgets. Cornelison Depo. pp. 57:16-58:6.

---

[1] The second page of the budget from Parks Construction erroneously refers to "Building 3," but the parties have elsewhere referred to that building as "Building 4," and have agreed any the references in that budget refer to Building 4.

Mr. Cornelison also opined that the amount of the Parks Construction budgets should be increased by 19.4%, based on information he read on CONSTRUCTIONDIVE.com, for an additional $103,709.36 on top of the $534,584.36 in the T.U. Parks Construction budgets. Cornelison Report p. 2. When questioned about this resource on which he based his opinions, Mr. Cornelison could not recall the name of the author or the article, but that he believed it was a report or article by a contractor outside of the Chattanooga area. *Id*. at pp. 150:18-151:20.

Finally, Mr. Cornelison went on to provide pricing for additional scopes of work that were not included in the Parks Construction budgets including $8,107.50 for repairs to insulation in Buildings 1 and 2; $13,617.82 for drywall and ceiling repair work in Buildings 1 and 2; $4,878.11 for replacement of a concrete sidewalk and ramp at Building 4; $44,322.00 for replacement of a concrete slab at Building 4, and $5,879.43 for "Gutters, Down Spouts, Metal Siding Front Corner Bldg 4." Cornelison Report p. 2. When asked about these scopes of work, Mr. Cornelison testified that he called Arch Willingham of T.U. Parks Construction and asked him if each of those additional scopes of work were included in either of the budgets provided in June 2023. Cornelison Depo. pp. 57:16-58:6. Mr. Willingham reportedly told Mr. Cornelison they were not, but provided no other information. *Id*.

Crucially for the purposes of this Motion and the Motion for Partial Summary Judgment that Airgas is filing contemporaneously, the Cornelison Report does not include any opinions about the reasons why any of the scopes of work might be necessary. The Cornelison Report does not identify when any particular repairs became necessary, whether the scopes of work were caused by any particular party, or whether they were caused by any alleged breach of the Lease agreement between BWS and Airgas. Cornelison Report, *supra*. Mr. Cornelison repeatedly confirmed this during his deposition, and testified that his opinions only extended to

the price to perform certain work, and not to cause or necessity of any scope of work. *See* Cornelison Depo pp. 171:20-172:18; 179:3-18; 197:16-19; 202:19-21; 208:15-18. At the end of his deposition, Mr. Cornelison clarified the limited scope of his opinions:

> Q So as I understand it with your opinions, you have told us what it's going to cost to perform this work; is that fair?
>
> A That is fair.
>
> Q. And with respect to the Parks Construction amounts, you have told us in your -- it's your opinion that those are fair amounts to do that scope of work?
>
> A That is correct.
>
> Q And as I understand it, you're not giving us an opinion about who caused the damage or when it was caused or what specific incident caused the damage; you're just talking about what it's going to take to fix it?
>
> A That is correct.
>
> Q Have you offered any opinion as to who needs to pay for that amount or just what it's going to cost to fix it?
>
> A Just what it's going to cost to fix it.

*Id*. at pp. 275:21-276:15.

## LEGAL STANDARD

A party may not submit expert testimony unless that witness's testimony is first established to be admissible under requirements set forth in Federal Rules of Evidence 702 and 703, Federal Rule of Civil Procedure 26 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993) and its progeny.

Reports by expert witnesses are governed by Federal Rule of Civil Procedure 26, which imposes the following disclosure requirements on expert witnesses who will testify under Fed. R. Evid. 702 and 703:

"To qualify as an expert under Rule 702, a witness must first establish his expertise by reference to 'knowledge, skill, experience, training, or education.'" *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000). The rule gives district courts a "gatekeeping role" in screening the reliability of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). The U.S. Supreme Court, in *Daubert* and subsequent rulings, has held that "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i. e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590.

It is in the discretion of the trial judge to determine "whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue." *Daubert*, 509 U.S. at 581. The Supreme Court has generally identified four items of inquiry to guide trial courts in determining whether expert scientific testimony should be admitted:

(1) whether a theory or technique can be or has been tested;

(2) whether the theory has been subjected to peer review and publication;

(3) whether a potential rate of error has been established; and

(4) whether the theory is "generally accepted."

