IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNNESSEE AT CHATTANOOGA

---

| | | |
|---|---|---|
| BWS PROPERTIES, LLC, | : | |
| | : | |
| | : | NO. 1:24-CV-29-KAC-CHS |
| Plaintiff, | : | |
| | : | JUDGE KATHERINE A. |
| -vs- | : | CRYTZER |
| | : | |
| AIRGAS USA, LLC, | : | MAGISTRATE JUDGE |
| | : | CHRISTOPHER H. STEGER |
| | : | |
| Defendant. | : | JURY DEMAND |

---

THE 30(b)(6) DEPOSITION OF
BWS PROPERTIES, LLC
By and Through: Jennifer Nevans
April 7, 2025

---

Whitney A. Vaughn, TN LCR# 418
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

INDEX OF EXAMINATION


Page

Examination By Mr. Robison............... 7


INDEX OF EXHIBITS


1 Notice of Deposition of Rule ......... 11
30(b)(6) Corporate Representative of Plaintiff BWS Properties, LLC

2 Lease between BWS Properties, LLC .... 21
and Airgas South, Inc.

3 First Amendment to Lease.............. 29

4 Industrial Building Lease............. 34

5 Addendum to Lease..................... 34

6 Industrial Building Lease............. 41

7 Letter dated 2/6/23 to Ms. Nevans .... 57
from Colin Donato

8 Email Re: Lease Renewal dated 2/7/23 . 58
from Ms. Nevans to Dawn

9 Letter dated 5/31/23 to Ms. Nevans ... 69
from Peter Van Slyke

10 Complaint............................. 69

11 Invoice 178, dated 5/31/23............ 84




Case 1:24-cv-00029-CHS Document 29-1 Filed 07/22/25 Page 2 of 28 PageID #: 339

INDEX OF EXHIBITS (CONTINUED)


| | | Page |
|---|---|---|
| 12 | Invoice 181, dated 1/3/24............. | 91 |
| 13 | Text Messages with Peter Van Slyke.... | 95 |
| 14 | Photographs........................... | 115 |
| 15 | Weeks Paving Quote.................... | 116 |
| 16 | Weeks Paving Pricing.................. | 116 |
| 17 | Photographs........................... | 137 |
| 18 | T.U. Parks Construction Co., ......... Preliminary Budget Breakdown | 192 |
| 19 | Plaintiff BWS Properties, LLC's ...... Initial Disclosures | 214 |
| 20 | Plaintiff's Answers to Defendant's ... First Interrogatories | 215 |
| 21 | Plaintiff's Answers to Defendant's ... First Requests for Production | 215 |
| 22 | Plaintiff's Supplemental Answers to .. Defendant's First Interrogatories | 216 |
| 23 | Plaintiff's Supplemental Responses ... to Defendant's First Requests for Production | 216 |
| 24 | Photographs........................... | 222 |

INDEX OF EXHIBITS (CONTINUED)

Page

25 LoopNet Advertisement..................227

26 LoopNet Advertisement..................227

27 Email dated 6/2/23 from Jennifer .....231
Nevans to Dawn

28 Email dated 10/9/23 from Dawn Van ....232
Dyke to Jennifer Nevans

**told us that you have been pretty exclusively doing the management of BWS Properties; is that right?**

A Correct.

**Q How long have you done that work?**

A I started in 1997.

**Q And it might make sense to go back a little bit in time. What was the original use of the property at 700 Manufacturers Road here in Chattanooga?**

A The original use?

**Q The original use.**

A Welding distribution of gases and parts, welders, welding supply. Brooks Welding Supply.

**Q Okay. And you can tell that I'm trying not to suggest it or testify for you. That was going to be my next question, what company was running it, and you went ahead and told me already?**

A Brooks Welding Supply.

**Q And was that -- I don't know if it's correct to call it your father's company of a family company, but was that a family business that your family had been involved in?**

A Yes. My grandfather started it.

**Q And what occurred that led you to**

**property, was it a purchase? How did Brooks Welding Supply relate to BOC, if that question makes any sense?**

A Can you clarify?

**Q Sure. Yeah. Your puzzled expression -- yeah. So did BOC purchase Brooks Welding Supply?**

A Correct. The business.

**Q The business. And did it purchase some of its assets and equipment as well?**

A Yes.

**Q Okay. Were some employees kept on and continued to work for BOC?**

A Yes.

