IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| BWS PROPERTIES, LLC, ) | NO. 1:24-CV-29-KAC-CHS |
| ) | |
| Plaintiff, ) | JUDGE KATHERINE A. CRYTZER |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| AIRGAS USA, LLC, ) | CHRISTOPHER H. STEGER |
| ) | |
| Defendant. ) | JURY DEMAND |

## DEFENDANT AIRGAS USA, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Airgas USA, LLC ("Defendant" or "Airgas"), pursuant to Fed. R. Civ. P. 56(c), hereby files this Memorandum of Law in Support of its Motion for Partial Summary Judgment as claims asserted by Plaintiff BWS Properties, LLC ("Plaintiff" or "BWS") for holdover tenancy, unpaid property taxes, damages to property prior to the final lease period, and damages not proven by expert proof.

## FACTS AND PROCEDURAL HISTORY

This dispute involves real property located at 700 Manufacturers Road in Chattanooga, Tennessee (the "Property"). Plaintiff BWS has owned the Property for many years, and it was formerly the location of Brooks Welding Supply, a family business run by the father of the four owners of BWS. Exhibit A, Deposition of Jennifer Nevans ("Nevans Depo.") p. 13:20-24; Exhibit B, Deposition of Tracy Harvey ("Harvey Depo.") p. 13:6-8. In 1997, Brooks Welding Supply was acquired by British Oxygen Company ("BOC"), and thereafter BOC operated at the Property, selling and repairing welding equipment and selling bulk and tank gases. Nevans Depo. pp. 13:12-14; 15:6-8.

In 2005, BOC was bought by Defendant Airgas. *Id*. at p. 20:8-16. In November of that same year, Airgas signed a lease with BWS for the use of the Property, which initially ran until 2010, but was later amended to run until October 31, 2013. *Id*. at p. 25:5-12. BWS and Airgas entered into another lease on November 1, 2013 (which was thereafter amended on November 19, 2018), for a period of five years, with an option to renew an additional three years. *Id*. at pp. 26:1-4; 34:16-24. Airgas exercised its option to renew until October 31, 2021. All of these leases were drafted by counsel for BWS. *Id*. at p. 15:13-17.

In 2021, BWS presented Airgas with a new lease that included 18,000 square feet of the exterior parking area as a "Loading Lot" that would be included in the calculation of the square footage of the buildings, dramatically increasing the annual rent of the Property. *Id*. at pp. 54:14-55:5. Airgas attempted to negotiate the rent back down to the range of the previous leases, but BWS wanted a higher rate. *Id*. at pp. 54:14-55:5; Exhibit C, Deposition of Dawn Van Dyke ("Van Dyke Depo.") pp. 28-29:14-5. Airgas then asked for a six-month lease at the new higher rate, to which BWS refused. Van Dyke Depo. pp. 30-31:22-4. During the negotiations, Airgas continued to occupy the Property as a holdover tenant, paying rent at a rate of 200% of the 2021 rent. Nevans Depo. p. 40:14-24. Eventually, BWS and Airgas entered into a final "Industrial Building Lease" with a Commencement Date of June 1, 2022, and a one-year term running from June 1, 2022, until May 31, 2023 (the "Lease"). A copy of the Lease document is attached to the Motion for Summary Judgment as Exhibit D.

Relevant to this action, the Lease contained the following terms:

- The Lease would automatically renew unless the tenant, Airgas, gave BWS notice of its election not to renew at least 90 days before the end of the Lease. Lease § 1.10.

- BWS was to pay all real estate taxes and assessments related to the Property, and Airgas was to reimburse BWS the real estate taxes "upon receipt from Landlord of marked 'paid' bills for Taxes or other prof of payment [] within fifteen (15) days of receipt of the same[.]" Lease §§ 3.3.1 and 3.3.2.

