```
 1          IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF TENNESSEE
 2                   AT CHATTANOOGA

 3   ------------------------------------------------
                             )
 4   BWS PROPERTIES, LLC,    )
                             )
 5        Plaintiff,         )
                             ) 1:24-cv-00029
 6      vs.                  ) Judge Christopher Steger
                             ) Non-Jury
 7   AIRGAS USA, LLC,        )
                             )
 8        Defendant.         )
     ------------------------------------------------
 9                      Chattanooga, Tennessee
                           April 24, 2025
10

11         DEPOSITION OF PETER VAN SLYKE, JR

12   ------------------------------------------------

13   APPEARANCES:

14              FOR THE PLAINTIFF:

15              JESSICA M. WOLINSKY, ESQ.
                Miller & Martin PLLC
16              832 Georgia Ave,  Su 1200
                Chattanooga, TN 37402
17              (423) 756-6600
                jessica.wolinksy@millermartin.com
18

19
                FOR THE DEFENDANT:
20
                PETER C. ROBISON, ESQ.
21              Lewis Thomason
                424 Church Street, Su 2500
22              PO Box 198615
                Nashville, TN  37219
23              (615) 259-1366
                probison@lewisthomason.com
24

25
```

**EXHIBIT C**

1  coordinate gas?
2     A   As my memory serves, I believe Corley Johnson told
3  me that we had attempted -- "we" being Airgas, had
4  attempted to have the gas transferred to BWS on at least
5  one occasion, perhaps two, and the gas company showed up
6  and they could not get into the property to do whatever
7  they needed to do to make that happen.  Therefore, I
8  reached out to Ms. Nevans and asked -- to try to
9  coordinate a time where she could be there and the gas
10 company could be there so she could allow them on the
11 property to do the transfer.
12    Q   And how did you become aware of at least the
13 potential that for some reason the property wasn't opened
14 for the gas company to access it?
15    A   I believe when the gas company reported back to us
16 that they had attempted to switch ownership of the gas
17 from Airgas to BWS and they could not gain access to the
18 property and let us know that.
19    Q   And just to confirm, who was it that in the end
20 met the gas company at the property to have the gas
21 switched over?
22    A   As far as I know, Ms. Nevans.
23    Q   Why did it take as long as it did for Airgas to
24 realize that the gas -- they had not changed the gas over
25 or turned it off?

1                MR. ROBISON:   Object to form.
2                THE WITNESS:   Shall I proceed?
3                MR. ROBISON:   Go ahead.
4     Q   Yes.
5     A   I don't know.  I believe that the utilities of the
6  property were dealt with by a different department within
7  Airgas.  I could be wrong about this.  And I believe
8  nobody, at least locally, thought about it until we were
9  notified by a different department from Airgas that we
10 were still being charged for the gas, even though we had
11 vacated the property.
12    Q   Was a final walk-through of the property performed
13 after Airgas had terminated the lease and had purportedly
14 finished moving from the property?
15    A   There was.
16    Q   And when did that walk-through occur?
17    A   I do not remember a specific date.  A few days
18 perhaps or a week after we vacated -- after Airgas
19 vacated the property.
20    Q   And who was present for that walk-through?
21    A   Myself and Ms. Jenny Nevans.
22    Q   And can you describe for me what happened and the
23 communications that occurred during that walk-through?
24    A   Sure.  When I got there Ms. Nevans was already
25 there.  She was in the showroom, as I recall.  And we

exchanged pleasantries, and we began walking the property, discussing the status of the property, and Ms. Nevans made observations about things that she did not think were maintained properly. And I, you know, I acknowledged her complaints. I took several pictures of things that Ms. Nevans had brought up during the walk-through, and I provided those pictures to the regional personnel that I mentioned earlier. This is -- by now we're kind of, the local team is kind of done. And that's pretty much it, that I recall.

