UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF TENNESSEE
                              CHATTANOOGA

BWS PROPERTIES, LLC,              )
                   Plaintiff,     )     DOCKET NO: 1:24CV29
                                  )
vs.                               )
                                  )     Chattanooga, TN
AIRGAS USA, LLC,                  )     April 16, 2026
                   Defendant.     )     2:07 p.m.
_____


                         STATUS CONFERENCE

B E F O R E:
          THE HONORABLE CHRISTOPHER H. STEGER
          Chief United States Magistrate Judge

A P P E A R A N C E S:

For the Plaintiff:          JESSICA MARIE WOLINSKY
                            LYNZIE JACQUELINE ARCHIBALD
                            Miller & Martin, PLLC
                            832 Georgia Avenue
                            1200 Volunteer Building
                            Chattanooga, TN 37402

For the Defendant:          PETER C. ROBINSON
                            MARY BETH WHITE
                            Lewis Thomason
                            1202 Demonbreun Street
                            Suite 1000
                            Nashville, TN 37203

Transcriber:                Martha C. Marshall, RMR, CRR

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

THE COURT: Please call the case.

THE CLERK: Civil action 1:24-CV-29, BWS Properties, LLC versus Airgas USA, LLC.

THE COURT: Can counsel, please, enter appearances for the record.

MS. WOLINSKY: Good afternoon, Your Honor.

Jessica Wolinsky and Lynzi Archibald for the plaintiff BWS Properties.

THE COURT: Thank you.

MR. ROBINSON: Good afternoon, Your Honor.

Peter Robinson and Mary Beth White for the defendant Airgas USA.

THE COURT: All right. Good to see all of you here today.

This is a status conference of sorts to help me better understand the posture of the case and to figure out if the issues have sufficiently whittled down that we ought to be trying to settle it or whether, you know, we need to move ahead.

So I'll state this off the top of my head and probably somewhat inarticulately. Let me say this. The recent spade of briefing and our having to deliberate on it and make some decisions was a bit revelatory to me because when the case originally came before me, and I think that was primarily in a dispute over the scope of expert witness's

testimony. He was testifying about, as I recall, and I haven't looked this up, but it was in the neighborhood of between two and three million dollars of damages, I think. It wasn't that? I thought it was that in repairs to the building.

MS. WOLINSKY: No, Your Honor. It was -- it included a variety of things. I believe it was close -- it was less than a million.

THE COURT: Oh, was it? Well, I've totally misremembered then. Pretty big number.

MS. WOLINSKY: Yes, Your Honor.

THE COURT: But perhaps I just misapprehended. He was going back over some period of time, though, and talking about damages that had occurred, it seemed to me, over a long period of time. Not just a one-year period. Maybe I did just misapprehend what you were saying then.

MS. WOLINSKY: Your Honor, our expert, Mr. Cornelison, he was looking at the quote we had from T.U. Parks. And he was looking at that quote specifically and then walking through the property to offer testimony on whether the estimates he saw in there were reasonable just based on the property he was looking at as he was walking through, whether there were things missing --

THE COURT: Right. I got that part.

So T.U. Parks, the scope of T.U. Parks' assessment

of damages that had taken place, was confined to the last one-year period of the lease?

MS. WOLINSKY: It was just confined to what they saw as they were walking through with Ms. Nevans at the end, looking over repairs and things that needed to be completed to address some of the things that occurred at the property that damaged it.

THE COURT: But Airgas had been in the -- had been leasing the property for a very long period of time. 20 years?

MS. WOLINSKY: It was actually acquired by another company that had been on there, but Airgas specifically had been there since, I believe, the late 80's, 90's, into the early 2000's.

THE COURT: Yes. That's a long period of time.

So when T.U. Parks was looking around the premises at things that needed to be repaired and damages that had occurred, did T.U. Parks have any way of knowing at that time whether those damages had been caused 20 years before or whether they had happened two weeks before?

MS. WOLINSKY: No, Your Honor. They only just looked to see what damage was present and walked through with Ms. Nevans and looked at those. They didn't look at it in terms of which ones were caused during a specific time period or otherwise, just what the property looked like and what

needed to be repaired.

THE COURT: All right. Well, let me ask you this. So in the briefing it appeared to me that you conceded that the only damages that you could collect upon were those that had occurred beyond normal wear and tear during the final year of the lease between BWS and Airgas. Is that correct?

MS. WOLINSKY: In part, yes, Your Honor. We agreed that that was the relevant time period in terms of being the final lease. And when we were seeking damages specifically just on, you know, this is the calculation to repair the property, it would have been within that time period.

