# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | |
|---|---|
| BWS PROPERTIES, LLC, ) | |
| ) | |
| Plaintiff, ) | CASE NO. 1:24-CV-29-KAC-CHS |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| AIRGAS USA, LLC, ) | CHRISTOPHER H. STEGER |
| ) | |
| Defendant. ) | |

### DEFENDANT AIRGAS USA, LLC'S PROPOSED FINDINGS OF FACT

Defendant Airgas USA, LLC ("Airgas"), by and through counsel, and pursuant to Local Rule 52.1 and the Amended Scheduling Order (Docket Entry No. 53), hereby submits its proposed findings of fact in advance of the trial of this matter.

1.     Plaintiff BWS Properties, Inc. ("BWS") owns real property located at 700 Manufacturers Road in Chattanooga, Tennessee (the "Property"). (Deposition of Jennifer Nevans ("Nevans Depo."), Docket Entry No. 29-1, p. 13:20-24.)

2.     The oldest of the buildings on the Property (known as the "gas house") was built in the 1930s, and the main building was built around 1953. (Deposition of Tracey Harvey ("Harvey Depo.") p. 38; Deposition of Jennifer Nevans p. 16.)

3.     The Property is the former location of Brooks Welding Supply, a welding supply business founded by the grandfather of the current owners of BWS, which was later run by the father of the current owners of BWS. (Nevans Depo. p. 13:20-24.)

4.     In 1997, when none of his daughters intended to continue the family business, the father of the current owners of BWS formed BWS as a new entity and transferred ownership of the Property to BWS, and then sold the business operations to British Oxygen Company ("BOC"). (Nevans Depo. pp. 13:12-14; 15:6-8.)

5.	From 1997 until 2005, BOC operated at the Property, selling and repairing welding equipment and selling bulk and tank gases. (Nevans Depo. pp. 13:12-14; 15:6-8.)

6.	In 2005, the business operations of BOC were purchased by Defendant Airgas. (Nevans Depo. p. 20:8-16.)

7.	BWS had not required a written lease from BOC, but when Airgas took over operations, BWS and Airgas signed a written lease with an initial period from 2005 until 2010, that was later amended to run until October 31, 2013. (Nevans Depo. p. 25:5-12.)

8.	BWS and Airgas entered into another lease on November 1, 2013 for a period of five years, with an option to renew for an additional three years, and that lease was amended on November 19, 2018. (Nevans Depo. pp. 26-1-4; 34:16-24.)

9.	The office space of the main building of the Property was remodeled sometime around 2012 after a severe hail event broke skylights in the main building, resulting in significant water damage. (Nevans Depo. pp. 36.)

10.	All leases between BWS and Airgas were drafted by counsel for BWS. (Nevans Depo. p. 15:13-17.)

11.	In 2021, BWS presented Airgas with a new lease that included 18,000 square feet of the exterior parking area as a "Loading Lot" that would be included in the calculation of the square footage of the buildings, dramatically increasing the annual rent of the Property. (Nevans Depo. pp. 54:14-55:5.)

12.	Airgas balked at this significant increase, and negotiated with BWS for lower rent or better terms while continuing to occupy the Property as a holdover tenant, paying rent at a rate of 200% of the 2021 rent. (Nevans Depo. p. 40:14-24.)

13.	Eventually, BWS and Airgas entered into a final "Industrial Building Lease" with a Commencement Date of June 1, 2022, and a one-year term running from June 1, 2022, until May 31, 2023 (the "Lease"). (*See* Lease, Docket Entry No. 29-4.)

14. No one from BWS performed a walk-through of the Property or otherwise documented the condition of the Property on June 1, 2022. (Nevans Depo. pp. 129:17-130:7.)

15. The Lease, like the leases before it, contained a provision that superseded and completely replaced all previous leases between BWS and Airgas. (Lease § 23.11.)

16. The Lease would automatically renew unless the tenant, Airgas, gave BWS notice of its election not to renew at least 90 days before the end of the Lease. (Lease § 1.10.)

17. Under the Lease, BWS was to pay all real estate taxes and assessments related to the Property, and Airgas was to reimburse BWS the real estate taxes "upon receipt from Landlord of marked 'paid' bills for Taxes or other proof of payment [] within fifteen (15) days of receipt of the same[.]" (Lease §§ 3.3.1 and 3.3.2.)