*Id.* Even where an expert's evidence is ruled admissible under the *Daubert* standards, a district court remains free to decide that the evidence amounts to no more than a mere scintilla. *Id.* at 596; *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011). "[N]othing … requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* [because I said so] of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Prior to the 2023 amendments to Rule 702, some courts required the proponent of expert testimony to prove to the judge by a preponderance of the evidence that the proposed testimony met the four reliability criteria of Rule 702, while other courts merely presumed admissibility and allowed the jury to determine the weight to give the testimony. The current Rule 702, as amended, clarifies that a proponent of expert testimony must prove—and the court must find by a preponderance of the evidence—that the proposed expert testimony meets Rule 702's four reliability requirements: (1) the expert is qualified, (2) the testimony is supported by sufficient facts or data, (3) the principles and methods are reliable, and (4) the expert has reliably applied those principles and methods. Rule 702 now expressly states that the proponent of the testimony must show that the expert's opinions and conclusions are based on sufficient facts and logically follow from the reliable application of reliable methods. Fed. R. Evid. 702.

Federal Rule of Evidence 703 additionally provides that:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

In addition to the requirements of Rule 702, the Court must also consider other factors about the reliability of the expert testimony such as "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langdon*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94). This is particularly crucial when an expert relies heavily on materials or information from other parties The "knowledge" prerequisite in Rule 702 requires "more than subjective belief or unsupported speculation." *Tamraz v. Lincoln*

*Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (quoting *Daubert*, 509 U.S. at 590). In its inquiry, a trial court should not look to "the qualifications of a witness in the abstract, but [to] whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

However, the factors the Court considers are not strict, rather they are "flexible" while the "overarching subject [should be]… validity" and "reliability." *Kuhmo Tire*, 526 U.S. at 158 (citing *Daubert*, 509 U.S. at 594-595). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008).

Courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kuhmo Tire*, 526 U.S. at 152 (1999). When the Sixth Circuit has excluded expert testimony, it has usually come from "[d]eficiencies such as an expert's lack of specific and relevant data, lack of relevant testing, overreliance on unhelpful studies unconnected to causation, failure to rule out alternative causes, and failure to comply with court-ordered report submission deadlines have all justified excluding proposed expert opinion." *Baker v. Blackhawk Mining, LLC*, No. 24-5490, 2025 U.S. App. LEXIS 15389, at *10 (6th Cir. June 23, 2025). Further, courts hold, "an expert's opinion must be supported by more than subjective belief and unsupported speculation and should be supported by good grounds based on what is known." *Endless River Techs., LLC v. TransUnion, LLC*, No. 23-3087/3144, 2025 U.S. App. LEXIS 1201, at *21 (6th Cir. Jan. 17, 2025) (quoting *McLean v. 988011 Ontario, Ltd.*, 224 F.3d

7

797, 800-801 (6th Cir. 2000). Anecdotal evidence is also a red flag when considering the validity of an expert's testimony. *Best v. Lowe's Home Ctrs. Inc.*, 563 F.3d 171, 177 (6th Cir. 2009).

**ARGUMENT**

In exercising its gatekeeping role, a district court should examine the "fit" between the expert's qualifications and the proffered opinions. "The fit requirement directs the Court to look beyond the qualifications of a witness in the abstract, and focus on whether those qualifications provide a foundation for a witness to answer a specific question." *Johnson v. Manitowoc Boom Trucks, Inc.*, 406 F. Supp. 2d 852, 859 (M.D. Tenn. 2005); *see also U.S. v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1994). "[F]or this kind of testimony to be admissible, a foundation would have to have been laid based upon the witness's firsthand familiarity" with the topics of the expert opinions. *Berry,* 25 F.3d at 1350.

1. **Mr. Cornelison lacks a basis for knowledge of expenses paid by BWS.**

In his report, Mr. Cornelison offered the blanket statement that the "Landlord funded repair expenses paid to date" were accurate, fair, and reasonable based on the known scopes of work[.]" Cornelison Report p. 2. Mr. Cornelison clarified in his deposition that the $7,388.50 worth of landlord funded expenses corresponded to invoices from four companies: Access Garage Doors ($237.50 dated 6/2/23), Scenic Breezeway ($5,575.00 dated 7/3/2023), A. Barnes Fence ($650.00 dated 11/7/2023), and Oasis Heating & Air ($926.00 dated 7/29/2024).

With respect to the Access Garage Doors invoice, Mr. Cornelison did not know on which door or on which building the roll-up door repair was performed. Cornelison Depo. pp. 44:8-11; 44:23-45:1. Nor did he know when the roll-up door stopped working correctly. *Id.* at p. 51:4-11. While Mr. Cornelison may be able to testify that the price for that scope of work is fair, he could

8
Case 1:24-cv-00029-CHS    Document 28    Filed 07/22/25    Page 8 of 14    PageID #: 328

not offer opinions as to the cause of the damage or whether Airgas should be responsible for such repair.