**Q I've become aware during the course of this litigation of at least one employee who continues to work at the successor entity Airgas, Mr. Tracy -- and you --**

A Harvey.

**Q Harvey. Thank you. It was my understanding that he worked for your father's company, before he worked at BOC, before he worked at Airgas?**

A Correct.

**Q So that gentleman has about 40 years**

**buildings, but if there is something that you need to tell me about Building 3 at any point, I don't want to gloss over it. I'm not trying to ignore it. It was just my understanding there is not a set of damages or repairs that has been pointed out in this lawsuit.**

A Correct.

**Q Okay. We've talked a little bit about the history of the building. At what point did you first have interactions with anybody from Airgas?**

A 2005.

**Q And is 2005 around the time that you understand Airgas to have bought or taken over operations from BOC?**

A Correct. I got a letter from BOC that I produced.

**Q Is -- strike that.**

**In 2005, BOC had been a tenant for a number of years at that point; is that fair?**

A Yes.

**Q Okay. And was there a lease between BWS Properties and BOC?**

A Correct.

**Q In 2005, was it the end of the lease or was there still some time left on the lease?**

**and you told me as much, so that's okay. So this is the first lease that you're aware of between BWS and Airgas?**

A Correct.

**Q I've handed you another document. And the title I see at the top of this page is First Amendment to Lease. Do you see that?**

A Yes.

**Q Okay. And if I'm reading it right, it was signed in September of 2010, and it looks like it extends the lease until 2013. Did I describe that correctly?**

A Correct.

**Q What led to the signing or the creation and execution of this First Amendment to the Lease?**

MS. WOLINSKY: I'm going to object to that one because that's going to get into attorney-client privilege.

BY MR. ROBISON:

**Q Yeah. So I can clarify and say without getting into anything that you told your attorney or that your attorney told you, what circumstances led to the first amendment lease being created and signed?**

A It's just their regular renewal period. They had it for five years and this is their option to renew for an additional three, according to the lease.

**Q And you went back and looked at the document we've identified as Exhibit 2, and I think you knew what to look for. There is an option to renew for a number of years; is that correct?**

A 2-B.

**Q And this First Amendment to Lease, is that when that option was exercised?**

A Correct.

**Q Okay. And --**

A It was actually, in accordance, ninety days earlier.

**Q And is this --**

A September, October, November.

**Q And does this document basically memorialize that or --**

A Yes.

**Q I have to ask. Since it's in the document, it's kind of funny. At the bottom there is some fine print and there is a Brett Cohen identified in the file path. Who is Brett Cohen, if you know?**

A He -- I don't know his title, but I do

it will make most sense to mark that as the next numbered exhibit, 4, and then the addendum to the lease Exhibit 5. And then we'll mark that before I ask you any more questions.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 4.)

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 5.)

THE WITNESS: I admit this is confusing.

BY MR. ROBISON:

**Q Well, it's less confusing now that you are explaining it out to me and I know the order in which things were signed. Let me ask you this. It looks like the effective date and the signing date on Exhibit 4, the Industrial Building Lease, is around November 1st of 2013; is that right to your knowledge?**

A Did you say November 1st?

**Q Yes.**

A That is when this lease would be effective, yes.

**Q Do you know when this lease was signed**

A Correct. They did.

**Q And was there a period of extendable years and an option to renew that they exercised?**

A Correct.

**Q And so at what point did Airgas finish up this lease including the additional optional years?**

A What do you mean with "this lease"?

**Q Thank you for the clarification addition. The 2013 lease, Exhibit 4.**

A What was the question again?

**Q Sure. Let me ask you again because we might not have been looking at the same document at the time. So looking at Exhibit 4, did Airgas stay in the property during the entire time period envisioned in this lease?**

A Yes. They completed their five years and exercised their option to renew for an additional three, and then they started a holdover tenancy.

**Q The optional years, did they -- I'm asking you to sort of check my math. Did they end around 2020 or 2021?**

A 2021, if I'm not mistaken. I think -- '21.

**Q Okay. I'm just doing the math in my**

MS. WOLINSKY: Object to form.

BY MR. ROBISON:

**Q Perhaps it's an inartful question, so let me ask it again. I see that the loading lot is included under the building section of 1.4 in Exhibit 6. Do you see that?**

A Yes.

**Q Okay. Was the loading-lot square footage treated as if it were square footage for a building?**

MS. WOLINSKY: Object based on privilege.