- Airgas was to "preserve in good working order (subject to normal and customary wear and tear and damage by casualty) and maintain and perform all repairs and maintenance to the Premises and the fixtures and appurtenances therein, including, but not limited to, the Premises' Mechanical Systems and the striping, paving and replacement of the driveways and parking lot serving the Premises; (b) maintain all doors and windows, including the replacement of glass, of the Building; (c) keep the Premises in a clean, safe and sanitary condition, including but not limited to providing its own janitorial service and garbage collection and including keeping the Premises free from any garbage and refuse; and (d) be responsible for keeping the grounds of the Premises reasonably mowed, trimmed, and free from overgrowth of vegetation." Lease § 6.2

- Under the lease, BWS had the duty to maintain and repair the foundation, flooring (excluding floor covering), interior and exterior load-bearing walls, the roof and roof structure, and "all other structural elements of the Building, including but not limited to the Premises' HVAC Systems." Lease § 6.1

- Under the Lease, Airgas was to repair or pay the cost of repairs of damage to the Property resulting from the installation and/or removal of Airgas's property Lease § 8.2.

- At the end of the Lease, Airgas was to "quit and surrender the Premises to Landlord [BWS] in as good of a condition as received by Tenant [Airgas] on the Commencement Date,

3
Case 1:24-cv-00029-CHS    Document 30    Filed 07/22/25    Page 3 of 14    PageID #: 411

except for ordinary wear and tear . . . [and] Tenant shall remove all of Tenant's Property therefrom. Lease § 20.

- The Lease superseded and completely replaced the prior lease that had existed between the parties since November 1, 2013, as well as the amendments dated November 19, 2018. Lease § 23.11.

On February 6, 2023, Airgas gave written notice to BWS that it would not renew the Lease, and that the Lease would terminate on May 31, 2023. Complaint ¶ 14; Exhibit E, Letter from Dawn Van Dyke of Airgas to Jennifer Nevans of BWS dated February 6, 2023. BWS, through its representative Jennifer Nevans, confirmed receipt of the notice to terminate the Lease on February 7, 2023. Exhibit F, Email from Jennifer Nevans to Dan Van Dyke dated February 7, 2023.

During May 2023, Airgas moved its operations out of the Property to another location. On May 31, 2023, Airgas District Manager Peter Van Slyke met with Jennifer Nevans of BWS, to surrender the Property and turn over keys to the Property. Exhibit G, First Deposition of Peter Van Slyke ("Van Slyke Depo. #1") p. 81:15-22. During their meeting, they walked through the Property and Ms. Nevans pointed out items BWS wanted Airgas to repair, while Mr. Van Slyke took photos of those areas. Nevans Depo. pp. 61:11-12; 151:11-18. Also on May 31, 2023, Ms. Nevans of BWS sent an invoice to Dawn Van Dyke of Airgas seeking five months of property taxes. Exhibit H, Email and Invoice dated May 31, 2023; Van Dyke Depo. p. 40:9-12; Nevans Depo. pp. 82-83:21-3. However, the invoice did not include proof of payment of property taxes, which were not due until later that year. Nevans Depo. p. 87:20-24. BWS had not actually paid taxes yet for the Property, and did not do so until November 2023. Id. at p. 85:1-9.

After May 31, 2023, BWS changed the locks on the Property, and Airgas had no way to enter the Property without the assistance of BWS. Id. at p. 78:16-22. When Airgas needed access

to the Property to discontinue natural gas service to the Property, it had to request access from Ms. Nevans of BWS to allow gas service to be shut off. *Id*. at pp. 75:12-76:5; Van Slyke Depo. #1 pp. 154-155:19-18; Exhibit I, Text messages between Jennifer Nevans and Peter Van Slyke.

BWS commenced this lawsuit on December 18, 2023, in Hamilton County Circuit Court, which action was removed to the U.S. District Court for the Eastern District of Tennessee. After BWS filed this lawsuit, it sent Airgas another invoice for real estate taxes and insurance, seeking payment for real estate taxes and insurance through January 5, 2024. Nevans Depo. pp. 88:14-90:12.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a motion for summary judgment, the court must consider all facts in the light most favorable to the nonmoving party and the nonmoving party should receive the benefits of every reasonable inference. *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 410 (6th Cir. 2024).