Q And you mentioned sending those pictures to regional personnel. Can you identify specifically who those regional personnel were that received those photos?

A I believe I sent them to Dawn Van Dyke. And I could've sent them to others as well, but do not -- I can't tell you that definitively.

Q And have those pictures been provided to counsel for production?

A Oh, absolutely.

Q And again, not asking for any attorney communications.

Can you describe for me -- and you mentioned it briefly, but can you describe for me in more detail what you saw on the property while walking around, starting with building 1?

1  A   I mentioned earlier that some of the drop ceiling
2  tiles were collapsed.  In other words, kind of falling.
3  They weren't flat anymore, they were falling.
4       When we got out into the warehouse, Ms. Nevans
5  noticed some things that she was not satisfied with.  I
6  cannot remember exactly what they were.  I remember
7  spending a decent amount of time in the warehouse.  And
8  then we were doing the walk around the property from the
9  outside, there was a lot of concern about certain parts
10 of the pavement or the asphalt on the property, which I
11 took several pictures of for documentation.  And we also
12 looked at the weld repair center, and Ms. Nevans had some
13 concerns about that as well.
14   Q   What were the concerns -- I'm sorry.  Continue.
15   A   I don't remember specifically.
16   Q   Did you walk through building 4?
17   A   Building 4, that would've been -- is that the gas
18 house, I think?
19   Q   Yes, sir.
20   A   Yes.  Yes.  That's right.  We did go through the
21 gas house as well, correct.  And Ms. Nevans pointed out
22 some things that she felt needed to have some attention
23 put to them in the gas house as well.
24   Q   And what were those items?
25   A   I remember broken windows, maybe some chunks taken

```
 1  out of the concrete floor.  That's all I can really
 2  remember.
 3      Q   Other than Ms. Nevans mentioning those, the items
 4  that you've identified, what other conversations did you
 5  have with Ms. Nevans while completing the walk-through?
 6      A   I don't remember.
 7      Q   Did you provide anything to Ms. Nevans during the
 8  walk-through?
 9      A   I gave Ms. Nevans, as I recall, two keys.  And I
10  think we also produced -- or I produced a final
11  walk-through sheet, that I gave Ms. Nevans a copy of.
12      Q   I'm going to show you what we're going to mark as
13  Exhibit 4.
14              (Exhibit 4 will be marked.)
15      Q   Do you see a document on your screen?
16      A   I do.
17      Q   What is the date of this letter?
18      A   May 31, 2023.
19      Q   And would that have been on or around the date
20  that the walk-through took place?
21      A   It would've, yes.
22      Q   And is this the letter that you -- or the form you
23  mentioned a moment ago that you provided to Ms. Nevans
24  during the walk-through?
25      A   I believe it is, yes.
```

1  Q   And if you need to take a moment to review, please
2  do so.
3  A   Could you possibly zoom in a little bit on it?
4  Q   Of course.  I can zoom in more if you need me to.
5  A   No, this ought to be good.  Thank you.
6      Okay.  Yes.  I remember this document, yes.
7  Q   Who drafted this document?
8  A   I do not know.  It was provided to me by somebody,
9  and I cannot remember who, from the regional offices.  It
10 could've been Dawn Van Dyke, but I'm not sure.
11 Q   I don't believe I've asked this.  What is
12 Dawn Van Dyke's position with Airgas?
13 A   I believe Dawn manages leased properties from the
14 Airgas perspective.  I don't really know.  I've never
15 talked to her about her job responsibilities.  I just
16 know that during all this process of vacating the
17 property, I talked to her more than once on the phone and
18 maybe had a Zoom call with her at one point.
19 Q   Is this letter signed?
20 A   It is not.
21 Q   Are you aware of a copy or -- strike that.  Is
22 there a copy of this letter that you signed?
23 A   I don't think so.
24 Q   And what was the conversation that you had, if
25 any, with Ms. Nevans when you provided this letter to