Just by way of update to the Court as well. Our client has finally been able to release the property. And that entity now is occupying the property and so we pled damages in the alternative. And so we would be focusing on the lost rental value which, of course, the damage to the property falls into that in terms of, you know, it causes diminution in that rental value and we have, you know, proof and evidence to that effect. So it shifted slightly, but those damages are still relevant to the assessment. It's just within that one-year period.

THE COURT: All right. Let me take another run at this because I'm not -- I'm still not sure I'm tracking with you.

Airgas or its predecessor had been in the property

for some decades. And, certainly, during that 20, 30 year period, they may have damaged the property, in your opinion, beyond normal wear and tear, whatever that means. But might have backed a fork lift into a garage and disabled it, something along those lines.

Based on the briefing that was before us, I believe the conclusion we reached, and the effect of our order, is that damages caused by Airgas prior to the commencement of the final lease period are damages that you cannot recover. Is that correct?

MS. WOLINSKY: Yes, Your Honor. And we would contend that most of the damage, relevant damage, occurred at the time of move out anyway.

THE COURT: All right. So what is the time period for the final lease period? I don't have that in my head.

MS. WOLINSKY: It's June 1, 2022 through May 31st, 2023, or to that first date, one year.

THE COURT: That's close enough.

June 1, 2022 through the end of May 2023.

MS. WOLINSKY: Yes, Your Honor.

THE COURT: So in terms of damages, with respect to damages, physical damages to the premises, you're seeking to collect those damages for things that happened between June 1, 2022 and May of 2023?

MS. WOLINSKY: Yes, Your Honor. And the impact that

would have had on the rental value.

THE COURT:  Yeah, I'm going to put rent and unpaid taxes penalty off to the side for a minute.  Just talking about the damages.

So as we looked at the summary judgment briefing, what we were focused on, we thought the intent of the briefing was, at first blush, defense counsel seemed to be arguing that your expert witness has not offered an opinion as to what damages were caused during that one-year period.  And, consequently, you can't prove your case.

And as I recall, I mean, the expert I was aware of, was not an expert who was going to testify about cause.  He was only going to testify about the cost of repairs to various items.  There may be other experts on cause.  I don't know.  I guess there's not, because defendant said there's not an expert on causation.

What we struggled with a little bit is we were not reading Defendant's Motion for Summary Judgment initially as saying summary judgment should be granted in its entirety because plaintiff has not proven that there were damages caused between June 1, 2022 and May 31, 2023.  I believe their argument, sort of taken in its most favorable light, would be you have to submit affidavits, excerpts of deposition testimony, something, to demonstrate that you can show that some of these damages happened during that period

of time. But I didn't think the briefing was real clear on that. And that's part of why I'm having this hearing today is because, frankly, I want to know if you can prove in some way what damages occurred during that one-year period. I mean, that's pretty important.

You know, as my Law Clerk and I were reflecting on it, we were thinking, well, I mean, in order to know what damages happened during that one-year period, you really would have to inventory the building on May 31, 2022, and figure out what shape the building's in so that you know what the starting point is. And then at some point you would have to have some witnesses testify as to discrete damages -- excuse me -- physical damage to the building or campus that occurred during the one-year period of the lease. You don't have an expert witness who is going to do it but, as I may have put in the order, you could have a disgruntled ex-employee of Airgas who is cooperating with you and say, yes, I ran the fork lift into the garage door or, you know, we damaged the building in this respect, or you could have other witnesses who might have just been in and out of the premises, for whatever reason, who could testify to those things. But nobody offered any of that to me. I mean, I don't think defendant's counsel didn't submit deposition and excerpts and affidavits establishing that no damage occurred. So I'm not sure that the burden shifted to you to submit

countervailing affidavits or deposition experts to establish that it did.

But this is what I want to focus on. We might talk about some other things in this hearing, but that's what I want to focus on for the moment.

Do you have some way to prove the damages with respect -- the physical damage to the building during that one-year period? So I'm going to let you go first and then I'll let -- yeah, let's take a swing at that.

MS. WOLINSKY: Glad to.

In short, yes, we do. And I'm happy to go through those.

Ms. Nevans, who is our client, her family has owned that property for an extensive amount of time. They are well established in that area. And Ms. Nevans as the property owner, through BWS Properties, can testify as to the property condition, the property appearance, its uses, who was present, which, of course, it was only Airgas for an extensive period of time.

But I think Ms. Nevans is also very uniquely positioned in that she is more than equipped and has a very deep understanding of commercial properties and leases. She has been coordinating leases and rental of commercial properties for quite some time. And some of our other witnesses have even mentioned to me how they view her so well

in that community in terms of her capabilities in that area. And so she is intimately familiar with the property and can testify accordingly.