18. Under the Lease, Airgas was to "preserve in good working order (subject to normal and customary wear and tear and damage by casualty) and maintain and perform all repairs and maintenance to the Premises and the fixtures and appurtenances therein, including, but not limited to, the Premises' Mechanical Systems and the striping, paving and replacement of the driveways and parking lot serving the Premises; (b) maintain all doors and windows, including the replacement of glass, of the Building; (c) keep the Premises in a clean, safe and sanitary condition, including but not limited to providing its own janitorial service and garbage collection and including keeping the Premises free from any garbage and refuse; and (d) be responsible for keeping the grounds of the Premises reasonably mowed, trimmed, and free from overgrowth of vegetation." (Lease § 6.2.)

19. Under the lease, BWS had the duty to maintain and repair the foundation, flooring (excluding floor covering), interior and exterior load-bearing walls, the roof and roof structure, and "all other structural elements of the Building, including but not limited to the Premises' HVAC Systems." (Lease § 6.1.)

20. Under the Lease, Airgas was to repair or pay the cost of repairs of damage to the Property resulting from the installation and/or removal of Airgas's property. (Lease § 8.2.)

21. At the end of the Lease, Airgas was to "quit and surrender the Premises to Landlord [BWS] in as good of a condition as received by Tenant [Airgas] on the Commencement Date, except for ordinary wear and tear . . . [and] Tenant shall remove all of Tenant's Property therefrom. (Lease § 20.)

22. On February 6, 2023, Airgas gave written notice to BWS that it would not renew the Lease, and that the Lease would terminate on May 31, 2023. (Lease Termination Letter dated February 6, 2023, Docket Entry No. 29-5.)

23. BWS, through its representative Jennifer Nevans, counter-signed the notice to terminate the Lease on or about February 7, 2023, and agreed to the following provision:

> Notwithstanding the Lease terms, neither party shall have any further responsibility to each other regarding the Lease and/or the Premises after the Termination Date, and the parties hereby mutually release and discharge each other from any and all claims, liabilities, charges and obligations that exist or may have existed between them.

(Lease Termination Letter dated February 6, 2023, Docket Entry No. 29-5.)

24. During May 2023, Airgas moved its operations out of the Property to another location. (Nevans Depo. p. 63.)

25. On May 31, 2023, Airgas District Manager Peter Van Slyke met with Jennifer Nevans of BWS, to surrender the Property and turn over keys to the Property. (Nevans Depo. p. 61.)

26. During the meeting between Mr. Van Slyke and Ms. Nevans on May 31, 2023, they walked through the Property and Ms. Nevans pointed out items BWS wanted to be repaired, while Mr. Van Slyke took photos of those areas. (Nevans Depo. pp. 61:11-12; 151:11-18.)

27. Also on May 31, Ms. Nevans of BWS sent an invoice to Dawn Van Dyke of Airgas seeking five months of property taxes and property insurance. (Nevans Depo. pp. 82-83:21-3.)

28. The invoice sent by BWS to Airgas on or about May 31, 2023, did not include proof of payment of the property taxes or the insurance. (Nevans Depo. p. 87:20-24.)

29. BWS had paid the property insurance by May 31, 2023, but would not pay the property taxes until November 2023. (Nevans Depo. p. 85:1-9; 87:20-88:2.)

30. BWS did not provide proof of payment of property taxes to Airgas until after it filed suit in December 2023, and at that time, BWS sought reimbursement for property taxes beyond the prorated 5-month period allowed by the Lease. (Nevans Depo. pp. 88:14-90:12.)

31. BWS has not produced or identified any evidence or exhibits to show that it provided documentation of insurance premiums that it paid for the Lease period to Airgas prior to the commencement of this action. (Plaintiff's Exhibit List, supra.)

32. In June 2023, Jennifer Nevans approached a contractor, T.U. Parks Construction, Inc., to get a quote for repairs and improvements to the Property. (Nevans Depo. pp. 190-191; 236; T.U. Parks Construction Budgets, Plaintiffs' Exhibit List Item 13, Docket Entry No. 27-1.)

33. T.U. Parks Construction, Inc. provided two budgets for the cost of performing significant work on the Property that amounted to a complete remodeling of the main building, repair shop, and gas house. (T.U. Parks Construction Budgets, Plaintiffs' Exhibit List Item 13, Docket Entry No. 27-1.)