Similarly, with respect to the A. Barnes Fence invoice, Mr. Cornelison did not know where on the Property a fence repair was made, or when the fence was damaged, or even if it was damaged before the date Airgas surrendered the Property. Mr. Cornelison only knew that some fence repair took place that was invoiced on November 7, 2023, some five months after Airgas surrendered the property. *Id.* at p. 47:15-48:3.

With respect to the invoice from Oasis Heating & Air, Mr. Cornelison could not remember which building on which the HVAC work was performed, but acknowledged that it took place on July 29, 2024, more than a year after Airgas surrendered the Property, and acknowledged that the scope of work (cleaning the coils, replacing a stopped-up drain line, and adding more refrigerant) was work that would periodically need to be performed to maintain the HVAC system, not work caused by a Tenant's occupancy. *Id.* at pp. 49:7-50:8.

In summary, though he offers the conclusory opinion that the four invoices paid by BWS are appropriate, Mr. Cornelison's deposition testimony revealed that he does not know the details of the work or what necessitated the work, and cannot offer any opinion as to the necessity of the invoices from Access Garage Doors, A. Barnes Fence, or Oasis Heating & Air. He had no explanation for why two of the invoices were incurred many months after Airgas vacated the Property, and could not explain when the alleged damage occurred or differentiate why maintenance tasks more than a year after surrender were somehow the responsibility of Airgas. In short, his testimony as to those landlord-funded expenses is little "more than subjective belief or unsupported speculation." *Tamraz*, 620 F.3d at 670. Accordingly, Mr. Cornelison's testimony

about invoiced amounts from Access Garage Doors, A. Barnes Fence, and Oasis Heating & Air should be excluded.

2. **Mr. Cornelison's testimony regarding the scope of work budgeted by T.U. Parks Construction lacks basis because he never reviewed the underlying bids or quotes, did not talk to T.U. Parks Constructions about the bids or quotes, and many of the line items had no supporting documentation or data.**

Mr. Cornelison admitted that he only reviewed the two pages of budgets produced by BWS from T.U. Parks Construction Co. Cornelison Depo. pp. 54:22-55:5. While he did have a brief conversation with Arch Willingham about what additional scopes of work were <u>not</u> included in the Parks Construction budgets, Mr. Cornelison did not gather any further information from Mr. Willingham in that phone conversation. *Id*. at pp. 57:16-58:6. He did not talk to anyone else at T.U. Parks. Mr. Cornelison could not remember if he reviewed bids or quotes supporting the various line items in the Parks Construction budgets. *Id*. at pp. 98:23-99:24. Consequently, though he has sought to offer opinions about the reasonableness of the pricing, he lacks the basic underlying information that would determine whether any particular line item is a fair price. During his deposition, Mr. Cornelison was handed invoices from multiple trades that provided quotes or bids to Parks Construction for work on the Property, including Triad Electrical Contractors, Stolpmann Plumbing, Weeks Paving, Walker Interiors, Pro-Coat, Inc. *Id*. at pp. 157:12-159:18. As to each underlying bid or quote, Mr. Cornelison admitted that he could not say whether he had ever seen it before, and consequently, he had no opinions on them. Necessarily, that lack of knowledge also means that his opinions regarding those line items lack a factual basis for foundation, and should be excluded.

Similarly, there were many line items in the Parks Construction budgets that lacked any documentation, whether due to a general "allowance" indication or simply due to a lack of documentation. Line items in the Parks Construction budgets that lacked any supporting documentation included miscellaneous carpentry work, doors, garage doors, epoxy flooring, masonry, storefront windows, or painting of Building 4. And yet, in his report, Mr. Cornelison attempts to opine that the prices of such line items are reasonable, without knowing what materials or scope of work are actually involved for those line items. His testimony amounts to an "*ipse dixit* [because I said so] of the expert" on which the Supreme Court has said a trial court may not rely. *Gen. Elec. Co. v. Joiner*, 522 U.S. at 146. Consequently, his opinions are not based on reliable information or data and should be excluded.