BY MR. ROBISON:

**Q And if you can answer -- not telling me, please, anything you said to your lawyers obviously -- whether you have an understanding as to whether the loading lot was included in building square footage.**

A I think that my purpose for that was to justify the fair market value of the property. And before where I had described the square footage in buildings, it was very easy for me as a property manager to do comps to find out what retail space is, what warehouse space is, but there is no comps for what a loading lot is for what they were doing to the

parking lot.

But because we described that it was their maintenance for the parking lot, loading lot, whatever you want to call it, I wanted to include that to justify the fair market value.

**Q If you look through Exhibit 6, there is some additional highlighting. And you can just take a moment and flip through.**

A Okay. Okay.

**Q Do you know who provided the highlighting in this document?**

A Myself.

**Q We're going to return to Exhibit 6 in a little bit. Before we do, I want to kind of finish up our timeline with lease-related documents. You've told me about a second lease that we haven't looked at yet.**

MS. WOLINSKY: Object to form.

BY MR. ROBISON:

**Q Thank you. You've told me about a second addendum that we haven't talked about yet. And you've described it, but we don't have it in front of us, right?**

A Correct.

**Q And this lease that's Exhibit 6 had a**

**Q That was going to be my next question. It says at the top hand-delivered. And let me just tell you, it's my understanding that this was handed to you on the last day of that tenancy term of --**

A Correct.

**Q Okay. I think there is a number of events around that time period. And I want to ask you about a lot of them, but I wanted to confirm that this was something that you received on May 31st or around that date. Is that still accurate?**

A It was on May 31st when I met with Peter to do the walkthrough.

**Q And you described this in BWS's responses to some of our written questions, our interrogatories in this case. And I may make those an exhibit here in a moment, too, but because this came up first, tell me about that meeting, if you would, and what he said to you as it relates to this letter.**

A Well, first of all, just walking through the letter, it says the delivery of the leased premises. The tenant is surrendering the leased premises in accordance with paragraph 20 of the lease. You'll also see paragraph 20 of the lease was what they agreed to do.

A Okay.

**Q And I'm going to start it over because it's important, and I don't want you to answer the wrong question.**

A Sure.

**Q It will get both of us in trouble. Did BWS, and presumably through you, coordinate with Airgas to give access to the property for the gas company to come in and make a change to the gas meter?**

A No.

**Q What do you recall about gas service to the property after May 31st of 2023?**

A I did not even think of the gas, and neither did anyone else until winter came. And that's when I was contacted by Peter Van Slyke to -- he asked if I would coordinate with the gas company. Airgas had no coordination with that. He just requested that I take care of it.

And so I sat down there for two days waiting for the gas people to come. And Airgas did not take that responsibility to coordinate with me so that they could sit down there for all day. I'm the one that had to sit down there all day to wait for the gas people.

**Q Did you ever propose or consider giving them keys to the gate so they could do the waiting?**

A Yes. I asked, yeah. Peter asked me to take care of it.

**Q You mentioned a lock on the gate. Was there a lock on the gate that was BWS property? What was the lock on the gate?**

A So all the truck drivers have a key to the lock on the gate. So Airgas took that lock with them to use at Access Road. So nobody -- they didn't have to redistribute keys to the gate. They just used the one from my gate and took it to theirs.

**Q Who originally purchased that lock?**

A I don't know.

**Q I heard you say a few moments ago that you didn't receive any keys from the property; is that right?**

A Correct.

**Q Did Peter Van Slyke not turn keys over to you on the 31st of May?**

A Not that I recall.

**Q Do you recall one way or the other?**

A If he gave me a key, it was to Building 1, but I don't think he did. And he

**do you have any memory or information about what keys were provided to you on the 31st of May in 2023?**

A No. There were none.

**Q Okay. I'm just trying to understand the possibly two responses you gave to me just now. Is it no, you don't recall, or that there were none?**

A I recall specifically getting a key to Building Number 2 from Steve Benton. I recall specifically getting a key to Building Number 3 from Bill Brooks. I recall I had a key to Building 1 already in my possession. I don't recall Peter giving me any keys on the 31st. However, it would have made sense that he left one on the counter when we left. So as for a set of keys to the property, I was not provided.

**Q Did you put new locks on the property after May 31st?**

A Yes.