Applying motions for summary judgment to contracts, "[i]f a contract is in writing and its terms are clear and unambiguous, we ascertain the contract's meaning in accordance with the contract's plainly expressed intent." *Trs. of the Rion Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 490 (6th Cir. 2024) (quoting *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 562 (6th Cir. 2015). If the terms of the contract could be reasonably interpreted in two different fashions, then extrinsic evidence is allowed to ascertain the true meaning of the contract. *Rion Workers*, 115 F.4th at 490. However, when the terms of the contract are clear and there is no legal question at stake, summary judgment is proper. *Avantax Wealth Mgmt. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407 (6th Cir. 2024). In *Avantax*, the court evaluated whether a force

majeure clause was enforceable when COVID-19 frustrated the purpose of the contract. *Id.* at 415, 416. The Court held that since the contract was unambiguous and COVID-19 restrictions would frustrate the basis of the contract, then the lower court's granting of the motion for summary judgment should be granted. *Id.* at 420.

## LAW AND ARGUMENT

**1. Plaintiff's claims based on purported holdover tenancy and unpaid utilities for that period fail as a matter of law.**

In its Complaint, BWS has asserted that Airgas is liable to BWS for unpaid monthly holdover rent, which BWS alleges ran from June 1, 2023, until January 5, 2024. Complaint ¶¶ 23-28. Notably, this action was filed on December 18, 2023, before the fictitious holdover tenancy period ended.

When evaluating whether a defendant is a holdover tenant, the physical presence of the tenant on the premises, rather than the condition of the premises, is the focus. In *Brooks v. Networks of Chattanooga*, the Tennessee Court of Appeals analyzed a commercial "triple-net lease", finding that "remaining on the premises without immediately executing a new lease constituted a failure to surrender the premises and the holdover provision was triggered." 946 S.W.2d 321, 325 (Tenn. Ct. App. 1996). In that case, the court found that the holdover provision was clear and unambiguous in stating that the tenant "shall surrender the leased premises" at the end of the lease term. *Id*. When analyzing the surrender and holdover provisions of the lease, the court effectively distinguished the surrender obligation, the condition obligation, and the failure to surrender resulting in holdover as distinct obligations, despite their existence in the same section. *Id*. The court's analysis focused on whether defendants continued to occupy the property, using the phrase "remaining on the premises" to describe the conduct that triggers holdover liability. *Id.*

Accordingly, the condition requirement for surrender is treated as a separate obligation from the general surrender requirement for holdover purposes. The failure to make repairs is typically cured differently, with repair costs, not holdover rent. *See Doramus v. Rogers Grp., Inc.*, 2001 Tenn. App. LEXIS 127, at *52 (Tenn. Ct. App. Feb. 28, 2001) (holding "a tenant's promise to make repairs is enforceable by the landlord, who is entitled to damages").

While no Tennessee case directly addresses whether failure to make repairs constitutes a holdover, the Tenth Circuit Court of Appeals, applying Kansas law, has provided a highly relevant holding on this issue. In *Fairfax Portfolio, LLC v. Owens Corning Insulating Sys., LLC*, the court addressed a very similar factual scenario with similar lease terms; a defendant tenant vacated the property but failed to complete the required repairs. 509 F. App'x 822 (10th Cir. 2013). In that case, a commercial lease included a provision which required the lessee to surrender the property in good repair ("section 18") when the lease expired, and a subsequent paragraph contained a holdover provision. *Id.* at 827. The lessor attempted to use the proximity of the clauses to show that the holdover provision was triggered by the failure to surrender the property in the proper condition. *Id*.

The court in *Fairfax Portfolio* was "unconvinced." *Id*. Focusing on the "plain and ordinary meaning" of holdover, the court affirmed the trial court's holding that "the term 'holding over' in this section of the lease agreement refers to the failure to surrender property, not failure to make required repairs or failure to surrender in a particular condition." *Id.* The court commended the trial court's reasoning, affirming that, "it would defy common sense to read section 18 as triggering the holdover provision where a tenant has surrendered the property but makes certain repairs after the expiration of the lease." *Id.* at 829.