Case 1:24-cv-00029-CHS   Document 31-3   Filed 07/31/25   Page 7 of 14   PageID #: 451

1  her?
2   A   As I recall, I said this is the final walk-through
3  letter.  And I do believe I said something about that I
4  wasn't going to sign it and left it to her discretion if
5  she wanted to or not.
6   Q   And did Ms. Nevans ever sign the letter?
7   A   I don't believe so.
8   Q   Did you leave a copy of the letter with Ms. Nevans
9  or did you present it to her and then --
10  A   No.  I'm sure I left a copy with her.
11  Q   Did you inform anyone in Airgas's regional
12 management that neither yourself or Ms. Nevans had signed
13 the letter?
14  A   I think I did.
15  Q   Who did you tell?
16  A   Maybe Chris Hopwood, the region president.
17  Q   And can you tell me about that conversation?
18  A   I don't remember any details, other than informing
19 Chris that I had done the walk-through and that this
20 document was not signed.
21  Q   Did you tell him why it was not signed?
22  A   Probably, but I do not remember any details of
23 that.
24          MS. WOLINSKY:  Let's go ahead and take
25 another quick break.

1  Q   And was there any reference in that to the repairs
2  and renovations done following the 2012 hailstorm?
3  A   Could you repeat that, please?
4  Q   Yes.  You had said that they were potentially
5  referencing, more likely referencing mostly building 1.
6  Was that including the fact that the building had repairs
7  to it following a hailstorm that I'll represent to you
8  took place in or about 2012?
9  A   I suppose, yeah.
10 Q   So after the walk-through that we talked about
11 that you conducted with Ms. Nevans of the property once
12 Airgas had left, was there a subsequent walk-through that
13 Airgas conducted with an external individual?
14 A   There was.  Tracy Harvey and a general -- I'm
15 going to call it a general contractor, I guess that's
16 what he is -- I was told met Ms. Nevans at the property
17 and did a walk-through with Mr. Kevin Cruz in tow to
18 potentially offer repairs to, primarily building 1, but I
19 was not there so I can't tell you what all they looked
20 at.
21 Q   And when or about when was that walk-through
22 conducted?
23 A   I'm just taking a guess.  Six weeks to eight weeks
24 after Airgas vacated the property.  Could've been longer.
25 Could've been more like 10 weeks, 12 weeks.

49

 1      Q    And did Mr. Cruz, Kevin Cruz, provide an
 2   assessment of or quote for repairing aspects of the
 3   property?
 4      A    He most certainly did, yes.
 5      Q    What do you recall about that?
 6      A    I saw the proposal, and there were several line
 7   items listed.  Most of the stuff that I talked about here
 8   today, things like repairing some drywall, repairing the
 9   ceiling tiles.  For some reason those two stick out.
10   There was much more.  Maybe some general plumbing.  A
11   menagerie of things, not to include anything -- I do know
12   that it was not including any asphalt repairs.
13      Q    I'm going to show you what we're going to mark as
14   [Exhibit 5](Exhibit 5).
15              ([Exhibit 5](Exhibit 5) will be marked.)
16      Q    Did you see an email pop up on the screen?
17      A    Yes.
18      Q    This has a couple pages to it.  I want to make
19   sure you're able to see it, so I'm going to just slowly
20   scroll through.  Let me know if you need to see anything
21   for a longer period or if there's anything you would like
22   to go back to.
23      A    If you wouldn't mind zooming a little bit, that
24   would be nice.
25      Q    Absolutely.