We do have photos as well.  It's not that specific date, but we do have photos that were taken before Airgas vacated the property, which were taken actually in planning to try and release the property thereafter.  Went ahead and took some professional photos of the property.  And also there were photos after they vacated the property which shows what you can see behind some of the furniture and other things that they removed and shows damage.

Airgas was the only tenant.  So we're not having to argue about others who may have caused damage.  Airgas was the only one present.  And actually, even some of Airgas's own employees, through depositions, have testified to certain damage that occurred within the relevant time period.  And each one testified to a little bit different.  Certain may remember that the ceiling was damaged, and others may remember that walls were damaged, or other specific areas that were damaged or not cared for within that last year that led to subsequent damage.  And there are at least three employees there who can testify in that regard.

We have also evidence regarding the -- we had said before why that resulted in lower rental value and struggles with getting it released despite best efforts.  But we have

all of those who are going to testify, as well as others, to bolster that testimony whether through walkthroughs in looking at the repairs, such as T.U. Parks, and then others who assisted in re-leasing it and had experience and familiarity with that area in general, but also with the property.

THE COURT: All right. Let me ask you a couple more questions then.

So I just have no doubt that Ms. Nevans is thoroughly familiar with the property and is fully capable of doing that. I think the critical thing is what I'm remembering is your expert witness, relying upon the T.U. Parks assessment or walkthrough, there was a laundry list of kind of serious issues with the building that needed to be remedied. But they certainly appeared, and as I was listening to it, and nobody dissuaded me from this, was that they were damages aggregated over the course of 20, 25, 30 years. And if somebody meant to suggest that all those damages occurred in the course of the one year, the last year of the lease, it certainly wasn't mentioned to me.

Is Ms. Nevans or some other witness going to be able to tell me that she walked through the property right before the last year of the lease started and looked at the property to figure out what the state of the property was so that she could then assess what damages were occasioned during that

one-year period from 2022 to 2023?

MS. WOLINSKY: It may not have been specific walkthrough that we point to in terms of a date, but she was frequently on the property. She's very familiar with the people who worked for Airgas. She was friends with them. She wasn't a stranger to the property and did visit it. But I can't honestly point to a specific date walkthrough prior to the start of the lease.

The photos we referenced before were taken three months before the close of the lease. So it was before the lease ended, within that relevant time period. But she can testify based on what she had seen as she went at various points.

THE COURT: Okay. Well, I don't want to get too granular and it's been a long time since our hearing. I do remember there were roll up, as I recall, truck bays, garage doors that I think roll up, they were damaged. Needed to be replaced. There was concrete repairs that needed to be made.

And I remember I thought at the time one of the challenges in this case is that, yes, if you have an industrial workplace with trucks and fork lifts driving in and out of it, you're going to have lots of heavy wear and tear and damage and bumping into walls and bumping into garage doors and so forth. Things break. And I thought it's going to be a challenge to figure out when all this stuff

happened and what normal wear and tear would be in an industrial setting. It's not a law office. It's people in trucks and fork lifts and so forth. So I think the challenge is even greater.

Those instances, the defective broken roll up garage doors, and the broken concrete, those were put out on the table in front of me and costs were attributed to those. Are you going to in any way be able to demonstrate that those damages occurred between June of 2022 and May of 2023?

MS. WOLINSKY: So if I may, I would actually split those into two kind of different categories. The lease treats the concrete asphalt a bit differently maybe than the rest of just the wear and tear application to the property. I'd be honest with you, I'd have to double-check the exact testimony on the roller doors and who might be testifying to that. Of course, Jenny is again -- Ms. Nevans is very familiar with that. In terms of whether the other three individuals would testify to that, I apologize, I'd have to double-check.

With regard to the concrete or the asphalt, one of the arguments that has been discussed before is just how it's treated under the lease. And the fact that it just generally says to maintain that concrete and asphalt, it's not treated the same way. And there's additional language that goes along with that. They're just treated a bit differently. So

my answer would be yes to the outdoor concrete asphalt.

THE COURT: Okay.

MS. WOLINSKY: And if I may, Your Honor, BWS recognizes this is a very testimony heavy case and there will be many different disputes, fact disputes that we'll have to face and to handle at trial.

THE COURT: Right. Okay. Let me put it one other way and just make sure I'm tracking with you.

There's some irony to this in my mind. But they were in the building for -- let's say they were in the building for 25 years before this last one-year lease period. And I know during that 25 year period they beat up the campus pretty good. They did some damage to it. But don't they get a free pass on all the damage they did prior to this last one-year period?