34. The scope of the budgets from T.U. Parks Construction, Inc. extended beyond the areas that Ms. Nevans had pointed out to Mr. Van Slyke on May 31, 2023. (T.U. Parks Construction Budgets, Plaintiffs' Exhibit List Item 13, Docket Entry No. 27-1.)

35. Ms. Nevans then sent those two quotes from T.U. Parks Construction, Inc. to Airgas and demanded that Airgas pay to BWS the amount of the quotes. (Email from Jennifer Nevans of BWS to Dawn Van Dyke of Airgas dated June 2, 2023, BWS-000063.)

36. Many of the repairs or damages included in T.U. Parks Construction, Inc.'s quotes related to elements of the structures that had not functioned for many years or decades before the Commencement Date of the Lease. (See, e.g., Harvey Depo. pp. 27:24-28:7 (roll-up doors); 35:22-36:5 (metal siding); 38:10-16 (windows); 75:6-76:6 (warehouse heater); 78:5-24 (bay door).)

37. The only damage to the Property verified to have occurred during the Lease period was damage to drywall in the office space when built-in desks were removed by Airgas when it moved out. (Nevans Depo. p. 180:2-6.)

38. Airgas has acknowledged the damage to drywall near the desks and has offered to pay for the drywall repair and repainting since before this suit was filed. (Letter from David Martineau to Lynzi Archibald dated November 13, 2023; Emails between Peter Van Slyke, Dawn Van Dyke, and Kevin Cruz.)

39. Jennifer Nevans of BWS and Peter Van Slyke of Airgas performed a walk-through of the Property in October 2023 with Kevin Cruz of [Cruz Remodeling], during which time Ms. Nevans identified conditions of the Property that she wanted to be repaired or improved. (Emails between Jennifer Nevans and Peter Van Slyke dated October 9-10, 2023; Deposition of Peter Van Slyke pp. 155-156.)

40. Many of the conditions for which BWS sought repairs were long-standing issues that pre-dated the Lease or Airgas operations at the Property, including the non-functioning bathroom at the rear of the warehouse, old roll-up doors that occasionally got off track, dented siding, etc. (Harvey Depo. pp. 27-28, 35-36.)

41. Certain personal property items present on the Property after Airgas' surrender, including a desk in the repair shop and lockers in the gas house, were present on the Property during the operations of Brooks Welding Supply, and predated Airgas' operations at the Property. (Harvey Depo. pp. 104, 127.)

42. Until the close of proof on July 1, 2025, BWS did not make any repairs to the Property other than resetting the roll-up doors on their tracks, fixing a leaking faucet, and fixing toilets that were running. (Nevans Depo. pp. 126, 140-141.)

43. BWS allowed a subsequent tenant to make repairs to the Property. (Industrial Building Lease between BWS and Applied Thermal Coatings, Inc., BWS Exhibit List, Item 32.)

44. The signage previously used by Airgas to display its name to the public was maintained on the Property for later use by subsequent tenants. (Nevans Depo. pp. 232-33.)

45. BWS has never received annual rental income in the range of $247,500 to $392,000 (the amount suggested by Henry Glascock) for the Property. (Lease, *supra.*)

Airgas reserves the right to amend these proposed findings of fact pursuant to rulings of the Court and evidence presented at the trial of this matter.

Respectfully submitted,

By: */s/ Peter C. Robison*

Mary Beth White, BPR #24462
Peter C. Robison, BPR #27498
LEWIS THOMASON, P.C.
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
(615) 259-1366
mbwhite@lewisthomason.com
probison@lewisthomason.com

*Attorneys for Defendant Airgas USA, LLC*

## CERTIFICATE OF SERVICE

This is to certify that on June 19, 2026, a true and correct copy of the foregoing has been served on the following counsel of record through the Court's electronic filing system:

Lynzi J. Archibald, Esq.
Jessica M. Wolinsky, Esq.
MILLER & MARTIN PLLC
832 Georgia Avenue, Suite 1200
Chattanooga, TN  37402
lynzi.archibald@millermartin.com
jessica.wolinsky@millermartin.com

*/s/ Peter C. Robison*
Peter C. Robison