3. **Mr. Cornelison's opinions regarding increased construction costs are based on unidentified and unreliable information.**

Mr. Cornelison's testimony that the T.U. Parks Construction scope of work should be increased by $103,709.36 represents one of the single largest components of BWS' claims, and yet it is based on an unidentified and unproduced article or blog post by an unidentified contractor who did not even work in the Chattanooga area. That $103,709.36 was based on an alleged 9.7% increase in construction costs between June 2023 and May 2025. During his deposition, Mr. Cornelison testified:

> Q Are there specific reports or articles that constructiondive.com has or particular web pages that you consulted in order to come up with this annualized increase of 9.7 percent?
>
> A Yes, sir.
>
> Q And what were those?
>
> A It was their article based on commercial construction cost increases.

11
Case 1:24-cv-00029-CHS    Document 28    Filed 07/22/25    Page 11 of 14    PageID #: 331

Q Who was the author of that article?

A I couldn't recall.

Q Was there an author?

A I'm pretty sure there is.

Q And where is that author based out of, do you know?

A I couldn't tell you.

Q Do you know if that author was based out of the greater Chattanooga area?

A It's not Chattanooga that I can recall.

Q Okay. Do you know where or in what market that author was operating?

A I do not know, but the article was in general for the entire area of the U.S.

Q Do you know what the author's qualifications were? Like, was this a general contractor, for example?

A I didn't look up his CV. I have no idea.

Cornelison Depo. pp. 150:18-151:20. In summary, Mr. Cornelison is repeating a number he read on the internet by a person he cannot identify who works in a market other than Chattanooga and whose qualifications are unknown. This is nearly a textbook example of opinions that are not sufficiently reliable to be permitted to go before a trier of fact.

To determine whether an expert is sufficiently reliable to testify, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *See United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (quoting *Daubert*, 509 U.S. at 592-93). In this case, Mr. Cornelison's opinions about purported increase in construction costs lacks any verifiable basis and should be excluded in its entirety.

**4. Mr. Cornelison's opinions about additional scopes of work are unsupported by any showing the necessity for the work or that such work occurred during the Lease period or was caused by Airgas.**

The additional scopes of work for which Mr. Cornelison provides pricing involve additional drywall, ceiling, concrete, gutters, downspouts, and metal siding. However, Mr. Cornelison's report and testimony do not include any opinions about the reasons why any of the additional scopes of work might be necessary. The Cornelison Report does not identify when any particular repairs became necessary, whether the scopes of work were caused by any particular party, or whether they are caused by any alleged breach of the Lease agreement between BWS and Airgas. Indeed, according to his testimony, Mr. Cornelison does not have knowledge of those facts. He did not get that information from Arch Willingham of T.U. Parks Construction Co., and he only visited the Property one time, in April 2025. On that occasion, he admitted that he did not take a single photograph or measurement. Cornelison Depo. pp. 77:20-22; 92:7-9. He did not know about previous uses of the Property by prior occupiers or tenants. *Id*. at pp. 84:22-85:15; 185:18-21.

## CONCLUSION

The scope of Mr. Cornelison's testimony is admittedly very narrow and only extends to pricing, and Airgas seeks an order excluding any testimony from him beyond the pricing for the indicated scopes of work. However, even in the narrow area of pricing, Mr. Cornelison's testimony in his deposition revealed that his opinions about landlord-funded expenses (other than Scene Breezeway), the budget items from T.U. Parks Construction Co., increases in costs due to undocumented inflation, and additional scopes of work are utterly without reliable basis. Mr. Cornelison's deposition testimony demonstrated that those areas of proffered testimony are mere

13

Case 1:24-cv-00029-CHS    Document 28    Filed 07/22/25    Page 13 of 14    PageID #: 333

"subjective belief or unsupported speculation." *Tamraz* 620 F.3d at 670. Accordingly, all of Mr. Cornelison's opinions in those categories should be excluded under existing Supreme Court and Sixth Circuit case law.

Respectfully submitted,

LEWIS THOMASON, P.C.

By: /s/ *Peter C. Robison*
Mary Beth White, BPR #24462
Peter C. Robison, BPR #27498
424 Church Street, Suite 2500
P.O. Box 198615
Nashville, TN 37219
(615) 259-1366
mbwhite@lewisthomason.com
probison@lewisthomason.com

*Attorneys for Defendant Airgas USA, LLC*

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing DEFENDANT AIRGAS USA, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF NICHOLAS CORNELISON has been served on the following counsel of record via email and through the Court's electronic filing system:

Lynzi J. Archibald, Esq.
Jessica M. Wolinsky, Esq.
Miller & Martin PLLC
832 Georgia Avenue, Suite 1200
Chattanooga, TN 37402
lynzi.archibald@millermartin.com
jessica.wolinsky@millermartin.com

This the 22nd day of July 2025.

/s/ *Peter C. Robison*