**Q Did you ever have to unlock the property for Airgas to remove items or possessions as we referred to it earlier?**

A Yes.

**Q Tell me about that. When did you have to do that?**

A I opened up for the dumpster for the

**on, how was it that BWS would pay some taxes and Airgas would reimburse or otherwise pay those taxes? How did it work?**

A Just like I explained earlier. I did it on paper in the old days and emailed it and scanned it, but I would -- every November when it -- because our leases all expired in November. But every November -- or that's when they started it, I guess. But every November I -- as soon as I got an invoice -- well, usually taxes come out in October. But I always -- but I sent it in one bill.

And I do taxes and insurance; county, city, and insurance. I take a picture of the bill or scan the bill and scan where I paid it, and then I also write an invoice.

Now, on this particular -- are you specifically talking about this particular unpaid amount?

**Q Yes. The amount that BWS is seeking in this lawsuit.**

A On, I think it was June 1st, I sent an email to Dawn saying that I had met Peter and we had a lot of things to talk about. And I had included an invoice for the prorated because -- just the five months. Now, because the insurance renews in

November, there was seven months of insurance, five months of city taxes, and five months of county taxes.

**Q And did I hear you say that you sent that on or about June 1st?**

A It was right after I met with Peter. So I would say it's very close to June 1st, yes.

**Q Let me hand you a document.**

A Yes.

**Q Okay. So the question -- which you may have just already asked -- answered. The question is, is this the invoice that you would have sent on or about June 1st of 2023?**

A No.

**Q Okay. What is the document we're looking at then?**

A This is a new invoice that includes the entire taxes of the year due to the holdover tenancy.

**Q Let me hand you a different document. I got them out of order.**

A Okay.

**Q Okay. So the one that I have just handed you, what's the date in the top left corner?**

A 5/31.

**Q By May or June of 2023, had BWS actually paid the property taxes on the property yet?**

A No.

**Q And --**

A I would have paid those in November of '23.

**Q And in terms of insurance, had BWS paid insurance premiums monthly?**

A No.

**Q Okay. Did I hear you say earlier that that was paid in November usually?**

A Correct.

**Q Okay.**

A For the next year. Property taxes are billed for the last year. Insurance is billed for the next year. So the insurance has most definitely been paid. The taxes were not paid until a few months later.

**Q And you told me a little earlier about how insurance amounts were included in a monthly rent so it would split them in like 12 portions. Do you remember that conversation?**

A Correct.

**Q How did that work with this last lease, the 2022 to 2023 lease? Was there a portion**

**if I was wrong about something. You have the memory and that's why we ask you the questions.**

**At what point did BWS make the payment for insurance for 2022 to 2023?**

A November. And I'm pretty sure we produced those documents.

**Q And this invoice that we're looking at that's Exhibit 11, did you tell me that you would have emailed this to them? How would you have sent it to the representative at Airgas?**

A Email.

**Q Email. And which person would you have sent it to?**

A Dawn Van Dyke.

**Q And was there anything else included in that email in an attachment?**

A On 5/31?

**Q On or about May 31st.**

A I don't recall.

**Q Okay. At some point did BWS send Airgas proof of payment of the insurance premiums or of the property taxes?**

A I did send them receipt of the insurance, but not the property taxes.

**Q And when did you send that receipt for**

**the insurance?**

A November of '22 when I paid it.

**Q Do you know if you provided that to your lawyers to provide to us in discovery?**

A I think so. I mean, I don't know what my lawyers provided. I don't think they provided everything I gave them.

**Q And --**

A But I did give them that. They --

**Q Okay. Because I don't get to find out about your communications with your lawyers, and I shouldn't, I'm just asking what you had provided them. I can leave it at that.**

**We did look at this other invoice that looked very similar. And I handed it to you first, but it's a later date and time. Can you go ahead and tell me what that was about?**

A Yes. Because there had been no remedy to the default specifically of the '22 lease, Exhibit 6, I reissued this invoice to reflect a full year.

**Q I'm going to look at the three line items on that invoice dated January 3rd of 2024.**

A Uh-huh.

**Q There is a reimbursement for insurance**

**from November of 2022 to December of 2023. And it's now $21,806.89; is that correct?**

A Yes.

**Q Does that include payments made for a calendar year by BWS in November of 2022 and again in November of 2023?**

A Could you repeat that one more time?