In the case at bar, it is undisputed that Airgas gave BWS notice of its intention to terminate the Lease on February 6, 2023. Exhibit E, Letter from Dawn Van Dyke of Airgas to Jennifer Nevans of BWS dated February 6, 2023. The stated basis for this claim is that "Airgas did not effectively surrender the Property in accordance with the Lease terms," so BWS argues that the tenancy continued under the Lease as a month-to-month holdover tenant." Complaint ¶ 23. However, it is undisputed that Airgas conducted no business operations at the Property after May 31, 2023; that representatives of Airgas and BWS did a final walk through; that Airgas turned keys over to Ms. Nevans of BWS; and that BWS changed the locks on the Property after May 31, 2023. After that date, Airgas did not have a key to the gate to enter the Property, and could only do so with the assistance of BWS. Nevans Depo. p. 78:16-22. When Airgas needed to allow the gas company to access the Property to turn off the natural gas service, Peter Van Slyke of Airgas had to contact Ms. Nevans to ask for her cooperation to allow the utility company to enter the Property, which she did. Nevans Depo. pp. 75:12-76:5; Van Slyke Depo. #1 pp. 154-155:19-18; Exhibit I, Text messages between Jennifer Nevans and Peter Van Slyke. These actions alone refute BWS' holdover tenancy claims.

BWS' holdover tenancy claims are also refuted by the allegations of the Complaint itself, which conceded that Airgas surrendered the Property to BWS and sought damages related to the condition of the property upon surrender. Complaint p. 2. If certain property items or trash remained on the Property after Airgas surrendered the Property to BWS, that would not create a holdover tenancy, particularly since Airgas had no access to the Property after May 31, 2025. Accordingly, BWS' claim for a holdover tenancy is unsupported by fact or law, and such claim should be dismissed with prejudice.

8
Case 1:24-cv-00029-CHS    Document 30    Filed 07/22/25    Page 8 of 14    PageID #: 416

Finally, Airgas would note that the Lease was drafted by counsel for BWS, and any ambiguity in the Lease should be construed against BWS as the drafter of the lease. *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 423 (6th Cir. 2008). To the extent that there exists any ambiguity as to whether a holdover tenancy existed, the terms of the Lease should be construed against BWS as the drafter and no holdover tenancy should be deemed to have existed.

Accordingly, for the reasons stated above, BWS' claim for holdover tenancy and unpaid rent monies or utilities due to the alleged holdover tenancy fails as a matter of law and should be dismissed. Similarly, all claims for unpaid utilities for the period of claimed holdover tenancy should also be dismissed.

### 2. BWS' claim for unpaid property taxes is barred by BWS' failure to provide Airgas with proof of payment prior to filing suit.

In its Complaint, BWS has sought "tax amounts due and owing under the lease," and alleged that Airgas failed to reimburse BWS for such tax amounts. Complaint ¶¶ 29-30. The payment of property and related taxes is governed by Sections 3.3.1 and 3.3.2 of the Lease, which state:

> **3.3. Taxes.**
>
> **3.3.1.** **Landlord's Obligation to Pay Taxes**. Landlord shall promptly pay all real estate taxes, assessments, and charges due and payable relating to the Premises ("Taxes") throughout the Term, subject to the respective rights to challenge Taxes as herein provided. "Taxes" shall be defined as real estate taxes, assessments, sewer rents, rates and charges, transit taxes, taxes based upon receipt of rent, and any other federal, state or local government charge, general, special, ordinary or extraordinary, which are levied or assessed or become a lien against the Premises or any portion thereof, and are payable in any calendar year during the Term and any tax in substitution of any of the foregoing. With respect to real estate taxes, "Taxes" shall be defined as those real estate taxes that are assessed against the Premises, or any portion thereof, for the calendar year to which they are applicable without regards to when they are due and payable.

9

Case 1:24-cv-00029-CHS    Document 30    Filed 07/22/25    Page 9 of 14    PageID #: 417

Notwithstanding anything herein to the contrary, Taxes shall not include any franchise, capital, stock, transfer, inheritance or income tax, late payment charges, interest and penalties imposed on Landlord. Taxes shall also include any personal property taxes (attributable to the year in which paid) imposed upon the furniture, fixtures, machinery, equipment, apparatus, systems and appurtenances of Landlord at the Premises to the extent used in connection with the operation of the Premises. In no event shall Tenant be responsible or be required to pay or contribute to the payment of any Taxes applicable to the period prior to the Commencement Date or after the Termination Date.