50

1  A  Thank you.
2  Q  And just let me know when you're ready for me to
3  scroll down.
4  A  I'm ready.  Are you waiting for me?
5  Q  Yes.
6  A  I'm sorry.  I'm ready.  You can proceed.
7  Q  There's just a little bit left at the bottom that
8  I'll scroll down to when you're ready.
9  A  Okay.
10  Q  And the rest is just his signature.  Is this the
11  quote or assessment of costs provided by Kevin Cruz that
12  you referenced a moment ago?
13  A  I believe it is, yes.
14  Q  And it's dated October 19, 2023.  Do you see that
15  line?
16  A  I do.
17  Q  Would it be that the walk-through was conducted in
18  or around October of 2023?
19  A  Yes.
20  Q  And now having seen this email, what else do you
21  recall about or do you know about the walk-through with
22  Mr. Cruz and the quote or assessment that was provided to
23  Airgas?
24  A  Well, I mean, as you can tell from the email, once
25  I got the information I forwarded it to regional

```
 1  officers.  And that's -- I mean, I don't -- I can't think
 2  of anything else worth saying about it.
 3      Q   Tell me about the conversations that you had with
 4  others at Airgas regarding the quote you received from
 5  Mr. Cruz?
 6      A   Well, I don't, I don't really remember any
 7  conversations after I submitted this.
 8      Q   Did anyone else have meetings regarding or discuss
 9  this quote with anyone else within Airgas or within at?
10      A   Not locally.  Not anybody that was part of my
11  team.
12      Q   Was this quote provided to Ms. Nevans?
13      A   If it was, it was not provided to Ms. Nevans by
14  me.
15      Q   Did Airgas do anything else with this description
16  and quote provided by Mr. Cruz, other than review the
17  email?
18      A   Your question was did Airgas?
19      Q   Did Airgas do anything else with this quote and
20  scope of work provided by Mr. Cruz, other than read the
21  email?
22      A   I do not know.  After I submitted it to my bosses,
23  that's kind of the last I heard of it.
24      Q   Did Airgas create any other internal assessment or
25  evaluation of the condition of or damage to the property
```

1  after June 1, 2022?
2      A   I don't know.
3      Q   Since June 1, 2022, has Airgas made any effort to
4  obtain quotes from third parties, other than Mr. Cruz, to
5  estimate the cost of repairing any aspect of the
6  property?
7      A   Not to my knowledge.
8      Q   Just a couple clarifying questions from earlier
9  after some additional thought.  Just to clarify, who did
10 you report to in the 2022 to 2023 time frame?
11     A   Before I reported to Jeff Mann I reported to Clay
12 Merrick.
13     Q   And did Mr. Merrick have any input into or provide
14 any instruction to anyone on the property with Airgas
15 about terminating the lease or vacating the property?
16     A   Not that I recall, no.
17     Q   Other than the topics that we ran through at the
18 beginning of the deposition to confirm, are there any
19 other topics that you were prepared by counsel to testify
20 to today?  Again, not asking for any specific
21 attorney-client communications.
22     A   No.
23     Q   Not wanting to know what any instructions were or
24 what communications there were.  Did your counsel give
25 any instructions on how you should prepare for this

1                REPORTER'S CERTIFICATE

2   STATE OF TENNESSEE:

3   COUNTY OF HAMILTON:

4            I, Sheila D. Wilson, Licensed Court Reporter
    #268 and Notary Public, in and for the State of
5   Tennessee, do hereby certify that the deposition of Peter
    Van Slyke, Jr., was reported by me, and that the
6   foregoing 56 pages of the transcript is a true and
    accurate record to the best of my knowledge, skills, and
7   ability.
             I further certify that I am not related to
8   nor an employee of counsel or any of the parties to the
    action, nor am I in any way financially interested in the
9   outcome of this case.
             I further certify that I am duly licensed by
10  the Tennessee Board of Court Reporting, as evidenced by
    the LCR number and expiration date following my name
11  below.
             In witness whereof, I have hereunto set my
12  hand this 26th day of May 2025?

13

14

15

16

17

18  *[signature: Sheila D. Wilson]*

19  _____
    Sheila D. Wilson, LCR #268
20  Expiration date: 6/30/2026.
    Notary Public Commission
21  Expires: 1/17/2027.

22

23

24

25