MS. WOLINSKY: With respect to the concrete/asphalt, the answer would be no. They don't get a free pass based on the language in the actual lease and how that's treated, which is based on some history with Airgas and BWS Properties in agreeing to repave that. And so it was written into the lease a bit differently than just the treatment of the rest of the property in terms of damage.

THE COURT: Well, let's talk about the rest of the property then. Walls, garage doors, breaking whatever they broke. If it happened before June 1, 2022, they don't have

to pay for that, do they?

MS. WOLINSKY: We've agreed that the relevant period is that one year. So yes.

THE COURT: All right. I got it.

And then the Court -- I'm going to move on from that in just a second. The Court has decided that they paid the tax -- they paid their share of the property taxes. They paid it late. We do find that that issue is still alive. And that even though they paid it, I think after the complaint was filed it's still -- that's okay.

There's a $500 contractual, I think, just a one time $500 penalty arguably. And then there's interest on that. So there's interest on the unpaid -- the period of time it was unpaid. I don't think that's a big number, is it? What is that number? Have you calculated it?

MS. WOLINSKY: I have. I do not have that specific calculation on me.

And I would also note that the taxes and insurance are two different paragraphs in the lease. And so each one incurs the penalty and each one separately incurs the interest.

THE COURT: Okay. Well, that will be an issue we will talk about.

MS. WOLINSKY: I think we estimated it's around 20K. It's not specific, but around 20,000.

THE COURT: Okay. Don't want to disparage anybody's claim. Maybe y'all get that one worked out.

And then tell me a little bit more about the lost rent. So it would be a period from -- talking about a period from May 31 or June 1, 2023 through the time that you were able to rent it. And you're saying it was not rentable because it was in -- it took a long time to rent it because the property was in bad shape and had to be rehabilitated for it to be suitable to be rented?

MS. WOLINSKY: Partially. So it did take a long time to get it re-leased because of the damage. And ultimately we took a hit and took less rent from our current tenant. And it's actually less than Airgas was paying. Because the tenant was willing to incur those costs to repair the property themselves.

So in addition to the lost rents from the time that Airgas left until the time that we were able to re-lease it, there's also the difference in the value of or the rental value from the time they started leasing the property, the new entity, to date.

THE COURT: All right. So let me say one tricky thing that we're going to experience here is the property was in bad shape. Let's say it's in bad shape. The property was in bad shape not exclusively because of the last year of the lease. The property was in bad shape for that year plus the

25 previous years. But you're giving them a pass on the prior 25 years.

So to the extent the property was in bad shape and it interfered with renting it, and it caused somebody to have to do repairs before they moved in and to pay a lesser rental fee, you're going to somehow put on proof as to what part of the diminished rent was due to the damages that occurred during the very last year of the lease as opposed to damages that happened during the previous 25 years. That's going to be awfully tricky. Mighty tricky. There's not a formula for that. It's going to be challenging.

So I think I understand, though, what the theories are. Mr. Robinson or Ms. White, I'll probably ask you some questions after you start talking, but why don't you start talking first.

MR. ROBINSON: Thank you, Your Honor.

I feel silly --

THE COURT: You're fine either place. Just be next to a microphone is all I ask.

MR. ROBINSON: If it's all right with the Court, I'll move to this.

THE COURT: That's fine.

And, Ms. Wolinsky, don't worry that you didn't come to the podium. I didn't ask you to. And you were perfectly fine from where you were.

MS. WOLINSKY: Thank you, Your Honor.

THE COURT: If we try the case, y'all going to have to stand up and be real formal.

MS. WOLINSKY: I'll make sure I wear higher heels. I'm rather short. But I don't know that you would have been able to see me anyway.

THE COURT: Quite all right.

MR. ROBINSON: I'll ask, if I may, put something on the viewer for the Court to view.

THE COURT: Sure.

MR. ROBINSON: Your Honor's right in describing the posture of the parties at the summary judgment level. It was our position that after all discovery was completed and all expert proof had been disclosed, there wasn't any proof that the damages to the property were incurred during that final year period which we've all agreed to is the relevant period. I know Your Honor said that's giving us a pass on that. To be clear, that's in the lease, that final year lease, dissolves all the other issues and other terms from the previous lease. So we really are just looking under the terms of the lease just to that one year.

THE COURT: I'm not complaining. It makes the lawsuit a lot simpler.