**Q Sure. Does that amount that I read include the payments made for a calendar year of insurance coverage that BWS paid in 2022 --**

A Correct.

**Q -- and in 2023?**

A Yes.

**Q Okay. Essentially two years worth of payments?**

A No, no. That's one year. 11/22 to 12/23 is one year.

**Q Okay. And the second line item, Hamilton County property tax --**

A Yes.

**Q -- is that for two calendar years?**

A No.

**Q Okay. What time period -- it just says 2023. What time period?**

A For the entire year.

**Q Okay. And so rather than a prorated five months, it's the 12-month period?**

A Correct.

**Q Okay. And then for Chattanooga city property tax, again, a 12-month period rather than a five-month prorated?**

A Correct. If you look over exactly what we're looking at on what we just looked at under monthly holdover, line 26, Airgas holdover tenancy shall therefore terminate on January 5th. And so that -- that's why I just went to the calendar year. And that's why I went to December on the insurance.

**Q So when you point at a document, I want to identify for the record what it is. We were looking at the complaint, which is Exhibit 10.**

A Correct.

**Q And what paragraph number are you in?**

A Line 26 on page 4.

**Q Okay. And just to -- because it's short, I'll just state it for the record. Line 26, paragraph 26 of the complaint states: Airgas's holdover tenancy shall therefore terminate on January 5th, 2024.**

A Correct. That's why on Invoice 181 -- we have not named it an exhibit yet, but that's why I

**said no, I would have been truly confused. Okay. Anything else we need to note in this or the following picture about the rear of Building 1?**

A The only thing that I see that bothers me or comes to mind at all is you can see that there is a window unit there that was taken in the move-out. They left a big hole there.

**Q Is that window unit to the right of the left side roll-up door?**

A Correct.

**Q In one of these photographs you can see an additional door to the left of the roll-up door.**

A Correct.

**Q Do you know if that door was functioning in spring of 2023?**

A Unfortunately, I did not do any kind of walkthrough between the holdover tenancy and the new lease. I did a walk-around. I met with the vice president. We walked around, but we did not -- we walked around the parking area and the paved lot and that, but -- and we were in the showroom. I -- I have been in the showroom, you know, several times to pick up some helium or some gloves or that, but I never go outside of that room.

And when I met with Clay Maverick (sic) -- I say his name wrong. I can't say it right. But we were outside the majority of the time, but that's the closest thing I came to a walkthrough or a walk-around. And I did not check the functionality of any of their doors other than the front door I walked in.

**Q Okay. You mentioned the vice president. Is that Clay?**

A Yes. Merrick.

**Q I was going to ask if it was Clay Merrick.**

A Yes.

**Q I think it might be spelled M-E-R-R-I-C-K.**

A Yes. For some reason, my dyslexia, you know...

**Q Okay. So we're looking at the rear of Building 1 in those photographs. The next one that I see I believe is Building 2 or the repair shop. Can you tell me if I'm wrong?**

A That is correct. That is Building 2, the repair shop.

**Q What kind of a roof does this building have?**

**Q What are we looking at in photograph BWS 98 and where is it in which building?**

A This is right outside the bathroom we just looked at. And it is a parts washing sink, and it runs constantly with no shutoff valve.

**Q Does it still run if water --**

A Yes.

**Q -- service was --**

A If water service was to it, yes, it would.

**Q Before I ask you about the photograph at BWS 99, the previous photographs that we have been looking at, who took those photographs?**

A If they are the ones I produced, I took them, but I know that there is a set during our walkthrough. I didn't take very many pictures because Peter said he would take care of it and submit those, you know, to Airgas.

So, like, Peter and I both were disgusted. And when he handed me that letter, he was like, yeah, I'm not signing it. I don't think you ought to either, because it's totally -- this is trashed and we're going to take care of it. And I'll take pictures to get it all, you know, taken care of.

**Q We mentioned that a little bit**

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :

COUNTY OF HAMILTON :

I, Whitney A. Vaughn, Court Reporter and Notary Public, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. BWS PROPERTIES, LLC, By and Through Jennifer Nevans, was duly sworn by me; that pages 1 to 238, inclusive, were reduced to typewriting under my direction and supervision, and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This is the 22nd day of April, 2025.

NDTCA - Signed Electronic Transcript

Whitney Vaughn

________________________________

Whitney Vaughn, TN LCR #418

Court Reporter and Notary Public

My Commission Expires 12/23/28