**3.3.2. Tenant's Obligation to Reimburse for Taxes.** During each Operating Year of the Term, Tenant shall reimburse to Landlord as Additional Rent, <u>upon receipt from Landlord of marked "paid" bills for Taxes or other proof of payment</u>, and within fifteen (15) days of receipt of same, the amount of such Taxes actually paid in that Operating Year. Tenant's liability for reimbursement shall be prorated if the Term expires or terminates prior to the end of the period for which such Taxes are assessed. In the event that the Premises incur any Taxes during the Term, whether special assessments or otherwise, which are payable in installments, calculation of Tenant's liability for such Taxes shall be limited to those Taxes due and payable during the course of the Term. During the Term, Landlord shall, upon receipt of any tax bills for any Taxes due and payable during the Term, promptly deliver a copy of said bills to Tenant. In the event Tenant elects to challenge any Taxes assessed as provided below, Tenant's liability for reimbursement to Landlord for Taxes shall abate until Taxes are required to be paid by the assessing authority. In the event Tenant does not reimburse Landlord within such fifteen (15) day period set forth herein, Tenant shall pay a late fee of Five Hundred and No/100 Dollars ($500.00) and any outstanding reimbursement shall accrue interest at the highest rate allowed by law.

<u>Exhibit D</u>, Lease §§ 3.3.1 and 3.3.2 (emphasis added).

Notably, the obligation of Airgas to reimburse BWS for real estate taxes was triggered only "upon receipt from Landlord of marked 'paid' bills for Taxes or other proof of payment." Lease § 3.3.2. However, BWS did not receive or pay the applicable real estate taxes for the Property when it sent an invoice to Airgas on May 31, 2023. Nevans Depo. p. 87:15-24. BWS did not even pay the real estate taxes until November 2023. *Id.* at p. 85:1-9. Consequently, in May 2023, BWS had no proof of payment to present to Airgas to trigger any obligation by Airgas to reimburse BWS for real estate taxes. BWS has admitted it did not send Airgas documentation of having paid real estate taxes until January 3, 2024, shortly after it paid those taxes and <u>after</u> the date this lawsuit

was already filed. *Id*. at pp. 88:22-90:12. Accordingly, BWS' claim for unpaid real estate tax reimbursement fails as a matter of law.

### 3. Airgas is not responsible for damages to the Property prior to the final lease period.

BWS has alleged contractual damages related to the condition of the Property at the time of surrender. Complaint pp. 2-3. Under the Lease, BWS had an obligation to maintain structural elements, the roof structure, and the HVAC systems, and Airgas was to "preserve [the rest of the premises] in good working order (<u>subject to normal and customary wear and tear</u> and damage by casualty)[.] Lease §§ 6.1 (emphasis added), 6.2. At the end of the Lease, Airgas was to "quit and surrender the Premises to Landlord [BWS] <u>in as good of a condition as received by Tenant [Airgas] on the Commencement Date, except for ordinary wear and tear</u>[.]" Lease § 20 (emphasis added). The Commencement Date of the Lease was June 1, 2022. Thus, in order to prove damages related to the condition of the Property at the time of surrender, BWS must show both that the condition of the Property was worse than it was on June 1, 2022, and that the condition was not simply the result of ordinary wear and tear. These allegations require expert proof in all but the most obvious instances of damage where a clear before-and-after photograph can establish the date of the damages. *See J&S Welding, Inc. v. Liberty Mut. Ins. Co.*, 693 F. Supp. 3d 823, 835 (6th Cir. 2023). No such evidence has been presented by BWS or its expert in this dispute.

The Property was occupied by three different companies—Brooks Welding Supply, BOC, and Airgas—over a period of many years, and the testimony in this case has revealed that many of the damages complained of occurred many years or even decades before the Commencement Date. *See*, *e.g.*, Harvey Depo. pp. 27:24-28:7 (roll-up doors); 35:22-36:5 (metal siding); 38:10-16 (windows); 75:6-76:6 (warehouse heater); 78:5-24 (bay door). BWS did not do a walkthrough prior to the Commencement Date of the Lease or document the condition of the Property as of the

Commencement Date. Nevans Depo. pp. 129:17-130:7. BWS has not produced any photographs or similar documentation of the condition of the Property prior to the Commencement Date.