MR. ROBINSON: It certainly does, Your Honor. But I think it puts plaintiffs in a position where they had an

obligation, particularly at the summary judgment level, where it's the so-called put up or shut up stage, where they had to come forward with some sort of proof to establish that the damages (a) were caused by Airgas, (b) were caused during the relevant one-year period, and then I guess also (c) that they were something beyond average, you know, or ordinary wear and tear.

And we all know that pavement left out for 10 or 15 years will develop just from rain and sun exposure a certain amount of cracking. It has nothing to do with any sort of trucks. If a truck never drives over it, it can still have wear and tear, as there's a useful life for every material. So I think that was something that plaintiffs at the summary judgment stage had to come forward with.

And as I'm understanding their arguments about diminished rental value, I think they would also at that point have to come forward with some sort of proof to show what those damages are. And we didn't have that at the summary judgment level, sort of to my surprise. The only expert that was disclosed was Mr. Cornelison. And by plaintiff's acknowledgement, and by his own statement in his deposition, which we discussed the last time we were here before Your Honor, he was very candid. He said I'm talking about pricing. This is what I know. I priced it out. These are appropriate prices. And I obviously had some

disagreements about some of his conclusions, but that's what he was addressing. And we don't have any proof about causation. This isn't sort of res ipsa sort of situation, right.

If Your Honor recalls, Airgas and BWS actually have a little bit of a weirdly like a common history. The original entity that owned and operated a welding supply business here was Brooks Welding Supply operated by, I believe, Ms. Nevans' father and uncle, I believe. It was a family business for many years. And when that business sold, the property and the business were split. And so BWS was created to hold that property and has, since then, been the owner of the property and leased to the various entities that have operated businesses.

I don't have the deposition transcript page to put in front of Your Honor, but there was testimony during this case that will come out at trial, that some of these specific damages, people have specific memories of when that damage occurred. And it was when it was owned by Brooks Welding Supply, or it was when British Oxygen Company owned the property before -- owned the business before Airgas ever had any role with the property.

There are multiple entities that had ownership and operation of the business that functioned here, one of which is a predecessor entity to BWS. So it is very much something

that has to be clarified because some of this damage has occurred, as Your Honor said, over the course of many years

THE COURT: Well, let me -- I'm going to stop you.

MR. ROBINSON: Yes, Your Honor.

THE COURT: And argue with you.

You know, in a medical malpractice case you have to have expert testimony to establish that a doctor failed to exercise the degree of care necessary.

MR. ROBINSON: Yes, sir.

THE COURT: It's required for the case to go forward.

So in that case, if you could file a motion for summary judgment as a defendant and say that the plaintiffs either didn't have an expert on causation or they -- or their expert, they had one, but the expert didn't testify in a way that established a lack of care. And you could -- because in a medical malpractice case or other professional malpractice, you have to have an expert support the lack of whatever the standard of care is to establish liability. We're tracking.

So you attacked their expert testimony and said there is no -- they have no expert testimony that establishes causation during the one-year period at issue here of damages, right? That's what you said.

MR. ROBINSON: Yes. Among other things. But, yes, Your Honor.

THE COURT: Okay. But they've listed their witnesses. You've had a chance to depose their witnesses. I doubt that you have deposed all of their witnesses. And you're essentially telling -- well, first of all, do you concede that they can establish causation of damages? And I'm talking about dents in the wall, moving furniture that damaged the wall, on and on, disabling a garage door, things like that. Beating up the facility. They can establish that through lay witnesses. They don't need experts to do that, do they?

MR. ROBINSON: My answer has three parts, Your Honor.

THE COURT: Well, give me the common sense one first.

MR. ROBINSON: But the first is to agree with Your Honor, that does not necessarily require expert proof.

But the second part of my answer is in the discovery process of this case, the corporate representative for BWS, Ms. Nevans, admitted in her deposition that she had not done a walkthrough of the property prior to the year lease. She wish she had, but she had not done one. It's on page 129 and 130 of her deposition, which is attached to our motion.

THE COURT: Right.

MR. ROBINSON: And she didn't do a walkthrough and didn't have information about the condition of the property

prior to it. And so the only -- and this comes the third part. The only proof that I'm aware of of damage during the year of the lease is the damage that Airgas has conceded from the very beginning. I have one photo that we can put on the viewer if Your Honor wants to see. It damaged the drywall when somebody, in their infinite wisdom, tore out a desk and took out a bunch of the drywall. And Airgas has from the very beginning said, yes, we will fix that. We will replace that.

THE COURT: I don't need to see. I grasp the concept.

Go with me. I mean, Ms. Nevans, N E V A N S?

MS. WOLINSKY: Yes, Your Honor.