To the extent that BWS may attempt to argue that Airgas has some responsibility to BWS under any prior lease, such claims are barred by the language the Lease that counsel for BWS drafted. The Lease superseded and completely replaced any prior lease that had existed between the parties. Lease § 23.11. Thus, BWS cannot use a prior lease to assert claims for damages that occurred prior to the Commencement Date of the Lease.

Airgas has conceded limited damage to some of the drywall in the office area of the main building on the Property that occurred when desks/counters or shelving were removed when Airgas vacated the Premises. However, there is no other proof that any other damages occurred after the Commencement Date of the Lease. Accordingly, all claims for damages beyond the limited repairs to drywall lack any factual basis or supporting expert opinions, and fail as a matter of law.

**4. BWS cannot recover damages not proven by expert proof.**

BWS has alleged that Airgas should pay for repairs to the Property and seeks a judgment against Airgas for the amounts that BWS claims it would cost to perform certain scopes of work. In support of those claims, BWS has produced the expert report of Mr. Nic Cornelison. However, Mr. Cornelison has freely acknowledged that his opinions only extend to the cost to perform those scopes of work, and that he has no opinions about what party caused any particular damage, when the damages was caused, or who should pay for it.

> Q So as I understand it with your opinions, you have told us what it's going to cost to perform this work; is that fair?
>
> A That is fair.
>
> Q. And with respect to the Parks Construction amounts, you have told us in your -- it's your opinion that those are fair amounts to do that scope of work?

> A That is correct.
>
> Q And as I understand it, you're not giving us an opinion about who caused the damage or when it was caused or what specific incident caused the damage; you're just talking about what it's going to take to fix it?
>
> A That is correct.
>
> Q Have you offered any opinion as to who needs to pay for that amount or just what it's going to cost to fix it?
>
> A Just what it's going to cost to fix it.

<u>Exhibit C to the Motion to Exclude Testimony of Nicholas Cornelison</u>, Deposition of Nicholas Cornelison ("Cornelison Depo.") pp. 275:21-276:15.

Moreover, the majority of the opinions of Mr. Cornelison lack a factual basis and are unreliable, such that they should be excluded pursuant to Airgas' contemporaneously filed Motion to Exclude Testimony of Nicholas Cornelison, which motion and supporting filings Airgas hereby incorporates by reference.

During this litigation, Airgas has acknowledged responsibility for damage to drywall related to removal of built-in desks and shelves. Accordingly, BWS' claims for damages to the property beyond those conceded and acknowledged by Airgas in this litigation should be dismissed.

**CONCLUSION**

The claims by BWS for holdover tenancy, utilities during the holdover tenancy, unpaid tax reimbursements, damages to the Property prior to the Commencement Date, and all damages unsupported by qualified expert proof fail as a matter of law and are subject to dismissal pursuant to Federal Rule of Civil Procedure 56. Accordingly, Airgas requests the Court enter an Order dismissing those claims with prejudice.

Respectfully submitted,

LEWIS THOMASON, P.C.

By: /s/ *Peter C. Robison*
    Mary Beth White, BPR #24462
    Peter C. Robison, BPR #27498
    424 Church Street, Suite 2500
    P.O. Box 198615
    Nashville, TN 37219
    (615) 259-1366
    mbwhite@lewisthomason.com
    probison@lewisthomason.com

*Attorneys for Defendant Airgas USA, LLC*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing DEFENDANT AIRGAS USA, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT has been served on the following counsel of record via email and through the Court's electronic filing system:

    Lynzi J. Archibald, Esq.
    Jessica M. Wolinsky, Esq.
    Miller & Martin PLLC
    832 Georgia Avenue, Suite 1200
    Chattanooga, TN 37402
    lynzi.archibald@millermartin.com
    jessica.wolinsky@millermartin.com

This the 22nd day of July, 2025.

    /s/ *Peter C. Robison*