THE COURT: Ms. Nevans may certainly not be the person to establish all of what happened during the one-year period, but any person who was physically present on the facility, in the facility, during that one-year period, could come into court and testify that they saw damage take place. They saw it happen.

MR. ROBINSON: I think that's true, Your Honor.

THE COURT: Well, how do you know they don't have a witness that's going to do that? Have you deposed all of them?

MR. ROBINSON: I would simply say, Your Honor, I deposed as many as were made available of. And if there was

any party or any witness that we have not deposed that I wasn't aware of, I would have certainly expected at summary judgment to get a declaration or an affidavit from somebody to prove that our assertion -- remember, this is put up or shut up -- that our assertion that they do not have proof beyond what we have already conceded, was damage that took place in the final year's lease was -- there must have been some witness to come forward to say what that is. And if I hadn't taken their deposition, it would come in presumably an affidavit or a declaration. And if I had taken their deposition, they would point to that deposition transcript.

THE COURT: All right. I'm just -- the summary judgment, respectfully, the summary judgment process doesn't work like this. It doesn't allow the defendant to simply say, well, I don't think they have any proof to establish their claim for negligence or breach of contract, and shift all of a sudden to the plaintiff a duty to go out and round up all of their testimony and evidence and put it in an affidavit, declarations, deposition experts, and file all that with the court. That doesn't happen in lawsuits.

What you haven't established -- there's a -- I've got to look at the evidence in the light most favorable to the non-moving party. And you haven't -- just by their lawyer saying we didn't -- they didn't damage the property during that year, that doesn't just shift the burden of them

producing all of this evidence. That's what a trial is for.

MR. ROBINSON: And Your Honor earlier said that you were going to argue with me. And so in the spirit of our argument, that is what Rule 56 says, Your Honor. A light most favorable to the plaintiff is probably appropriate at the the Rule 12 stage. But here we are at the end of all proof and all expert disclosures and discovery. It is, and this is the colloquial phrase, but the Courts of Appeals have picked it up and use it occasionally, this is put up or shut up. And so it was our position at summary judgment that they must come forward and identify some proof that would create an issue of fact.

I understand what Your Honor is indicating, but my understanding of Rule 56 is that it is the burden of the proof on the claiming party, which is plaintiff in this case, to prove their case, or to at least create an issue of fact as to each of the claims. And to their credit, where they couldn't, they conceded and we narrowed the issue. And that was very good and productive. And where they have not with respect to our motion, I contend that it was -- they have not produced the sort of proof that would allow an issue of fact to be created.

And to be clear, we didn't move for summary judgment on a couple of the points because I think there's an issue of fact. And so I didn't belabor those points. We don't have

that in front of the Court.  What may happen down the road or what they may come forward with or be able to come forward with, I would have expected to see that at summary judgment.

THE COURT:  Well, when you filed your summary judgment, did you attach excerpts of all the witnesses that you had deposed and the questions you asked them about what damages they observed and what they attribute it to?

MR. ROBINSON:  I think there might be one witness that we didn't attach a transcript from that ended up, you know, was sort of duplicative.  But I think I even cited multiple depositions of Peter Van Slyke.  We attached the depositions of Ms. Nevans.  We attached the deposition of a gentleman whose name escaped me at the moment who had worked for Brooks Welding Supply and then BOC and then Airgas and had 40 years memory with the property.  He was very helpful.  Probably the best witness in the whole case in terms of what the condition of the property was over time.  Then we attached excerpts from his deposition.  So, in short, with maybe one exception, yes, Your Honor, we attached all those excerpts.

THE COURT:  Did you depose -- well, first of all, I mean, I don't know what questions you asked and I don't know how good a deposition you took.  And I don't know if you didn't ask some questions that you should have.  But plaintiff's counsel doesn't have a responsibility to come

back behind you and if you missed some questions, they don't have to clean up the record to try to, you know, sus out some testimony that you forgot to ask about. And that happens all the time. Even though I know you're a very fine lawyer. They don't have to do that. And just because you say that I deposed this witness and I don't think that this witness has any information that will buttress their claim the damages were incurred during that one-year period, your position that you're espousing to the Court is that they then have an obligation to go back to that witness, get a declaration from him, and try to put together everything conceivably that person could say when they take the stand in court to overcome summary judgment. I don't think that's the standard. I really don't.

MR. ROBINSON: Your Honor, to say that they have have to produce a declaration or affidavit that says every single thing that person knows, I don't think that's required either. But it is incumbent upon the non-moving party that has the burden of proof at trial to establish some sort of issue of fact to support some of their claims.

And I appreciate Your Honor's faith in me as a deposing attorney. I feel like I'm the most brilliant attorney in the world when I walk out of the deposition and I think of the questions I should have asked. Certainly, if I don't ask them the important questions or I don't realize

there's an issue there and I don't appreciate that because I haven't done my homework, I don't think it's the plaintiff's job to educate me. They don't have to. But when it comes in front of Your Honor and they have to identify an issue of fact, that's the time. That's the time to put up. And if they cannot, that's the proverbial then shut up and withdraw the claim.

So with respect to, you know, what's before the Court, I'm not aware of facts beyond what's been conceded by Airgas about what damages actually occurred in the year. And they haven't been put in front of the Court. And I think it really creates a real challenge for plaintiff going forward as we get close to trial.

If Your Honor has other specific questions, I'm happy to answer them. I was just sort of wanting to hit those points because I heard those from counsel for plaintiff and wanted to address them.

THE COURT: What do you -- just touch on the unpaid taxes and the penalties on that. Just seems like that's something y'all should -- there is a penalty if you pay late. I think y'all did pay late, didn't you?

MR. ROBINSON: We did. Well, depends how Your Honor reads it and whether the claims had accrued, right. And I think there's an issue.

Your Honor's order, as I read it, addressed the

issue of ripeness. And I am aware that in certain cases, particularly in like the civil rights context, you can have a period of time where a claim will accrue. I'm aware of like the draft cases where somebody is going to be drafted, they had a draft number. They were getting higher and higher. And they knew they were going to be drafted and they filed suit. It eventually would become ripe.

I feel like that's a little different than the position we have here where, under the lease, the trigger for any sort of obligation for the defendant in this case, Airgas, was performed by BWS. And in this case it was the payment of the taxes and the sending of the proof of payment to Airgas. That's what triggered the obligation. And I think it's, respectfully, a little different in this case to have a situation where the claiming party had not performed the triggering action that gave rise to the obligation until after the claim was already filed.

THE COURT: Okay. It's a contractual claim, isn't it?

MR. ROBINSON: It is.

THE COURT: Six years statute of limitations.

MR. ROBINSON: Yes, Your Honor.

THE COURT: So, I mean, if they had moved at any point, including today, to amend the complaint to add a claim for these unpaid taxes, the Court could grant that and relate

it back, couldn't they?

MR. ROBINSON: If Your Honor -- I don't specifically recall if Your Honor's order had a deadline for amendment of the pleadings.

THE COURT: Well, I'm still in control of that. As justice requires, you know.

MR. ROBINSON: As justice requires.

THE COURT: Yes. I just -- it's a small claim.

MR. ROBINSON: It is, Your Honor.

THE COURT: So you're arguing the procedural matter and let's not -- we can disagree about that. I'm trying to -- the taxes were paid a few months late. Isn't there clearly a $500 penalty if you pay them late?

MR. ROBINSON: I believe so, Your Honor.

THE COURT: So you're not arguing about that, are you?

MR. ROBINSON: No. I don't have the specific calculation in front of me either, but it's going to be -- it's by the numbers. It is what it is. I mean, it will be by the days and by the numbers. We know what the date was when BWS sent the notification, again, after the filing of the suit, and we know when it was paid. So that's -- I imagine that we'll be stipulating to that calculation.

THE COURT: Yes. Frankly, I don't recall how you

are -- is there any difference between the parties as to how interest is being calculated?

MR. ROBINSON: We haven't specifically addressed it, but I believe it's clear enough in the lease. I believe that we're going to have an agreement about how that would be calculated.

THE COURT: Okay.

MR. ROBINSON: It is not the focus of the lawsuit.

THE COURT: Oh, I know it's not. It's low hanging fruit. I'm not sure.

MR. ROBINSON: And there's a very similar situation with the insurance, but we didn't move for summary judgment on there because there's a little bit of an issue, a factual dispute issue, about how and when that was communicated. And, frankly, I left that aside for trial or whatever. Because, again, I didn't think that it was worth Your Honor's time to try to make that argument when there's a factual dispute. Because that was in a deposition and did come out and I think that's clearly, you know, there's a dispute there.

In terms of the other claims, I mean, those are the substance of our motion, was the holdover rent. I don't know if BWS has also withdrawn its claim for unpaid utilities and they were related to the holdover year. It wasn't clear to me in their response. But to the extent those are related to

it, I think that would probably go together.

So holdover rent, holdover utilities, the damages that we addressed, and there's the ongoing issue about whether it's in the year or not in the year, and then the taxes. Those are the topics that I think were in our motion.

Does Your Honor have any other questions about the issues that were in our motion or additional information?

THE COURT: Let's take a five-minute break. Mr. Claridge has been helping me with this case. I'd like to pick his brain and see if I'm missing anything. But I think we've covered most of what I wanted to cover. But two minds are better than one.

(Recess.)

THE COURT: All right. Let me wrap up the motion hearing part of this and then we'll just talk about the status of the case.

One thing I believe the Court struggled with as we were deciding this case is that counsel, I'm talking to defense counsel now, in your Motion for Summary Judgment, your initial Motion for Summary Judgment, what you focused on was that they didn't have expert proof to establish causation of damages during the relevant period of time. And they came back essentially and said, yeah, but we can prove damages in another way through lay witnesses. I'm over-simplifying. And then in your rebuttal brief is when you took a stab at

staying, well, you don't have any proof. That's a new argument. You didn't make that argument in your initial briefing. You can't do it that way. It doesn't then shift the burden of it. They only have to respond to your motion. And you can't raise a new argument in a rebuttal brief and then impose another duty on them to respond to that new argument. And that did confuse the issue for the Court a little bit as we were trying to deliberate on this thing. But, in any event, that was part of the basis for why we decided this the way we did.

I find that I'm going to let the order stand as it was delivered. And I think that plaintiff, by the narrowest of margins, is keeping alive this claim for damages that occurred during the one-year period.

Now let me turn to plaintiff's counsel and say you really are -- if you want to try the case, you are going to have to come in with some proof as to when the premises were damaged to demonstrate that those damages occurred during that one-year period. That's your burden of proof.

And I know that in defendant's briefing they did attach excerpts from depositions of witnesses they took who didn't seem to do a good job of trying to establish that these damages occurred during the one-year period that you're claiming. So I'm not sure how you're going to do it.

But it's a non-jury trial. It's only going to be my

time.  That will make it more efficient.  But the Court will give you as much latitude as it can in allowing you to call witnesses and try to establish this, but -- I know you're fine lawyers.  But you guys can figure out before you come in here and spend two or three days of the Court's time whether you really do have witnesses who are going to be able to establish this.

And if the case ends up, you know, if it's not very strong in that direction and it's really just a case about penalties, unpaid tax, interest and rent, and the portion of the diminution in rent that's attributable not to all the damages in the facility, but only those that occurred during the last year, it's hard -- it's going to be hard.  Try to figure that out.

You guys mediated this case in front of Bill Colvin, is that right?

MR. ROBINSON:  The second time, yes.

MS. WOLINSKY:  Second time, yes.

THE COURT:  Second time.  You've done it twice.

MS. WOLINSKY:  Yes, Your Honor.

THE COURT:  Did you do it after the Summary Judgment Order dropped?

MS. WOLINSKY:  No, it was before that, Your Honor.

MR. ROBINSON:  While it was pending.

THE COURT:  Well, I'm not going to make you do

anything. It just seems like both sides have a really good handle now on what the case is about and what the scope of the issues is. And it's, you know, under any circumstances, it's not a huge case. It's been narrowed considerably from how I was looking at it at the very beginning.

So armed with that, you might want to take another half day of Mr. Colvin's time and see if you can't get this to the finish line. I'm not going to twist your arm. I don't mind trying your case. I just want -- I don't want y'all to spend a whole lot more money getting ready for trial and trying the case if that money could be better applied to the lady sitting behind you, you know, trying to bring this thing to a landing.

Okay. That's all I'll say about it. Anything y'all would like to discuss from a case management standpoint?

MS. WOLINSKY: Nothing from the plaintiff, Your Honor.

THE COURT: Okay.

MR. ROBINSON: No, Your Honor. We were discussing scheduling. I don't think we have any other issues. I believe the order sets out our schedule for the rest of the case.

THE COURT: Yes. So if you run into any problems, you guys just reach out to me and we can have a video conference in the afternoon so I don't make you drive from

Nashville.

The other thing I would say, counsel, is this is good lawyering by both sides. And through what you've done, this motion practice, you've narrowed the issues. We've eliminated some issues. We've added great clarity to the case. Really glad that that was done before we get together for a trial. Seems to me that you know enough about each other's positions that you could probably craft a fair settlement at this point, save some money in trial preparation in trying the case and the uncertainty, you know, there's still some uncertainty about the outcome. I would encourage you to do that. But talk with your clients and see if that's a possibility. Say the Judge kind of encouraged you to do it. But, otherwise, just stay on track and we'll get you tried. All right.

All right. We can be adjourned.

(Whereupon, proceedings adjourned at 3:17 p.m.)

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

Martha C. Marshall/s                04/19/2026
Signature of Transcriber            Date