IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNNESSEE AT CHATTANOOGA

---

| | | |
|---|---|---|
| BWS PROPERTIES, LLC, | : | |
| | : | |
| | : | NO. 1:24-CV-29-KAC-CHS |
| Plaintiff, | : | |
| | : | JUDGE KATHERINE A. |
| -vs- | : | CRYTZER |
| | : | |
| AIRGAS USA, LLC, | : | MAGISTRATE JUDGE |
| | : | CHRISTOPHER H. STEGER |
| | : | |
| Defendant. | : | JURY DEMAND |

---

THE 30(b)(6) DEPOSITION OF
BWS PROPERTIES, LLC
By and Through: Jennifer Nevans
April 7, 2025

---

Whitney A. Vaughn, TN LCR# 418
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

INDEX OF EXAMINATION

Page

Examination By Mr. Robison............... 7

INDEX OF EXHIBITS

1 Notice of Deposition of Rule ......... 11
30(b)(6) Corporate Representative of
Plaintiff BWS Properties, LLC

2 Lease between BWS Properties, LLC .... 21
and Airgas South, Inc.

3 First Amendment to Lease.............. 29

4 Industrial Building Lease............. 34

5 Addendum to Lease..................... 34

6 Industrial Building Lease............. 41

7 Letter dated 2/6/23 to Ms. Nevans .... 57
from Colin Donato

8 Email Re: Lease Renewal dated 2/7/23 . 58
from Ms. Nevans to Dawn

9 Letter dated 5/31/23 to Ms. Nevans ... 69
from Peter Van Slyke

10 Complaint............................ 69

11 Invoice 178, dated 5/31/23............ 84


Case 1:24-cv-00029-CHS Document 89-1 Filed 11/04/26 Page 2 of 238 PageID #: 940

INDEX OF EXHIBITS (CONTINUED)


| | | Page |
|---|---|---|
| 12 | Invoice 181, dated 1/3/24............. | 91 |
| 13 | Text Messages with Peter Van Slyke.... | 95 |
| 14 | Photographs........................... | 115 |
| 15 | Weeks Paving Quote.................... | 116 |
| 16 | Weeks Paving Pricing.................. | 116 |
| 17 | Photographs........................... | 137 |
| 18 | T.U. Parks Construction Co., ......... Preliminary Budget Breakdown | 192 |
| 19 | Plaintiff BWS Properties, LLC's ...... Initial Disclosures | 214 |
| 20 | Plaintiff's Answers to Defendant's ... First Interrogatories | 215 |
| 21 | Plaintiff's Answers to Defendant's ... First Requests for Production | 215 |
| 22 | Plaintiff's Supplemental Answers to .. Defendant's First Interrogatories | 216 |
| 23 | Plaintiff's Supplemental Responses ... to Defendant's First Requests for Production | 216 |
| 24 | Photographs........................... | 222 |

INDEX OF EXHIBITS (CONTINUED)


| | | Page |
|---|---|---|
| 25 | LoopNet Advertisement................. | 227 |
| 26 | LoopNet Advertisement................. | 227 |
| 27 | Email dated 6/2/23 from Jennifer ..... Nevans to Dawn | 231 |
| 28 | Email dated 10/9/23 from Dawn Van .... Dyke to Jennifer Nevans | 232 |

APPEARANCES:

Appearing for Plaintiff:

JESSICA M. WOLINSKY, ESQUIRE
jessica.wolinsky@millermartin.com
Miller & Martin
Volunteer Building, Suite 1200
832 Georgia Avenue
Chattanooga, Tennessee 37402
(423) 785-8406

Appearing for Defendant:

PETER C. ROBISON, ESQUIRE
probison@lewisthomason.com
Lewis Thomason
424 Church Street, Suite 2500
Nashville, Tennessee 37219
(615) 259-1366

The 30(b)(6) deposition of BWS PROPERTIES, LLC, By and Through: Jennifer Nevans, called as a witness at the instance of the Defendant, for purposes of discovery, pursuant to the Federal Rules of Civil Procedure, taken pursuant to notice on April 7, 2025, at the law offices of Miller & Martin, Volunteer Building, Suite 1200, Chattanooga, Tennessee 37402, commencing at 11:02 a.m., before Whitney A. Vaughn, Court Reporter and Notary Public.

S T I P U L A T I O N

It being agreed between counsel for the respective parties that Whitney A. Vaughn, Court Reporter and Notary Public, may swear the witness, take her deposition in machine shorthand, afterwards reducing the same to typewriting.

All objections, except as to the form of the question and responsiveness of the answer, are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., are expressly waived. Signature waived.

//

BWS PROPERTIES, LLC,
By and Through: Jennifer Nevans,
called at the instance of the Defendant, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ROBISON:

**Q Good morning. Since we're on the record, would you state your full name?**

A Jennifer Brooks Nevans.

**Q And do you often go by Jenny?**

A I do.

**Q Okay. I won't call you by your first name because we're in a deposition and we tend to be fairly formal, but you and I have met once before at the site of the property when we did the inspection, and you were at another deposition. But for the record, I'm Peter Robison. I represent the defendant in this one, Airgas. And this is my one chance to take your deposition and talk to you before trial.**

**You have probably been prepared by your lawyer. And I don't want to know anything your lawyer has told you or that you have told your lawyer, but you have probably been told some of the rules of the deposition. Do you mind if I go over**

**them out loud, maybe for my benefit as well as yours?**

A Sure.

**Q Obviously, we have a court reporter here. We're going to try to be fairly efficient. But to the extent possible, we'll try not to talk over each other. If one of us does it, it won't be the first time or the last time. And so if the court reporter asks us to slow down a little bit, I'll just take her directions. But I think you've probably been prepared for that, so we shouldn't have too much trouble. When you're on Zoom, it's a lot harder because of the lag.**

**If you need to take a break at any time, let us know. We obviously will take a break when you need to get something to eat for lunch.**

**Unless there is a pending question, I probably would ask that that question be answered. Then we can take a break any time you need to?**

**Do you have anything scheduled or anything that's going to occur later today that you might need to take a break for that we can plan around?**

A (Shakes head.)

**Q Okay. Now --**

A No. I'm sorry.

**Q No. You were shaking your head, and that's illustrative of one of the things I was going to tell you. When --**

A I knew better.

**Q No. It's -- knowing better and it's still -- we're all humans and we communicate like humans, which is a huge amount of it. Nonverbal. But for the purposes of the transcript, I will occasionally, if necessary, ask you to confirm was that yes or no. Please don't take it personal. We're not trying to get on your case.**

**If you have any health conditions that you're experiencing or if you take any medication that affects your ability to recall facts, would you let me know? Are you taking any medication like that or do you have any health conditions such as that?**

A No.

**Q And I'm not going to ask you what medications you take. I just need to know if it affects your memory.**

A No.

**Q It does occasionally come up. Before I forget, just basic background information before you. But it's my understanding that you are here as a corporate representative for BWS Properties, LLC;**

**is that right?**

A Yes.

**Q Are you -- and I don't mean to suggest something. If I'm wrong about it, please correct me and let me know, but are you one of the owners of BWS?**

A Yes.

**Q That was my understanding. Who are all the owners of BWS?**

A My four sisters: Margaret Colmore Brooks, Mary McDonald Brooks, and Katherine Elizabeth Magley.

**Q And so together the four of you own BWS Properties?**

A Correct.

**Q Is it an even share between the four of you?**

A Correct.

**Q My understanding previously was that you had generally done a lot of the management of the company; is that fair?**

A All of the management of the company.

**Q I didn't want to presume, but you have done all the management. So you're, obviously because you're here, the best-suited person to answer**

**these questions?**

A Yes.

MR. ROBISON: I had sent to your counsel a notice with some topics that we're going to go over today. We might use it as a road map as we go through them. I'm going to hand you a copy, and this will probably be the first numbered exhibit for the deposition. And the court reporter will mark our exhibits, so I'll let her do that as well.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 1.)

BY MR. ROBISON:

**Q Now, you won't necessarily need to read through all those topics right now, although you're welcome to do so. The topics are in the back and it's part of the exhibit or the, kind of, selection of topics. And we will probably use those as a road map to work our way through.**

**Let me ask you first just very briefly about your background. Did you graduate from high school?**

A Yes.

**Q Okay. Where did you graduate?**

A Rhea County High School.

**Q And did you do any education after high school?**

A UTC.

**Q Okay. And did you get a degree from UTC?**

A No.

**Q How many years were you there?**

A Initially, four. And then I went back in 2019 for another little bit. And then COVID happened and I have two classes left.

**Q Okay. Do you think you'll ever finish it up at some point?**

A I don't see the necessary -- the -- I mean, other than a personal goal, I don't see the necessary.

**Q When you were pursuing studies at University of Tennessee Chattanooga, what program or major were you generally pursuing, if you had one?**

A The first time I went was business administration, and the second time I went was political science and history.

**Q What is your home address?**

A [redacted].

**Q In terms of your work history, you**

**told us that you have been pretty exclusively doing the management of BWS Properties; is that right?**

A Correct.

**Q How long have you done that work?**

A I started in 1997.

**Q And it might make sense to go back a little bit in time. What was the original use of the property at 700 Manufacturers Road here in Chattanooga?**

A The original use?

**Q The original use.**

A Welding distribution of gases and parts, welders, welding supply. Brooks Welding Supply.

**Q Okay. And you can tell that I'm trying not to suggest it or testify for you. That was going to be my next question, what company was running it, and you went ahead and told me already?**

A Brooks Welding Supply.

**Q And was that -- I don't know if it's correct to call it your father's company of a family company, but was that a family business that your family had been involved in?**

A Yes. My grandfather started it.

**Q And what occurred that led you to**

**begin managing BWS Properties in 1997?**

A We sold the business to BOC Gases, British Oxygen Company.

**Q Prior to 1997, what company or entity had owned the property that we're talking about in this lawsuit at 700 Manufacturers Road?**

A Brooks Welding Supply.

**Q And in 1997, is that when it was transferred to BWS Properties, LLC?**

A Correct.

**Q And it's been in that company's name ever since?**

A Correct.

**Q Was your father involved in the management of BWS Properties, LLC?**

A No.

**Q Okay. Is he still living?**

A Yes.

**Q Is he retired?**

A Yes.

**Q Was he continuing to do any work with Brooks Welding Supply after 1997?**

A No.

**Q When the -- when the BOC became involved and operating at the Manufacturers Road**

**property, was it a purchase? How did Brooks Welding Supply relate to BOC, if that question makes any sense?**

A Can you clarify?

**Q Sure. Yeah. Your puzzled expression -- yeah. So did BOC purchase Brooks Welding Supply?**

A Correct. The business.

**Q The business. And did it purchase some of its assets and equipment as well?**

A Yes.

**Q Okay. Were some employees kept on and continued to work for BOC?**

A Yes.

**Q I've become aware during the course of this litigation of at least one employee who continues to work at the successor entity Airgas, Mr. Tracy -- and you --**

A Harvey.

**Q Harvey. Thank you. It was my understanding that he worked for your father's company, before he worked at BOC, before he worked at Airgas?**

A Correct.

**Q So that gentleman has about 40 years**

**of experience in the area, although not -- I guess after 2023 he wouldn't have been at that location; is that correct?**

A Correct. Except he did do a walkthrough inspection after they left.

**Q Okay. Do you know if that was still 2023?**

A Yes.

**Q We'll definitely get to that. I'm trying to make sure that I understand the history of the property correctly.**

**Do you know when the first building on that property was built?**

A I may not know specifically, but I think it was around '53.

**Q Okay. And which of the buildings on the property that we're talking about here at 700 Manufacturers was the first to be built?**

A I'm not certain. I could guess, but -- I was looking at some pictures from a historical site of downtown Chattanooga, and there was a picture which looked like half of Building Number 1 was the original.

**Q Okay. And I appreciate you not guessing or speculating because a lot of times**

**lawyers don't want you to do that and want to find out what you actually know. And for the purposes of the lawsuit, I don't know how much it makes a difference, but in 1953, it's your understanding that the first of the buildings were built on the property; is that right?**

A Yes.

**Q Okay. And is that when your father purchased the property -- or his father, your grandfather's business?**

A I am not certain. I know that Union Carbide started, and he -- and then they left. I don't -- I really don't know any of those details.

**Q Okay. Do you believe that the -- well, let me ask this. It's my understanding that there are four buildings on the property currently; is that still correct?**

A Yes.

**Q In some of the documents in this action, there has been a little bit of confusion about the numbering of the buildings, and so I want to make sure that we're operating under the same numbering scenario which I think is solidified. But if I refer to Building 1 or the main building, do you know which one I'm talking about?**

A Yes.

**Q Is that the largest of them?**

A Yes.

**Q And it had, during Airgas' tenancy, a showroom and a warehouse and some offices?**

A Correct.

**Q Okay. And is Building 2 more towards the back of the property and has also been referred to as the repair shop?**

A Yes.

**Q Okay. And Building 3, is that sort of between Building 1 and 2 towards the Paper Mill Road side?**

A Yes.

**Q Okay. And then Building 4, I believe, has also been referred to as the Gas House?**

A Correct.

**Q I'm going to refer to those names or numbers according to what I just laid out. And if we look at some documents that have different numbering, I may ask you to clarify about which one we're talking about.**

A Yes. I'm aware of those documents --

**Q Okay.**

A -- and the confusion.

**Q But I think we got those clarified early on or at some point. But early on, especially before I had laid eyes on the property, it certainly gave me a little bit of confusion.**

A Yes.

**Q Do you know when Building 2 or the repair shop was built?**

A No.

**Q Do you know when Building 3 was built?**

A No.

**Q And then Building 4 or the Gas House, do you know when that was built?**

A No.

**Q Were these all built all --**

A I was alive when building -- when the repair shop, Building 2, was built. So it was after '73, but I couldn't tell you -- I couldn't tell you that. I think that it -- everything was built before I was born except for the repair shop, Building Number 2. I was born in 1973.

**Q In the context of this lawsuit, are there any alleged damages to the building that's known as Building 3?**

A No.

**Q I'm going to be focusing on the other**

**buildings, but if there is something that you need to tell me about Building 3 at any point, I don't want to gloss over it. I'm not trying to ignore it. It was just my understanding there is not a set of damages or repairs that has been pointed out in this lawsuit.**

A Correct.

**Q Okay. We've talked a little bit about the history of the building. At what point did you first have interactions with anybody from Airgas?**

A 2005.

**Q And is 2005 around the time that you understand Airgas to have bought or taken over operations from BOC?**

A Correct. I got a letter from BOC that I produced.

**Q Is -- strike that.**

**In 2005, BOC had been a tenant for a number of years at that point; is that fair?**

A Yes.

**Q Okay. And was there a lease between BWS Properties and BOC?**

A Correct.

**Q In 2005, was it the end of the lease or was there still some time left on the lease?**

A There was several months left on the lease. I can't remember how many. But as soon as it expired, we negotiated a new lease with Airgas.

**Q I'm going to hand you some of these and we'll work our way through them and use them to help our timeline. Let's make sure we know what it is before we attempt to mark it.**

A Okay.

**Q As you can tell, or may be able to tell, in the bottom right-hand corner, there are some stamps, these Bates numbering that indicate where a document came from. That's been added later as part of the lawsuit. And for the record, this begins at BWS Bates 2, and the range goes through page 20.**

**If you can take a look at this and see and confirm whether this is the lease that we were just talking about between BWS and Airgas in 2005.**

A Yes.

MR. ROBISON: And let's go ahead and mark that as Exhibit 2.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 2.)

BY MR. ROBISON:

**Q Who drew up this document?**

A Evan Allison.

**Q And who is Evan Allison?**

A He is a corporate real estate lawyer here at Miller and Martin.

**Q Now, I don't want to know anything you told your legal counsel for the purposes of this lawsuit -- and that's attorney-client privilege -- but I do want to generally ask, was this drawn up at your request or the request of BWS?**

A It was a mutual request between Airgas and BWS Properties to have an independent agreement that superseded the previous lease with BOC.

**Q Were there different terms in the previous lease with BOC that were not included in this lease?**

A I didn't go back to familiarize myself with the BOC lease, and I'm certain that they were very similar.

**Q Again, not asking any information that you might have given to your legal counsel, but do you -- does Evan Allison still do work for BWS?**

A Yes.

**Q Okay. And can you tell who signed this lease on behalf of BWS?**

A That is my oldest sister, Margaret

Colmore Brooks.

**Q And her title that she indicates underneath her signature line is chief officer?**

A Is there not an executive in there? Yeah. We -- would you like me to explain that relationship?

**Q Oh, sure. If you want to, yeah. What -- what is the relationship and tell me whatever that you want to tell me about that.**

A All three of my sisters have professions, and I've been chosen to manage the company. However, in a checks and balances, we always let the oldest sister sign for property transfers and such just as checks and balances.

**Q Do you know if your older sister Margaret signed prior leases with BOC as well?**

A I -- no. I know she did not.

**Q Do your other sisters maintain officer positions with the company as well?**

A Can I clarify something?

**Q Sure.**

A When BOC bought the business, they -- part of the sale of the business was a lease. And it was executive -- it was executed by my father in the dealings of the sale. So this is the first time

we've -- BWS Properties had ever signed a lease with -- with accordance to that property.

**Q Okay. That's helpful. And so in 2005, is it your understanding this would have been the first lease that would have been drawn up between BWS and any tenant of the property?**

A That is correct.

**Q And by the way, we keep talking about the property. Do we understand that that's the property at 700 Manufacturers?**

A Correct.

**Q If we need to clarify about a different parcel, just let me know.**

**So you helped me understand that your sister signed it. She had an officer position of some sort with the company at the time?**

A (Nods head.)

**Q Is that yes?**

A When I file my secretary of state, we just list both of our names.

**Q And was she authorized to sign for the company in 2005?**

A Yes. We have documents to support that as well.

**Q Okay. Well, you're here testifying**

**and you told me as much, so that's okay. So this is the first lease that you're aware of between BWS and Airgas?**

A Correct.

**Q I've handed you another document. And the title I see at the top of this page is First Amendment to Lease. Do you see that?**

A Yes.

**Q Okay. And if I'm reading it right, it was signed in September of 2010, and it looks like it extends the lease until 2013. Did I describe that correctly?**

A Correct.

**Q What led to the signing or the creation and execution of this First Amendment to the Lease?**

MS. WOLINSKY: I'm going to object to that one because that's going to get into attorney-client privilege.

BY MR. ROBISON:

**Q Yeah. So I can clarify and say without getting into anything that you told your attorney or that your attorney told you, what circumstances led to the first amendment lease being created and signed?**

A It's just their regular renewal period. They had it for five years and this is their option to renew for an additional three, according to the lease.

**Q And you went back and looked at the document we've identified as Exhibit 2, and I think you knew what to look for. There is an option to renew for a number of years; is that correct?**

A 2-B.

**Q And this First Amendment to Lease, is that when that option was exercised?**

A Correct.

**Q Okay. And --**

A It was actually, in accordance, ninety days earlier.

**Q And is this --**

A September, October, November.

**Q And does this document basically memorialize that or --**

A Yes.

**Q I have to ask. Since it's in the document, it's kind of funny. At the bottom there is some fine print and there is a Brett Cohen identified in the file path. Who is Brett Cohen, if you know?**

A He -- I don't know his title, but I do

know that he negotiated this lease with me.

**Q Is he somebody that did work for BWS or is he somebody that did work for Airgas?**

A Airgas.

**Q You mentioned a little while ago that your sisters have careers of their own. Do you do any other work, whether property management or other work, for any entities other than BWS Properties?**

A Yes.

**Q Okay. What does your other work involve?**

A Property management.

**Q Okay. And are there other legal entities that you do work for, LLCs, things of that nature?**

A There is an -- I'm not sure. I have two houses that I manage for two brothers in Nashville. And I'm pretty sure they are an LLC, but I just know them by James and Will Brown. I don't -- I don't know -- they have probably sent me a 1099 that have their LLC on it, but I don't recall the name.

**Q Okay. So those are properties in Nashville. Do you manage any properties --**

A No.

**Q -- here?**
A No. They live in Nashville. I manage for them here.
**Q Thank you for clarifying. So they have properties here in the Chattanooga area?**
A Yes.
**Q And are there any other properties that you manage?**
A Yes.
**Q Okay. What other properties do you manage?**
A Okay. I have -- do you want addresses?
**Q Well --**
A Because I've got about 20 tenants.
**Q That's fine. That's a good sort of help. Let me ask you the question that I really was looking to find out. Are any of those other properties, is there any shared ownership with any of the ownership of BWS?**
A No.
**Q Okay. So they are totally separate?**
A Correct.
**Q That's really what I was wanting to find out.**

A And like I just mentioned, I get a 1099 because it's my personal income. It doesn't have anything to do with BWS Properties. Everything that's managed by BWS Properties is owned by BWS Properties.

**Q In your other property management work, do you get your 1099 individually, it's in your name?**

A Uh-huh.

**Q Is that yes?**

A Yes.

**Q And do you do any other property management work through an entity like you do with the property at issue in this case through BWS Properties?**

A No.

MR. ROBISON: Okay. Again, I don't know if any of that mattered, but it's nice to know what we're dealing with. We looked at the First Amendment to Lease. Let's go ahead and mark that as Exhibit 3.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 3.)

//

BY MR. ROBISON:

**Q So the next document I have handed you just now has a title of Addendum to Lease. And this one looks like it was dated sometime in October of 2013; is that correct?**

A Correct.

**Q And take a moment, if you need to, to look to the subsequent pages. Looks like it's only two pages long. My first question to you is going to be, do you know if this addendum or agreement was ever completely signed or executed?**

A Yes.

**Q Okay. On the back page -- sorry. Go ahead.**

A If you would like me to clarify, this was my copy and I just failed to sign it. We did sign and return to Airgas. This was before electronic signature. So where we had to sign it and mail it --

**Q I understand. Based on the timing, that doesn't surprise me, but I had to ask, right? But it's your understanding that there is a completely signed version of this?**

A Correct.

**Q And BWS and Airgas operated under this**

**Addendum to Lease at some point; is that correct?**

A Correct.

**Q If I'm wrong about any of that, you just let me know.**

**And then same question as before. I'm not asking you any information about communications with your lawyers, but what circumstances led to the creation or signing of this Addendum to Lease?**

A If you'll notice in Exhibit 3, this starts at 2010 and extends it until October 31st, 2013. So we -- we created another lease. And it was October 2013. And we added some insurance costs that were not -- I don't think that this addendum is reference to Exhibit 2.

**Q When you say that the addendum is not reference to Exhibit 2, what did you mean by that?**

A If I'm not mistaken, there is -- after this first amendment, Exhibit 3, after it expired in October 31st, 2013, we drafted a new lease. And this is an addendum to the new lease.

**Q Okay. So it may be that we're a little out of order.**

A Yes, sir.

**Q Okay. I think I have the new lease. So let me hand you that and maybe we can figure this**

**out together.**

A Okay.

**Q Do you have the document in front of you that has a title of Industrial Building Lease and it has a date on the front page of November 1st, 2013?**

A That is correct.

**Q Okay. So if you would, tell me what I think you were beginning to tell me about the lease that ended in October 31st of 2013 and this new lease. Is that what we're looking at here?**

A Correct. As I'm sure you are aware, we wanted to make some changes, and so we created a new lease. And in which -- I think it's 21. Let me go back and look. No. That's the -- in this, you'll see that Airgas had -- in this lease, they were paying insurance. In this lease, they are not. I'm -- I'm paying the insurance and they are reimbursing me.

**Q And because you pointed to stuff, just for the record, when you pointed to "in this lease, they were paying insurance," you were pointing to Exhibit 3, the first amendment to the lease from 2010?**

A Well, yes. But really there is

nothing that describes insurance in Exhibit 3. The insurance is described in Exhibit 2. And Airgas had elected to hold their own insurance, which didn't turn out very well for me.

And so in the November 1st lease, we changed that to BWS Property paying the insurance and that Airgas would reimburse us for that.

Now, if you look on page 2, you'll see the monthly rent for this was 7,000. But because of the insurance cost, we increased. But instead of paying the entire insurance, we prorated it out. And that was -- that was basically done through counsel, so...

**Q And, again, I'm not going to be asking you about what you said to your lawyer or what your lawyer said to you, but you can describe for me whatever factual events led to the determination or anything that you know in terms of facts and events.**

**Let me ask you this and then we'll mark these as exhibits. Am I correct in understanding you that the document we looked at with the title of Industrial Building Lease came before the Addendum to Lease?**

A Correct.

MR. ROBISON: Okay. And so I think

it will make most sense to mark that as the next numbered exhibit, 4, and then the addendum to the lease Exhibit 5. And then we'll mark that before I ask you any more questions.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 4.)

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 5.)

THE WITNESS: I admit this is confusing.

BY MR. ROBISON:

**Q Well, it's less confusing now that you are explaining it out to me and I know the order in which things were signed. Let me ask you this. It looks like the effective date and the signing date on Exhibit 4, the Industrial Building Lease, is around November 1st of 2013; is that right to your knowledge?**

A Did you say November 1st?

**Q Yes.**

A That is when this lease would be effective, yes.

**Q Do you know when this lease was signed**

**by the parties?**

A I would venture to say we had it executed well before the date that it was to go into effect.

**Q Your older sister, Margaret Brooks, has her name again on the lease. It's not dated on this back page.**

A Right.

**Q But it's yours understanding that it occurred before the Addendum to Lease?**

A Correct.

**Q So let me ask you about that Exhibit 5, the Addendum to Lease. All I have here is the month of October that's on the first page.**

A Yes. I see that.

**Q Do you have any knowledge about what date this would have been signed?**

A I would say that, again, if you -- that we do this way long before -- we execute documents and do -- and write this stuff up long before. I think it's 180 days is written in the lease of, you know, that we can start negotiations.

However, if you look at the second paragraph of the addendum, it says, Landlord and tenant entered into that certain lease effective

November 1st, 2013. That is a direct reference to Exhibit 4.

**Q Okay. So these two should be read together?**

A Correct.

**Q You mentioned to me a few moments ago about insurance and something did not go well for you.**

A Correct.

**Q I don't want to assume I know what that might be referring to, but let me ask you, was there an event or what were you referring to about insurance and something not going well for BWS?**

A There was a hailstorm, major casualty, and that's when we found out Airgas was not -- they were holding the insurance, but their deductible was unreasonable and didn't cover any of the casualty.

**Q The hailstorm that you mentioned is something that I'm sure we are going to discuss a little bit here. Can you tell me the year that that occurred?**

A 2012.

**Q Do you know the month?**

A I think it was spring, but I'm not certain.

**Q It certainly would make sense if it was. We've had a week of storms here before the date that we're sitting here today. So that would make sense. I'll probably ask you a little bit more about that later and the specifics of it, but am I understanding your testimony correctly today that that was a motivator for the Addendum to Lease that was signed?**

A It wasn't the addendum. It was Exhibit 4. That was -- the addendum was to correct the cost of insurance, to add the cost that wasn't -- again, instead of charging them a bill for all $12,000 of the insurance, you know, in one lump, we spread it over. And that's all that this describes basically.

**Q And this --**

A I'm sorry to...

**Q The lease from 2013 that's Exhibit 4 has insurance provisions in it; is that right?**

A Correct.

**Q And as I understand you, tell me if I'm wrong, the insurance provisions in this lease are different than a previous lease because now BWS Properties would be obtaining the insurance and Airgas would be reimbursing a portion or all of**

**whatever that policy was; is that --**

A All, yes. It's a triple net lease. They reimburse me for taxes and insurance or at least they are supposed to.

**Q Is -- if you can take a look at page 5 on that 2013 lease. Do you see some highlighting there?**

A Uh-huh.

**Q Do you know who provided the highlighting?**

A Me.

**Q Okay.**

A I think this was my original copy. I'm guessing it was me. My original copy has a lot more highlighting on it than this.

**Q There are other documents that also have some highlighting, and I'll probably ask you the same question.**

A I'm a highlighter.

**Q Lawyers of all people can appreciate that.**

**Exhibit 2, the 2005 lease, did it have a right of first refusal?**

A No. That came in Exhibit 3.

**Q Exhibit 3. Okay. Was that right ever**

**exercised?**

A No.

**Q And the later lease, Exhibit 4 that we're looking at, did it have a right of first refusal?**

A I can't remember that. I would have to read on. I know that we did take it away, but I'm pretty sure it was at the next addendum that I haven't seen yet.

**Q We've talked about the lease from 2013 and the addendum to it that happened shortly thereafter.**

A Uh-huh.

**Q Is that yes?**

A Yes.

**Q And those two are read together and that's Exhibits 4 and 5?**

A Correct.

**Q And so you mentioned a later lease, and I think you're talking about the one that I'm about to hand you. So let me have you take a look at this.**

**As you look at that lease, let me ask you this. Did Airgas stay on the property throughout the lease period from the lease dated 2013?**

A Correct. They did.

**Q And was there a period of extendable years and an option to renew that they exercised?**

A Correct.

**Q And so at what point did Airgas finish up this lease including the additional optional years?**

A What do you mean with "this lease"?

**Q Thank you for the clarification addition. The 2013 lease, Exhibit 4.**

A What was the question again?

**Q Sure. Let me ask you again because we might not have been looking at the same document at the time. So looking at Exhibit 4, did Airgas stay in the property during the entire time period envisioned in this lease?**

A Yes. They completed their five years and exercised their option to renew for an additional three, and then they started a holdover tenancy.

**Q The optional years, did they -- I'm asking you to sort of check my math. Did they end around 2020 or 2021?**

A 2021, if I'm not mistaken. I think -- '21.

**Q Okay. I'm just doing the math in my**

**head. If it's eight years total, five plus the optional three, and it began in 2013, that would make about sense. And so you told me just now -- and this was going to be one of my questions -- there was a period then after the optional extension that Airgas went month to month?**

A Correct.

**Q Okay. And I think just by the math you have told me that that would have begun in 2021?**

A Correct.

**Q Okay. Do you --**

A November of 2021.

**Q Okay. That was going to be my next question. And is the next lease signed by BWS and Airgas the lease that I have put in front of you that we haven't numbered as an exhibit yet --**

A Correct.

**Q -- with a date of June 1st, 2022?**

A Correct.

MR. ROBISON: Let's mark that as our next numbered exhibit.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 6.)

//

BY MR. ROBISON:

**Q Was Airgas month to month from November of 2021 until June 1st of 2022?**

A Correct.

**Q Okay. And how long is this lease for?**

A Twelve months.

**Q Twelve months. The previous leases that we looked at were five-year leases and they had three-year optional extensions?**

A Correct.

**Q What led to the different format for this lease?**

MS. WOLINSKY: I'm going to object based on privilege.

BY MR. ROBISON:

**Q I don't want to know what you said to your lawyers and I don't want to know what your lawyers said to you, but what circumstances led to the lease period being different in this lease?**

A We couldn't -- we're missing a document, which is an addendum to Exhibit 4 that describes that. But Airgas has two locations in Chattanooga. One had a casualty and they left it. There was a fire and a lot of water damage from the sprinkler system. And so that's why they decided

to -- because BOC had a location on 700 Manufacturers Road, Airgas had a location on Access Road, the -- and since the 700 Manufacturers Road had been counter sales, welding supply sales, it's a better location and it's a better reputation of, you know, location in general with counter sales, the longevity of it. So Airgas decided to move to 700 Manufacturers Road and abandon the property on Access Road.

However, they kept that property in its damaged condition. And, again, the addendum to Exhibit 4 that's not in front of us, Airgas was in default of Exhibit 4. And so to cure that default, we added another addendum.

And that addendum basically said that I'll let you have the grassy area, but when we -- because if you look at Exhibit A on the lease, the 2013 lease, there is a paragraph that says, Notwithstanding the foregoing, specifically excluded from this lease is a certain grassy area adjacent to the building of which the premises are a part.

So they paved that grassy place without any consent or -- they didn't ask. And so I had a brewing company that wanted to come in and build and they needed the exact space of that grassy area. So when I came down to view it, I realized

that Airgas had paved it and was using it.

And so to cure that default, I needed them to pay more money. And we were close to the end of this lease, so I asked for market value. Because the lease in 1997 was part of the sale with BOC, their rent was $500. It was something ridiculously low. And Airgas wanted that ridiculously-low price. And it was always a fight just to get them to about half of market value. And so we really wanted -- with annual increases. So we really wanted to cure that default with another long-term lease, a five and three, but we wanted it at market value.

So at that time when the end of the lease came, we hired an appraiser, and they came in and said this is the market value. And even though Airgas had already signed the addendum to renew at market value, they chose not to. That's when -- and I can't speak for them, but that's when they started to do the renovations on the Access Road property.

Now, I can't really speak to when that happened or anything that Airgas did in that way, but I know that that was a contributing factor. They decided to move back to Access Road. However, they had to have a year to get it finished. And so since we couldn't come up with any agreement for a

long-term lease renewal and they wouldn't renew what was here -- they wouldn't renew Exhibit 4 -- it was over. That lease was expired. And it wasn't over, actually, because during the time from November to June, they were in a holdover tenancy. And so that was their only legal way to operate under this current lease was in a holdover.

So the holdover was more expensive than the market value. So I went with -- we decided on a market value that they would pay. Really it was -- it was below, but we worked it out just for a year while they could get to their next building. I was well aware that they were going to move to Airgas -- to Access Road.

**Q Okay. I have a couple questions about a couple things that you mentioned just now, and I'm sorry if I jump around. Is there -- you mentioned an addendum like a second addendum to the 2013 lease.**

A Yes.

**Q Was that addendum signed?**

A Yes.

**Q Okay. And do you know if you provided it to your lawyers to turn over in this lawsuit?**

A Yes.

**Q About when would that addendum have**

**been signed? What year?**

A I produced the document. I would be -- just a guess, somewhere around '17, maybe. Somewhere around in there. But, again, I -- it was -- it was specifically -- there were also other things in there, but it was specifically designed to deal with their default.

**Q Tell me a little more about the default that you described. Is that in relation to the grassy area?**

A Correct.

**Q Okay. At what point, to your knowledge, did the paving occur that you mentioned?**

A I don't know. I tried to go on Google Earth -- you know how you can do the little timeline -- but there was not a lot of aerial photos at the time. And I can't remember exactly when it was. Well, I mean, I didn't know they were going to pave. They didn't give me any warning. I just found out when I took the brewery -- when I was setting up a meeting with the brewery that wanted to build in that grassy area.

**Q Was the intention with the brewery to partition the property in some way?**

A Correct.

**Q Where would the entrance have been, do you know, if a brewery was in that part of the property?**
A We never got that far. It was paved. We didn't have to worry about any of that because -- and like I said, I immediately contacted Airgas to discuss it, and that's when we came up with a cure to the default that we both agreed upon.
**Q Do you recall who you would have been speaking with at Airgas when you discussed the second addendum to the 2013 lease?**
A I am going to assume it was Dawn Van Dyke, but I don't know if it was Leigh Purdy or Dawn Van Dyke. I don't know when Leigh Purdy -- I don't know when she retired. They worked together for a long time. In 2005, I began working with Leigh Purdy. I just can't remember.
**Q Do you have any understanding as to whether there was gravel in the area that was paved over in that time period?**
A I'm probably going to say this a lot, but that whole parking lot was covered. You know, I mean, they palletized all their cylinders. And so -- and you can still see where the painted lines are for each different type of gas and they are labeled. So

it's really hard for me to recognize when they put gravel, but I did see that there was some gravel in that Google Map or Google -- or Earth -- Google Earth.

**Q Is this like aerial photography of some sort?**

A Yes. Google Earth is a -- is a website.

**Q But I guess I was asking whether it was an overhead view or --**

A Yes.

**Q -- the street view that Google also sometimes offers?**

A They didn't have street view back then.

**Q Okay. One of the questions that I had for you, looking at Exhibit 4, the 2013 lease, and Exhibit 6, the 2022 lease, was about the change to paragraph -- or Section 1.4. And you might have given me the answer, but let me ask to be clear about that. I noticed in the building description that there is an additional box in that description that lists 18,000 square feet of loading lot. Do you see that?**

A I do.

**Q Okay. I don't want to assume, but can you tell me what that loading lot is?**

A Basically all the parking, paved space.

**Q Is this the portion of the property that is towards the back and I might describe as being behind the Gas House or to the left as you enter from the main gate?**

A There is a loading dock there. There is also a loading dock at Building Number 1 in the back. There is a loading dock at Building Number 2 that has a two-ton lift. And on Building Number 4 is a loading dock area as well. But Airgas was bringing in tractor-trailers and palletizing cylinders. So when cylinders would come in, they would be on pallets and manipulated with a forklift.

**Q I may have misspoken or I don't know if we're talking about the same thing, so I'm going to ask maybe a different question. I'm asking about a loading lot that's described in the 2022 lease --**

A Correct.

**Q -- under Section 1.4. What is your understanding of what the loading lot is?**

A Well, I don't know how to describe it differently. But if you think of a very large

tractor-trailer and the trailer being a flatbed, they would pull into an area of paved parking lot, paved -- what we would -- what we would consider a parking lot. But it's a loading lot because they bring these giant trucks in and then forklifts load them in the middle of everything.

**Q And where on the property was the loading lot or the 18,000 square feet that is described in that box under 1.4?**

A Between Building 1 and 2 and over to Building 4.

**Q Okay. And that loading lot, had it existed prior to 2022?**

A Again, on the second addendum to Exhibit 4, it's -- it is described. And I'm sure you have already seen Exhibit A in the back. The paragraph excluding the grassy part is eliminated. So that's adding that loading lot up there. And I would have to check the square footage. I know that they used the loading lot from, you know -- I don't know if the square footage is just the square up in the grassy part or if it's down below. I don't know the square footage.

**Q Okay. That was going to be my next question. Is the loading lot corresponding in any**

**way to the area that you mentioned from Exhibit --**

A Yes.

**Q -- 4 as being described as the grassy area?**

A Yes. It's included. I think the 18,000 square feet is a little bit more than that specific one, but that's why it was added here is because we -- in the amendment that you're missing is -- that's -- it's described.

**Q This Exhibit 6 that we're looking at --**

A Yes.

**Q -- who drafted this lease?**

A Evan Allison.

**Q And that was BWS's counsel here at Miller and Martin?**

A Correct.

**Q Do you have Exhibit 4 in front of you still?**

A Yes.

**Q I'm looking at Exhibit 6 and Exhibit 4 together.**

A Okay.

**Q These documents are obviously pretty similar; is that right?**

A Correct.

**Q I think you told me before they were drafted by the same person --**

A Correct.

**Q -- at BWS's request? I was looking at 1.3 which is above the boxes that describe the buildings.**

A Uh-huh.

**Q In the 2013 lease, there is a mention that the premises include 78,500 square feet parking lot. Do you see that?**

A I do.

**Q And then it's slightly different in 1.3 from 2022. It says, The premises also includes a 60,500 square-foot parking lot and an 18,000 square-foot loading lot. Do you see that?**

A I do see that.

**Q How was the loading lot differentiated from a parking lot?**

MS. WOLINSKY: Object to phrasing based on privilege.

MR. ROBISON: And you mentioned privilege. I don't want to get into privilege. Was that an instruction for the witness not to answer?

MS. WOLINSKY: Yeah. If you want to

rephrase and then we can talk about some of the facts, but you've essentially just asked what's the meaning of --

MR. ROBISON: I just didn't know if I needed to wait for a question -- an answer.

MS. WOLINSKY: All good.

BY MR. ROBISON:

**Q Ms. Nevans, do you have an understanding about what the parking lot is and what the loading lot is as they are described in Section 1.3 in Exhibit 6?**

A No, I do not. I mean, I see what you see obviously. And I do not know how the square footage was calculated or why or -- but -- or how it could have been -- could have been an error in measuring. That is a good question, but it still -- it was not paved in 2013, so I don't know -- I don't know. That baffles me.

**Q The term parking lot or loading lot, is that a term that BWS used?**

A Yes.

**Q And then was the rental rate including that square footage, is that how the rental rate was set? I'm trying to understand how it's included in the Section 1.4 table.**

MS. WOLINSKY: Object to form.
BY MR. ROBISON:
**Q Perhaps it's an inartful question, so let me ask it again. I see that the loading lot is included under the building section of 1.4 in Exhibit 6. Do you see that?**
A Yes.
**Q Okay. Was the loading-lot square footage treated as if it were square footage for a building?**
MS. WOLINSKY: Object based on privilege.
BY MR. ROBISON:
**Q And if you can answer -- not telling me, please, anything you said to your lawyers obviously -- whether you have an understanding as to whether the loading lot was included in building square footage.**
A I think that my purpose for that was to justify the fair market value of the property. And before where I had described the square footage in buildings, it was very easy for me as a property manager to do comps to find out what retail space is, what warehouse space is, but there is no comps for what a loading lot is for what they were doing to the

parking lot.

But because we described that it was their maintenance for the parking lot, loading lot, whatever you want to call it, I wanted to include that to justify the fair market value.

**Q If you look through Exhibit 6, there is some additional highlighting. And you can just take a moment and flip through.**

A Okay. Okay.

**Q Do you know who provided the highlighting in this document?**

A Myself.

**Q We're going to return to Exhibit 6 in a little bit. Before we do, I want to kind of finish up our timeline with lease-related documents. You've told me about a second lease that we haven't looked at yet.**

MS. WOLINSKY: Object to form.

BY MR. ROBISON:

**Q Thank you. You've told me about a second addendum that we haven't talked about yet. And you've described it, but we don't have it in front of us, right?**

A Correct.

**Q And this lease that's Exhibit 6 had a**

**termination date or an end date of May 31st of 2023; is that right?**

A Correct.

**Q I'm going to have you take a look at this next document. Do you recall receiving this document?**

A Let me familiarize myself with it, please.

**Q Sure. Take your time.**

A Okay.

**Q Do you recall receiving this document?**

A Yes.

**Q And to me this looks like a letter from somebody at Airgas to you giving notice of Airgas's intention to be completed or terminate the lease on May 31st, 2023.**

A Correct.

**Q Okay. And I'm not trying to put words in your mouth; I'm just trying to speed this up. Looks like it's dated February 6th of 2023.**

A Uh-huh.

**Q Is that yes?**

A Yes.

**Q And do you have a memory of receiving it around that time period?**

A Yes.

**Q Okay. And I don't expect you to remember what you ate for breakfast on a particular day two years ago, but I just wanted to confirm. I do notice, by the way, CC'd here is Evan Allison at Miller-Martin. Okay. So he was still involved, I guess, with working for BWS?**

A Correct.

MR. ROBISON: Let's go ahead and mark this as the next numbered exhibit. I think it will be 7.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 7.)

BY MR. ROBISON:

**Q And then just to finish this up with apologies to the small print. I blew it up as big as I could. It looks like you responded and confirmed receipt of that document on or about February 7th of 2023. Does that appear correct to you?**

A Yes.

**Q Okay. Is this your email address, the bwsproperties@gmail.com?**

A Correct.

**Q I say you. You in your management**

**capacity for BWS Properties. I don't expect this to be your personal email, but is that the email that you used with the company?**

A Correct.

MR. ROBISON: Let's mark this as the next exhibit, 8.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 8.)

BY MR. ROBISON:

**Q It looks like you signed the letter that they sent to you and then sent it back to them as an attachment to this email. Does that sound right?**

A Yes. In the second paragraph it asks me to do so.

**Q Okay. And then the attachment that would have been attached to this email is what we just marked as Exhibit 7?**

A Correct.

**Q Because it has your signature on it.**

A Correct.

**Q It's a very short email. I'm just going to read it out loud and you can confirm what it says.**

**Dawn, I got the letter from Mr. Donato today. I hate to see Airgas leave. You have been a good tenant over the years. I acknowledge and agree with the decision not to renew. I have attached the executed notice as requested. I'm sure there will be details to discuss. Please feel free to discuss any time. Thanks. Jenny. Did I read that right?**

A Correct.

**Q Since this email is from February 7th and the letter is dated February 6th, do you think that you received it either on or about that same date?**

A This says -- exhibit says via overnight mail. So I'm certain that I promptly responded.

**Q Sounds like you would have received it on the day of the email or maybe --**

A Probably.

**Q -- around that same time period?**

A I can look and see what time the email was sent. Yeah. Afternoon, 5:00, 4:48.

**Q Believe it or not, I believe this will help a little bit. So it will be somewhat legible. It was much smaller. The next document I want to hand you is from May 31st of 2023.**

A May 31st of 2023.

**Q And I'll give you a moment to take a look at it if you need to.**

A I'm aware of this document. Well, wait a minute. Let me make sure.

**Q Sure. Yeah. Please confirm if you need to.**

A Okay. I have.

**Q Do you recall receiving this letter or document?**

A I was shown this document.

**Q Okay. Did you get a copy of it at some point?**

A I think I did on -- I think that Peter handed me the document.

**Q Okay. And the reason I ask is that you can see that stamp down at the bottom right that says BWS on it. That means that BWS's counsel provided it to us, and so it was in the possession of BWS.**

A Correct.

**Q So I take it it's your understanding you did get a copy of this letter?**

A Yes. I -- only by Peter handing it to me.

**Q That was going to be my next question. It says at the top hand-delivered. And let me just tell you, it's my understanding that this was handed to you on the last day of that tenancy term of --**

A Correct.

**Q Okay. I think there is a number of events around that time period. And I want to ask you about a lot of them, but I wanted to confirm that this was something that you received on May 31st or around that date. Is that still accurate?**

A It was on May 31st when I met with Peter to do the walkthrough.

**Q And you described this in BWS's responses to some of our written questions, our interrogatories in this case. And I may make those an exhibit here in a moment, too, but because this came up first, tell me about that meeting, if you would, and what he said to you as it relates to this letter.**

A Well, first of all, just walking through the letter, it says the delivery of the leased premises. The tenant is surrendering the leased premises in accordance with paragraph 20 of the lease. You'll also see paragraph 20 of the lease was what they agreed to do.

So it was -- I responded, Thank you very much. I agree with this as long as you're pursuant to the lease to paragraph 20, which is what it says in here, pursuant to terms of Section 20 of the lease. I mean, that's what they promised to do. And so I was okay with that. Thank you. I knew they were leaving. You have been a great tenant.

I mean, we've had the insurance casualty, but we've always -- we've always gotten through problems. I've had lots of late payments, but we've gotten through those, you know, basically. And I expected that they would do this.

This letter was not a representation of paragraph 20 in the slightest at all. And, I mean, we can go through -- I mean, because it's a lot.

**Q Yeah. In what respect? And if we're talking about -- let me back up and ask you this.**

**When you say it's not in accordance with or a representation of paragraph 20, are you talking about the condition of the property?**

A Correct.

**Q Because I do have a lot of questions about that, obviously.**

A Yes, yes. And we can go through

Section 20.

**Q Let's -- since you mentioned it, let's do that. So that would be Section 20 of the lease from 2022 that's Exhibit 6. And I note that there are some highlighting in that paragraph in the document we have.**

A Correct.

MS. WOLINSKY: When you get to a stopping point, can we take a quick break?

MR. ROBISON: Absolutely. It does seem like we might be launching into something soon. Maybe we'll address this paragraph and then take a break?

MS. WOLINSKY: Uh-huh.

BY MR. ROBISON:

**Q I'm sorry to interrupt. Tell me what it was that you were referring to or what you wanted to tell me about in paragraph 20 of the 2022 lease.**

A If you look at the highlighted area, we don't even have to go back to May 31st when -- or June 1st when they signed this lease. We don't have to go back that far. We can go back to May of -- you know, May 1st, because all the damage basically occurred at move-out.

And it was not in good condition

whatsoever. Things were torn out of the walls and the tenant's property was not removed. There was a giant dumpster. There was still trucks on the property. There was desks, chairs, oil bins, cylinders. And then for some reason there was someone's personal trash that was spilling out of the dumpster. I don't know where that came from.

No repairs were performed. In the second part of the highlighting, there were no repairs done. Toilets were running. Sinks were dripping into buckets below them. Let's see. There is more.

And I was just very, very surprised. I had no -- we had taken -- they had allowed me to go in to take some pictures with a professional photographer, and everything seemed to be just fine.

**Q When were those professional photographs taken?**

A I would have to look, but I knew that it was going to have to go on the market June 1st. So I would -- well, I'll tell you the Bradford pear was blooming. So it would be in late April or -- what is it? It would be in April. Early April, probably. Well, when the Bradford pears bloom, which they just quit.

**Q March or April?**

A Uh-huh. Probably April 1st. I didn't want to -- I don't remember, but they have been produced. I'm sure that there is a time stamp on them.

**Q We'll probably look at those in a little bit. Whether there is a time stamp, I don't know, but we will probably look at those.**

A I certainly have it in email.

**Q They were part of a PDF when I received them, so I don't know if they would have a time stamp.**

A Well, I can provide that for you.

MR. ROBISON: Why don't we go ahead and take that break since we've sort of mentioned a bunch of the topics that we're going to be moving into and go ahead and take that now.

THE WITNESS: Okay.

(Lunch break.)

BY MR. ROBISON:

**Q We're back on the record after taking a little bit of a lunch break. I had two questions that I was going to ask before. Is it okay if we go back to those, finish those up --**

A Sure.

**Q -- and then we'll launch into kind of the next section of our conversation today?**

**You had mentioned as one of the reasons for the change in some of the language to Exhibit 6, the 2022 lease, about a default by Airgas that involved the grassy area, and you described that to me. Do you remember that conversation we had?**

A Yes.

**Q And to be -- just to clarify, because I need to know and I'm about to talk about the complaint. Is that default a subject of the lawsuit? Is there any portion of the claim in this lawsuit that's related to that default or is that a previous issue that was resolved via the addendum?**

MS. WOLINSKY: I'm going to object based on -- I'm sorry -- privilege since it was a -- it relates to our drafting of the complaint.

BY MR. ROBISON:

**Q Is there any amount in the complaint, in this active lawsuit, that BWS is seeking related to the default that you mentioned from the 2013 lease?**

A No.

**Q Okay. I just wanted to be clear so I wasn't omitting something that we needed to talk**

**about. You also mentioned some late payments. Are those late payments that are the subject to this lawsuit or are they other late payments?**

A They are not subject to this lawsuit.

**Q Okay. Tell me just briefly, when you mentioned late payments, what were those or what was the circumstance?**

A Before, we had ACH deposits and we had to cut checks. And really before the technology was -- to get Airgas to reimburse for the taxes and insurance was always an issue. Whether it was in Exhibit 4, the industrial lease there, even though they paid their insurance, they reimbursed me for taxes.

And once I would -- what I normally did was photocopy the check and photocopy the bill -- the bill I received and where I had paid the check. And then I would mail that to Airgas. And then sometimes it would be three months before I was paid.

**Q You mentioned ACH and some better technology. Did that improve once things got a little more automated?**

A Yes, it improved. It wasn't as -- there was definitely an incentive in the -- I increased the late payment -- the late fee, and that

was an incentive to pay quicker.

**Q And after increasing the late fee, did those payments get made more promptly?**

A It got better. However, there was several incidents where I charged the late fee.

**Q Was the late fee increased in the 2022 lease or was it a previous lease?**

A It remained the same. It was -- it was changed in Exhibit 4 and it maintained through Exhibit 6.

**Q Okay. So that was something you had revised in the 2023 lease?**

A No. I increased it in the 2013 lease, and it remained.

**Q I may have misspoken. So that was -- what I had intended to ask was, so that was something that you revised for the 2013 lease?**

A Correct.

**Q I want to hand you a copy of the complaint that began this lawsuit. Have you seen this document before?**

A Yes, I have.

MR. ROBISON: Let's go ahead and mark this before we forget. I think it's going to be Exhibit 9.

MS. WOLINSKY: I have Exhibit 9 as the surrender letter. Is that not --

THE WITNESS: We never labeled it.

MS. WOLINSKY: Did you want to do --

MR. ROBISON: Let's go ahead and do that then. Let's mark the surrender letter as 9 and then the complaint will be 10.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 9.)

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 10.)

BY MR. ROBISON:

**Q I want to ask you a couple questions about the topics and the facts that are mentioned in this complaint. I'm not going to ask you about any communications you had with your lawyers or things that your lawyers said to you.**

**I want to just look over this document a little bit and get the categories together, make sure that I'm not missing something. And then what I would like to do is go through different categories and use that as a guide to some of the claims that BWS is making in this case, and hopefully that will**

**give us a little bit of organization.**

**At some point if we talk about damages to property, maybe we might break it up by building and go building by building. We'll see what makes the most sense, but we'll try to move through it efficiently if we can.**

**If you look through the complaint, there is some headings. For example, I'm looking on paragraph -- or page 4. You see there is an all caps heading that says Unpaid Monthly Holdover Rent?**

A I do.

**Q Okay. The next one I see -- I'm going to take -- go over these a little bit and then come back to each category.**

A Okay.

**Q The next one, Unpaid Taxes?**

A Correct.

**Q You have mentioned that a little bit and told us how that was supposed to work. And very similarly, there is a category of Unpaid Insurance Costs?**

A Correct.

**Q There is an Unpaid Utility Cost?**

A Correct.

**Q And then there is a heading that says**

**Notice of Default and Fail to Cure. Do you see that at the bottom of page 5?**

A I do.

**Q And if you turn to the page 6, there is then -- under Causes of Action, there is count 1, breach of contract. Do you see that?**

A Yes.

**Q Okay. Now, I expect that your lawyer has wrote this and that you weren't doing the actual writing of this document?**

A Correct.

**Q I'm not going to ask you to define legalese for me, but I do want to know about some of the facts, and I thought we might use this to go through it. And I might just take it in the order that it was listed. If there is a better way of describing it or categorizing it, let me know.**

**But I thought I would first take unpaid monthly holdover rent. Is it BWS's position that Airgas owed money -- rent money to BWS for dates after May 31st of 2023?**

A Yes.

**Q Okay. What facts would you point me to to show that Airgas had a tenancy at this property on Manufacturers Road after May 31st of 2023?**

A Their possessions were still on the property. I had not received any keys. They took the gate off the lock -- I mean, they took the lock off the gate -- excuse me -- so that they could have access. The -- they did not -- they did not -- according to this letter, that they were going to turn off the utilities. No utility companies at all had been notified.

They still paid -- they still provided me with insurance information. And I seriously thought that they were going to come back and do the repairs and that that -- they did not surrender the property according to the lease.

**Q I might take them in reverse order. You said insurance information. What do you mean by that when you told me that they didn't provide insurance information?**

A They did.

**Q Oh, did.**

A They were still -- so part of our agreement is that I hold the -- a portion of the insurance with the liability of -- I think it's 200, something like that -- and that they are to have a liability insurance policy as well as a tenant. And they are still providing me with -- I just got one in

the mail not long ago, so -- of a certificate of coverage that they have for their liability property. I mean, their liability policy for 700 Manufacturers Road.

**Q Is it your understanding that BWS was or is an additional named insured on policies obtained by Airgas?**

A No. I'm not sure.

**Q Okay. Do you have any understanding as to what the insurance information is that you have been receiving?**

A Their general liability policy, proof of insurance.

**Q And you receive a copy of the proof of insurance?**

A Every six months.

**Q And is it BWS's position that BWS's receipt of that insurance information is a reason why Airgas is responsible for unpaid monthly holdover rent after May 31st of 2023?**

A That alone, no.

**Q You mentioned utilities. Did I understand you or did I hear you right or remember correctly -- since it's been a couple minutes -- that none of the utilities had been shut off?**

A Correct.

**Q Is it your position that the electricity had not been removed from the name or account of Airgas?**

A That is correct.

**Q I recall communications about the gas needing to be turned off. Do you recall conversations about that?**

A Yes.

**Q And was there a need to coordinate with BWS for the gas company to come in and turn off the gas or switch the account over into BWS's name, whatever it was?**

MS. WOLINSKY: Object to form.

BY MR. ROBISON:

**Q Sure. I'll ask that again. Is it your understanding that the gas was still in Airgas's name as of June 1 of 2023?**

A June 1 of 2023, it was, yes.

**Q And did you have to coordinate with Airgas for a time when the gas company could come in and make some change to the meter --**

A No.

**Q -- to take it -- let me finish the question.**

A Okay.

**Q And I'm going to start it over because it's important, and I don't want you to answer the wrong question.**

A Sure.

**Q It will get both of us in trouble. Did BWS, and presumably through you, coordinate with Airgas to give access to the property for the gas company to come in and make a change to the gas meter?**

A No.

**Q What do you recall about gas service to the property after May 31st of 2023?**

A I did not even think of the gas, and neither did anyone else until winter came. And that's when I was contacted by Peter Van Slyke to -- he asked if I would coordinate with the gas company. Airgas had no coordination with that. He just requested that I take care of it.

And so I sat down there for two days waiting for the gas people to come. And Airgas did not take that responsibility to coordinate with me so that they could sit down there for all day. I'm the one that had to sit down there all day to wait for the gas people.

**Q Did you ever propose or consider giving them keys to the gate so they could do the waiting?**

A Yes. I asked, yeah. Peter asked me to take care of it.

**Q You mentioned a lock on the gate. Was there a lock on the gate that was BWS property? What was the lock on the gate?**

A So all the truck drivers have a key to the lock on the gate. So Airgas took that lock with them to use at Access Road. So nobody -- they didn't have to redistribute keys to the gate. They just used the one from my gate and took it to theirs.

**Q Who originally purchased that lock?**

A I don't know.

**Q I heard you say a few moments ago that you didn't receive any keys from the property; is that right?**

A Correct.

**Q Did Peter Van Slyke not turn keys over to you on the 31st of May?**

A Not that I recall.

**Q Do you recall one way or the other?**

A If he gave me a key, it was to Building 1, but I don't think he did. And he

definitely did not give me a key to Building 2, 3, or 4.

**Q Was there a lock on Building 4?**

A No.

**Q Okay.**

A Well, it's there. It's not used.

**Q Am I correct that Building 4 has like an open bay where you can walk right in?**

A Yes. But may I just clarify --

**Q Sure.**

A -- that it does have doors that lock?

**Q Is that a --**

A But they have been damaged, so they can't close.

**Q The doors that lock, is that a portion that was leased to somebody else for a period of time in the past?**

A No.

**Q Are they doors just to enter the general space in Building 4?**

A Actually, there was no provision to subleasing and they may have sublet it. I don't know. I would not know. I mean, in the lease they have no responsibility to tell me who they sublet to.

**Q In terms of keys as we sit here today,**

**do you have any memory or information about what keys were provided to you on the 31st of May in 2023?**

A No. There were none.

**Q Okay. I'm just trying to understand the possibly two responses you gave to me just now. Is it no, you don't recall, or that there were none?**

A I recall specifically getting a key to Building Number 2 from Steve Benton. I recall specifically getting a key to Building Number 3 from Bill Brooks. I recall I had a key to Building 1 already in my possession. I don't recall Peter giving me any keys on the 31st. However, it would have made sense that he left one on the counter when we left. So as for a set of keys to the property, I was not provided.

**Q Did you put new locks on the property after May 31st?**

A Yes.

**Q Did you ever have to unlock the property for Airgas to remove items or possessions as we referred to it earlier?**

A Yes.

**Q Tell me about that. When did you have to do that?**

A I opened up for the dumpster for the

dumpster to come in, be taken away. I opened up another time for a truck to be moved. And the rest of the possessions -- oh, I opened up another time for the oil tank to be removed, and they weren't able to do it. And it's still there.

Then I never got any other requests to remove any of the other property. I opened up the gate for Airgas's repairman to come look, and Tracy Harvey came with him.

**Q I remember some conversation about that. Do you remember when that would have been?**

A I would say that it would be shortly after -- after the complaint. So I would say spring of '24 possibly.

**Q Do you think it's possible that it was before the complaint was filed?**

A Oh, I bet you -- yeah, I think that's right, because we tried so desperately to work it out without filing a complaint. So, yes, I bet you're right, yes.

**Q We talked about the unpaid monthly holdover rent, and you identified some factual basis for that, and I didn't want to cut you off. Were there any other factual bases for unpaid holdover rent before I ask you about unpaid taxes?**

A Just the fact that none of the repairs were done. And all of our previous communication, I had expectations that they were going to come in and finish.

**Q When you talk about previous communication, who would you generally be talking to if you were talking -- communicating with Airgas?**

A Well, in the statement I just made, I was just talking about the leases that were written. I really trusted that they would -- you know, that we could come to an agreement of, you know, just these simple things. And if I was going to call someone at Airgas, it would be Dawn Van Dyke.

**Q What was the name of the repair person that you met with with Mr. Tracy Harvey?**

A Oh, I can't recall. Kurt or something. I can't recall.

**Q I'm not trying to put words in your mouth, but does the name Kevin Cruz sound familiar?**

A Yes, I think so.

**Q And did you ever have any understanding about any quotes or bids or work that Kevin Cruz had proposed to do to make repairs to the property?**

A I recall that Dawn saying that he

couldn't -- that his scope of work, he didn't have the ability to do all of the repairs, but he could do some of them. And -- but I never saw a quote. I never -- I never got any kind of response as to what he could do and what he couldn't do.

**Q Are there any other facts that support BWS's request for holdover rent that we should talk about before I ask you about unpaid taxes?**

A Let's see. Repairs, maintenance, keys, unpaid -- I'm -- I think we have covered them.

**Q Okay. With respect to unpaid taxes, is this for the lease period for the 2022 lease?**

A Yes.

**Q Okay. And at what point did BWS give Airgas notice or any sort of communication about the taxes that needed to be paid?**

A Well, can you repeat that question?

**Q Sure. At what point did BWS give Airgas notice or some sort of communication about the taxes that needed to be paid?**

A I don't understand the question because that's something that we've had an agreement for since, you know, 19 -- I mean, 2005. They have had notice that they have to pay.

**Q Well, let me ask you this. From 2005**

**on, how was it that BWS would pay some taxes and Airgas would reimburse or otherwise pay those taxes? How did it work?**

A Just like I explained earlier. I did it on paper in the old days and emailed it and scanned it, but I would -- every November when it -- because our leases all expired in November. But every November -- or that's when they started it, I guess. But every November I -- as soon as I got an invoice -- well, usually taxes come out in October. But I always -- but I sent it in one bill.

And I do taxes and insurance; county, city, and insurance. I take a picture of the bill or scan the bill and scan where I paid it, and then I also write an invoice.

Now, on this particular -- are you specifically talking about this particular unpaid amount?

**Q Yes. The amount that BWS is seeking in this lawsuit.**

A On, I think it was June 1st, I sent an email to Dawn saying that I had met Peter and we had a lot of things to talk about. And I had included an invoice for the prorated because -- just the five months. Now, because the insurance renews in

November, there was seven months of insurance, five months of city taxes, and five months of county taxes.

**Q And did I hear you say that you sent that on or about June 1st?**

A It was right after I met with Peter. So I would say it's very close to June 1st, yes.

**Q Let me hand you a document.**

A Yes.

**Q Okay. So the question -- which you may have just already asked -- answered. The question is, is this the invoice that you would have sent on or about June 1st of 2023?**

A No.

**Q Okay. What is the document we're looking at then?**

A This is a new invoice that includes the entire taxes of the year due to the holdover tenancy.

**Q Let me hand you a different document. I got them out of order.**

A Okay.

**Q Okay. So the one that I have just handed you, what's the date in the top left corner?**

A 5/31.

**Q Okay. Take a look at it, look through it, make sure I'm not wrong on something again. Is this the document that you would have sent around June 1st of 2023 involving both property taxes and insurance?**

A Correct.

MR. ROBISON: Okay. Let's mark this one then as the next numbered exhibit.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 11.)

THE WITNESS: May I note?

BY MR. ROBISON:

**Q Please do.**

A Because I billed this, you know, June 1st, I did not have the tax bills that come out in October. I called this -- the Hamilton County and the city to ask if there would be any rate increase or to ask if there was a reappraisal. And because both of those answers were no, I prorated off the previous bill.

**Q In terms of city and county, do they reappraise property every ten years or so?**

A I think it's every four. Three or four.

**Q By May or June of 2023, had BWS actually paid the property taxes on the property yet?**

A No.

**Q And --**

A I would have paid those in November of '23.

**Q And in terms of insurance, had BWS paid insurance premiums monthly?**

A No.

**Q Okay. Did I hear you say earlier that that was paid in November usually?**

A Correct.

**Q Okay.**

A For the next year. Property taxes are billed for the last year. Insurance is billed for the next year. So the insurance has most definitely been paid. The taxes were not paid until a few months later.

**Q And you told me a little earlier about how insurance amounts were included in a monthly rent so it would split them in like 12 portions. Do you remember that conversation?**

A Correct.

**Q How did that work with this last lease, the 2022 to 2023 lease? Was there a portion**

**of the rent that was added on the base rent or something that Airgas needed to pay monthly?**

A No.

**Q How did that work?**

A Again, this was to take a big bill and split it out. They requested that I do this.

**Q And we're looking at Exhibit 5 just for the record?**

A Exhibit 5 dated 2013. This was just to help them absorb going from a $4,700 lease to a $7,000 lease. They didn't -- they didn't want to take the 12,000 on top of that. And so I agreed to split that -- split that up. Then they paid annually in November from that.

There has been communications. Again, we always worked it out. We always got it paid. It may have -- it may have been different at times or confusing at times, but that had nothing to do with the '22 lease.

**Q That's helpful. So in 2022, there was an amount that would be due, and it would be paid in one payment and not 12 payments?**

A Correct.

**Q Okay. Thank you for clarifying because I remember you saying that, and I didn't know**

**if I was wrong about something. You have the memory and that's why we ask you the questions.**

**At what point did BWS make the payment for insurance for 2022 to 2023?**

A November. And I'm pretty sure we produced those documents.

**Q And this invoice that we're looking at that's Exhibit 11, did you tell me that you would have emailed this to them? How would you have sent it to the representative at Airgas?**

A Email.

**Q Email. And which person would you have sent it to?**

A Dawn Van Dyke.

**Q And was there anything else included in that email in an attachment?**

A On 5/31?

**Q On or about May 31st.**

A I don't recall.

**Q Okay. At some point did BWS send Airgas proof of payment of the insurance premiums or of the property taxes?**

A I did send them receipt of the insurance, but not the property taxes.

**Q And when did you send that receipt for**

**the insurance?**

A November of '22 when I paid it.

**Q Do you know if you provided that to your lawyers to provide to us in discovery?**

A I think so. I mean, I don't know what my lawyers provided. I don't think they provided everything I gave them.

**Q And --**

A But I did give them that. They --

**Q Okay. Because I don't get to find out about your communications with your lawyers, and I shouldn't, I'm just asking what you had provided them. I can leave it at that.**

**We did look at this other invoice that looked very similar. And I handed it to you first, but it's a later date and time. Can you go ahead and tell me what that was about?**

A Yes. Because there had been no remedy to the default specifically of the '22 lease, Exhibit 6, I reissued this invoice to reflect a full year.

**Q I'm going to look at the three line items on that invoice dated January 3rd of 2024.**

A Uh-huh.

**Q There is a reimbursement for insurance**

**from November of 2022 to December of 2023. And it's now $21,806.89; is that correct?**

A Yes.

**Q Does that include payments made for a calendar year by BWS in November of 2022 and again in November of 2023?**

A Could you repeat that one more time?

**Q Sure. Does that amount that I read include the payments made for a calendar year of insurance coverage that BWS paid in 2022 --**

A Correct.

**Q -- and in 2023?**

A Yes.

**Q Okay. Essentially two years worth of payments?**

A No, no. That's one year. 11/22 to 12/23 is one year.

**Q Okay. And the second line item, Hamilton County property tax --**

A Yes.

**Q -- is that for two calendar years?**

A No.

**Q Okay. What time period -- it just says 2023. What time period?**

A For the entire year.

**Q Okay. And so rather than a prorated five months, it's the 12-month period?**

A Correct.

**Q Okay. And then for Chattanooga city property tax, again, a 12-month period rather than a five-month prorated?**

A Correct. If you look over exactly what we're looking at on what we just looked at under monthly holdover, line 26, Airgas holdover tenancy shall therefore terminate on January 5th. And so that -- that's why I just went to the calendar year. And that's why I went to December on the insurance.

**Q So when you point at a document, I want to identify for the record what it is. We were looking at the complaint, which is Exhibit 10.**

A Correct.

**Q And what paragraph number are you in?**

A Line 26 on page 4.

**Q Okay. And just to -- because it's short, I'll just state it for the record. Line 26, paragraph 26 of the complaint states: Airgas's holdover tenancy shall therefore terminate on January 5th, 2024.**

A Correct. That's why on Invoice 181 -- we have not named it an exhibit yet, but that's why I

added an extra month for the insurance to cover one more month. And I did pay that. And I probably -- if I'm not mistaken, I'm very sure that along with this invoice was provided necessary documents.

**Q And what were the necessary documents provided along with that invoice?**

A The tax bill.

MR. ROBISON: You're right that we hadn't marked that as an exhibit yet. Let's go ahead and do that. It will be Exhibit 12.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 12.)

BY MR. ROBISON:

**Q Were there any other unpaid taxes or insurance that are not referenced in those documents that are part of the lawsuit that BWS is claiming from Airgas?**

A No.

**Q What utility services does this property receive?**

A There is four electric meters, one water meter, and one gas meter.

**Q Between water, electricity, and gas, let me ask a couple follow-up questions. When you**

**say there are four different meters for electric, are they all on one account or are they separate accounts?**

A They are separate accounts.

**Q For water, is sewer billed differently than incoming water or is it all part of one bill?**

A It's all part of one bill.

**Q Is it okay if I refer to them as water, electric, and gas? Is that how you think of them?**

A Yes.

**Q We talked about gas service a little while ago.**

A Yes.

**Q You mentioned some communications with Peter Van Slyke about the gas service. I'm going to hand you some text messages that you were kind enough to provide to us in this lawsuit. And if you want to take a moment and look through this exchange before I ask you questions about it, take your time.**

A Okay.

**Q We were talking about when that exchange might have happened and here we have some time stamps.**

A Winter.

**Q I'm going to ask you about the exchange that begins November 28th of 2023. Do you see that on the first page?**
A Yes.
**Q And the reason I'm going to ask you this first, it's a text that looks to be from Mr. Peter Van Slyke to you saying, Hi, Jenny, did you have any luck with the gas company? Do you see that?**
A Yes.
**Q Was there some conversation that happened before this text?**
A Yes.
**Q I assume it didn't come out of the blue.**
A Yes.
**Q Tell me about that conversation. What was it?**
A As I previously mentioned, he just said that we don't have anybody to do it. Would you please contact the gas company and do it yourself? And I told him I would.
**Q At that point did you have a new lock on the gate?**
A Yes.
**Q Did you put new locks on the buildings**

**as well?**

A No.

**Q Okay. Do you know of any way that Airgas would have access to the property without the key to the lock?**

A Yes, they would. Several people have keys to -- and I -- I gave one to Steve Benton for the oil people, but -- that didn't get moved.

But as you can see from the 5/30, tell me what time and I'll be there. You know, I've been just -- they all know that they can call me and get a key or that I'll meet them.

**Q There is a couple different emails back and forth. We've probably spilled to the second page. There is BWS 71 in the Bates label.**

A Yes.

**Q You told them that you were working on getting it scheduled. And a couple days later on December 1st, you report to him, Peter, I met Chattanooga Gas yesterday for your final reading. As of today, the gas is in BWSP name.**

A Correct.

**Q Just to be clear, BWS Properties --**

A Properties, yes.

**Q -- is BWSP? And he says, Thank you,**

**Jenny.**

**Is there any other portion of this exchange that we don't have or is this the whole thing?**

A I would venture to say that's the last text that I have ever sent to him possibly.

MR. ROBISON: Okay. Let's mark this as our next numbered exhibit, 13.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 13.)

BY MR. ROBISON:

**Q As we sit here today, is there electric service to the property?**

A Yes.

**Q And --**

A One meter.

**Q One meter. How did the meters work? Were they of the different buildings?**

A Yes.

**Q When you say one meter, is it to the main building?**

A Yes.

**Q Is there current electric service to the Gas House, to Building 3, or to Building 2, the**

**repair shop?**

A No.

**Q In whose name or in what entity's name is the gas meter that is currently in service?**

A Holtec.

**Q And how do you spell that?**

A H-O-L-T-E-K, I think. I'm not sure. And honestly, that's who I got the lease with. So I don't know if they have it under a different name. Because they have several businesses, and they are just storing some things in the warehouse.

**Q Is BWS involved in getting electric service for a tenant?**

A No.

**Q Okay. Holtec went out and did that themselves?**

A Correct.

**Q They didn't need you to do that for them is what I'm asking.**

A Correct. Can I note, though, what I think is important? Is that when I first took possession of the property, all four meters were on and I switched them all over into my name, all four meters. And upon -- after cleaning and after going through, when I got the tenant for Holtec and they

switched it into their name, I went ahead and terminated the lease -- the electric because it was just a waste of money.

**Q And --**

A And we were paying minimum fees and it was just not worth it. So...

**Q Is there some minimum fee that you have to pay to the electric company just to have a meter even if --**

A Yes.

**Q -- you don't use any electricity?**

A Yes. And that's what I was avoiding.

**Q At what point did you terminate those other electric meters in the other buildings?**

A Just not too long ago. Let's see. Three -- maybe November of 2024.

**Q Is November of 2024 the approximate time that Holtec began leasing space?**

A Correct.

**Q Is that a year or month-to-month lease? What's the current arrangement?**

A Well, the current arrangement was a three-month lease, but they are now a holdover tenant as well.

**Q The work that they are working on is**

**taking a little longer than expected?**

A Correct. I was supposed to be a storage facility for their new operations and it is taking longer.

**Q That's a familiar story right now. Okay. At what point did you move the electric meters over to your name?**

A I don't recall specifically. I did produce my first in several electric bills. They are a majority of space in the -- in the amount of files is all the electric bills. So we could go back and look, but it was very close after June 1st.

**Q Okay. That was my understanding. And without maybe going through a couple hundred pages of electric bills, can I just ask you this? The first bill that we have chronologically, would that have been the bill when you put them in your name?**

A Yes.

**Q We're trying to be efficient here. Thank you. So we asked about gas, we talked about gas. We asked about electric. What about the water service? At some point did you put the water service for the building or buildings in your name?**

A Yes. It was very -- very soon after the lease was up.

**Q Okay. Is it -- are we talking days?**
A Yes. After the letter that says that they have already informed the utility companies to discontinue service and they never did, I took it upon myself to do so.
**Q Do you know whether they called the power company or the water company to tell them to turn off service?**
A All I know is the water and the electric were not turned off. I'm assuming or I -- you know, I would deduct -- reasonably deduct that they did not contact anyone.
**Q Okay.**
A I'll also add that the EPB, the Electric Power Board, has their own lock on the gate so they can get in at will, and the water meter is outside of the gate.
**Q Thank you for bringing that up. I was going to ask you about the location of the meters. The water meter is outside the gate. And so anybody can come by and read that or turn it off?**
A Correct.
**Q The gas I inferred was inside the gated property?**
A Correct.

**Q Okay. And the electric meters, were they on each of the buildings?**

A There is two on Building Number 4, there is one on Building Number 1, and there is one on a telephone pole outside Building 2 and 3.

**Q Is the telephone pole inside or outside the --**

A Outside.

**Q Let me finish. You probably are right about what I'm going to ask, but just to make sure we don't get crosswise. Was the meter that you mentioned on a telephone pole inside or outside the fenced area?**

A Inside the fenced area.

**Q Where was it? Was it towards the street or is it -- when you walk in -- if you come in the front gate, where is the pole?**

A Directly in front of you at the gate, at the other side of the fence. So if you look from the gate, you know, it's on the fence line on the back side of the property.

**Q Okay. I want to start asking you about the claimed damages to the property.**

A Okay.

**Q I understand that in the lawsuit there**

**is an additional claim for legal fees. Let me just ask you this. Do you have any knowledge about facts of the legal fees sought in this lawsuit? And I recognize that lawyers are still working for you and that that amount is not a fixed in-time amount.**

A I have receipts. I have invoices and paid receipts.

**Q Okay. Those have not been produced to us so far. And it's the nature of the case where lawyers are still doing work that the amount is not set. We will follow up with that, but you maintain those records and you have receipts of amounts paid; is that right?**

A I do.

**Q Okay. For today, that's all we really need to kind of confirm.**

**You mentioned interest fees and late fees a couple times here and there. Are those all provided for in the leases? Is that the source that we need to look for for the amount of late fees or interest?**

A Correct.

**Q Okay. I'm trying to avoid asking you what the lease means or giving me legal opinions or something like that. That will move through things.**

**All right. I want to then turn our attention. If we need to take a break, it might be a good time to do it. If you're doing well, we can keep on going, but I want to talk to you about the condition of the property.**

THE WITNESS: I'm doing fine.

THE COURT REPORTER: Do you mind if we take a quick restroom break?

MR. ROBISON: Sure. Let's do that.

(Short break.)

BY MR. ROBISON:

**Q So we're back on the record. And I want to look through some photos with you. There are two big sets of photos that BWS has produced so far in this lawsuit, and we mentioned one of them earlier. So I think I'm going to go ahead and take a look at that first. Do you remember talking about the professional photos that BWS had taken of the property?**

A Yes.

**Q Okay. And you mentioned that it was springtime because the Bradford pears were in bloom.**

A Correct.

**Q If we look through this and you get a more distinct memory of what time it was -- but I**

**think we generally understand these to have been taken in the spring of 2023; is that right?**

A Correct.

**Q Okay. I'm going to hand them to you and we'll just go through them photo by photo as we need to.**

**And I guess for the record, these can be found at Bates range BWS 579 through 612.**

**Does BWS have any photographs of the property prior to June 1st of 2022?**

A Excluding these?

**Q I'll just ask it again.**

A Okay.

**Q Does BWS have any photographs of the property prior to June 1st of 2022?**

A No.

**Q Okay. You mentioned earlier that you have looked at Google imagery, but BWS itself doesn't have any property -- any photographs of the property?**

A Correct. Oh, may I clarify?

**Q Sure.**

A I worked there my whole life. I'm sure that there are pictures before then, but not -- not since I left in '97.

**Q Let me ask just generally because that**

**is an important point. When you say you left in '97, and you worked there your whole life, what was your experience with the property in terms of your presence on the property prior to 1997?**

A I would often spend time there as a child. In high school, I would work summer -- or gosh, all the time I would work summer jobs. You know, he might have me mowing grass as a, you know, young kid. I started counter sales probably when I was about 16. And there is not a job I didn't do there.

**Q Prior to 1997, how often were you on the premises?**

A Can you be more specific in your time range?

**Q Sure. We talked briefly about your work history, and I think it now is a little bit more important for us to nail it down because I understand what your experience is with the property. During what periods were you working regularly at the property at 700 Manufacturers Road?**

A From the time I was 18, maybe even 17, I was there five days a week, if not more.

**Q After --**

A And while I attended UT, I was still

working. I was still there, you know, daily.

**Q And what was the time period when you first attended UT Chattanooga?**

A Let's see. I would say my first year of college was at Lesley College, and that would be 2000 -- no. That would be '93-4. So '94 to '97.

**Q When you were at Lesley College, where is that?**

A Cambridge.

**Q Were you working at your father's business during that time period?**

A No. But it was such a part of my life, I was probably there at some capacity.

**Q In 1996 to 1997, the last year or so that Brooks Welding Supply was operating at this location, were you working on site there?**

A Actually, I -- in retrospect, I left before '97. I left in '96. And then I was not part of the negotiations of the sale. I moved -- I moved to Georgia and -- for a job down there. And then they started negotiating a sale.

**Q Were you involved at all in the negotiations of the sale?**

A No.

**Q Where did you live in Georgia?**

A I was a dorm mother at Tallulah Falls School in Tallulah Falls, Georgia. Just for a little -- I know I'm not supposed to say too much, but my father had asked me, Do you want to run this business? And I said, No, I want to be a mother and I want to go spend some time with my best friend at Tallulah Falls School. And that's when he started negotiating the sale.

**Q And you told us earlier that was -- it eventually went through and BOC purchased the property -- the business?**

A Correct.

**Q Do you know if BOC's legal name is BOC or British Oxygen Company? What was the legal name, if you know?**

A I have looked at it, but I'm not sure.

**Q Okay.**

A And we have a letter that was produced from them. So I'm sure the legal name would be on the heading.

**Q Okay. I've seen plenty of DBAs on letterheadings, but I understand.**

A That's where I would get the information. I don't know off the -- again, I was not part of that sale whatsoever. From '96 to 2005,

I didn't have anything to do with the property.

**Q This will eventually get named -- numbered as an exhibit, but let's take a look through this to make sure we know what it is. If we need to refer to a particular page, I'm going to try to refer to it by its Bates number label on the bottom right. It's hard to read and it's in black, but we'll muddle through.**

A Okay. Yeah, I'm going to take your word on that. That is very hard to read.

**Q You can see the numbers are there, but they are hard to read sometimes. The first photograph that we're looking at -- and this is what was presented to us obviously in discovery -- is this the warehouse area?**

A No.

**Q Okay. What is this?**

A This is Building 2, the welding repair shop.

**Q Okay. This may come up and be important later on. Is there any portion of the flooring in Building 2, the welding repair shop, that has tile flooring?**

A Yes.

**Q What area has tile flooring in the**

**repair shop?**

A The office area.

**Q Okay. How big is that area?**

A Maybe ten by ten.

**Q Okay. Am I correct -- and tell me if I'm wrong -- that the majority of this building is a concrete floor like we see here?**

A Correct.

**Q The second photograph, BWS 580 --**

A Uh-huh.

**Q -- where and in which building are we seeing this office space?**

A This office space would be in Building Number 2 in the welding repair.

**Q And here I see some tile on the floor.**

A Correct.

**Q Is this the office you were referring to?**

A Correct.

**Q Third page, BWS 581. What are we looking at here?**

A Building Number 3.

**Q And the area in front of Building Number 3, is this an area that has been titled in some of the leases as the loading lot?**

MS. WOLINSKY: I'm going to object to that one based on -- based on privilege.

A I'll tell you exactly where that was. That's where you load welding wire into the warehouse, not where you load palletized cylinders. So what I refer to as loading lot is where they load the palletized cylinders. I'm sure we'll get there in a minute.

BY MR. ROBISON:

**Q There is a lot of photos. And I just -- it was something I was trying to understand from you earlier.**

A So it's -- again, how are we going to define loading lot? But, yes, tractor-trailers did load into the warehouse because Building Number 1 would be right there.

**Q Okay. The area that we're looking at here in front of Building Number 3, did I understand your testimony just now correctly that this is not part of the loading lot?**

A Correct.

**Q Okay.**

A Can you clarify? The loading lot described in the lease?

**Q Yes.**

A Okay. Correct.

**Q Well, that's the only loading lot I'm aware of. Is there another one?**

A You unload trucks here, so, you know, we could describe it -- we could describe a lot of places on this as loading lots. But in the lease, it was specifically the use of palletized trailers that was -- that they were loading.

**Q There is a space described as the loading lot in the lease that we've identified as Exhibit 6 that was signed in 2022. Are you following me so far?**

A Yes.

**Q Okay. Is there any other loading lot that you are aware of that I should know about before I ask you questions about a loading lot?**

A To be honest, I'm confused about what the loading lot is, and I would need to go back and measure it to find out exactly. You know, that was described so long ago that -- what was that? In 2010? So it's difficult for me to answer that question without -- without going back to measure. But the lot in question I do not think includes this.

**Q Okay. As we look through some other photographs, maybe I'll continue to ask you about if**

**some of them depict the loading lot.**

A Okay. Well, we're just going to refer to what -- again, I'm unsure on what square footage the loading lot is. So that's a problem.

**Q I'm not going to -- let me kind of back up and ask you this. You're not like an engineer by training, are you?**

A No.

**Q I'm not going to ask anybody to do that. You're not a surveyor, are you?**

A No.

**Q So I'm not going to ask you about metes and bounds or dimensions. If there is an area that you understand corresponds to the loading lot, I'll just ask you to identify it for me in these photos.**

A Okay.

**Q Let's go to the next photo then for areas. The next photo -- this is BWS 582. Does this show like the drive that goes around Building 1?**

A Correct.

**Q And is that Paper Mill Road, to the extent that it's a road, off to the left?**

A Yes. And the blooming Bradford pear.

**Q There you go. The next page, this is**

**BWS 583. What building are we looking at here?**

A This is Building Number 4, the Gas House.

**Q Okay.**

A And these pallets of cylinders explain that that's where the loading lot is.

**Q The next --**

A But --

**Q The next photograph is 584. It's an overview, an aerial photograph, taken by an aircraft of some sort and probably gives us the best overview of the property so far. Would you -- would you point out to me where on this property, if you can identify it, that the loading lot is located?**

A Okay. If you look pretty much in the center, which would be the upper right-hand corner of the property next to the railroad track, and you follow the wood line all the way to Building Number 2, you'll see palletized pallets, palletized cylinders all through there.

So, again, it's hard for me to determine what is the loading lot. And the language in the lease is very vague to describing that. There is no exhibit or anything. So I would say that the loading lot extends the whole -- everywhere that you

see palletized cylinders.

**Q In this photograph?**

A Correct. Specifically at the upper right-hand you'll see trucks. I think those trucks could have pulled around depending on what cylinders they are picking up.

**Q Can you point out to me in this photograph the area that you described as the grassy area in a previous lease that was later paved?**

A If you look at the holly bushes that go along Manufacturers Road, the one -- the very last one towards the middle of the page straight across to the corner, right beside Building Number 4, that was all grass that was later paved.

**Q Is there a seam in the pavement that you can see that corresponds to that rough line?**

A I think so.

**Q Did you tell me earlier when that section was paved?**

A I do not know.

**Q Is that the most recent paving that has been done on the property?**

A Correct.

**Q When was the last time that the other areas of this pavement were paved?**

A So part of our lease negotiations way back in 2005 required me to pave the entire parking lot. Now, that would not include what was added by in the grassy area. But I had Weeks Paving come and do everything else you see, and that was part of my requirements in our negotiations.

**Q And when did that take place?**

A In 2005 sometime.

**Q It's not a long document, but take a look at this. Is this the bill or quote for the work that you described in 2005?**

A This is the executed permission for them to begin the work.

**Q And was the work actually done and did BWS pay this amount, $22,900, to Weeks Paving?**

A Yes. There were -- I think there were two different payments.

MS. WOLINSKY: Are you going to enter any of these into the --

MR. ROBISON: I'm going to put another one up there before I put them together.

BY MR. ROBISON:

**Q You mentioned two payments. The document that I just handed you, which is BWS 129 to 130, that has a $22,900 payment, like a checking**

**amount. Do you see that?**

A I see that.

**Q And like you described, there is a second amount. What is that second amount for?**

A I don't -- I don't recall.

**Q Okay.**

A I don't have -- I don't recall. Obviously for not what was described here.

**Q Well, the date for the later amount on the check is from February of 20 -- 2006. February 15th.**

A Correct.

**Q Do you have any memory as to what that would have been for?**

A No, I don't. It was twenty years ago.

**Q I understand.**

A I think I have to get to a point where I say, no, I don't. I hate to.

MR. ROBISON: Let's do this because we've got a couple different documents out here. Before we forget, let's go ahead and mark the collective photos as Collective Exhibit 14.

(The photographs, as referred to above, were marked and subsequently attached hereto as Exhibit No. 14.)

MR. ROBISON: And then I would have -- well, let's have the quote from Weeks Paving as Exhibit 15.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 15.)

MR. ROBISON: And since we referred to it, let's have the two checks. That will be Exhibit 16.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 16.)

BY MR. ROBISON:

**Q Before I move on about some of the photographs, let me ask you about paving. Is this the last time that a portion of the property was paved and BWS paid for it?**

A Correct.

**Q We had looked earlier at a portion of pavement that I asked you whether it was the loading area. Is that then an area of paving that would have been paved in 2005 or 2006?**

A Yes.

**Q That's actually pretty helpful to get a timeline, so thank you. We'll probably kind of**

**skip through. There is several, several overview -- overhead photographs; am I correct about that?**

A Yes.

**Q I probably don't need to ask you about every single one of them. If there is any piece of information in there that helps us understand something, go ahead and let me know. Otherwise, I was going to ask you about the next interior photograph which is BWS 589.**

A Okay.

**Q Where is this photograph taken?**

A The very back office next to -- it's the main office -- the main door to the offices.

**Q And in which building?**

A Number 1.

**Q Okay. So Building Number 1, main building, in one of the offices. The next photograph?**

A It's in the same portion of the building.

**Q And this is still Building 1?**

A Correct.

**Q Do you know if this is an area known as the break room?**

A No. This is training center.

**Q Training center. The next photograph, this is BWS 591. And if I'm wrong, please tell me. Is this the showroom floor and the consumer-facing side where items were sold out of the store in Building 1?**

A Correct.

**Q Some of these are upside down. The one that's upside down, it looks like it's BWS 594. Do you know what area this is?**

A This is what we call inside sales. This was one of the -- both the showroom and this room were very heavily damaged.

**Q Was any of that damage visible in this photograph?**

A Well, it hadn't occurred yet. This is where they ripped the desk out of the wall and left the sheetrock ripped open.

**Q Earlier you said this is what we called inside sales. Is that a term that was used when you were working at your father and grandfather's company?**

A Correct.

**Q I didn't want to assume, but you have spoken the we, the royal we. Do you know if Airgas continued to use this as an inside sales space?**

A Yes.

**Q All right. The next photograph is 595.**

A Can I also say a note that I wasn't allowed into any of these offices due to OSHA? I had to go through a sign-in process. So I didn't have a lot of access to this. They gave it to -- they gave me special permission to go and take pictures, but I just wanted you to know that that was a part of the area that I wasn't generally allowed into without a formal request.

**Q Under the lease, was there a provision that allowed the landlord BWS to enter the property if it may be necessary with a certain reasonable notice?**

A I am not familiar with one, but most leases have them. And they would offer it to me if I put in a legal -- you know, a -- what do you call it -- formal request.

**Q Sure. Like, I think you told us here, was done to have these photographs taken?**

A Correct.

**Q Were there any other instances in which a repair or something was required other than the 2012 casualty loss that you mentioned where you**

**or somebody from BWS went in to take a look at something?**

A Not that I recall.

**Q Okay. Is the only time that you recall that happening the hail damage?**

A Well, again, we're talking about over twenty years. So if you could specify a time frame, because I did do repairs to HVAC units. They are all documented and all submitted. But during the lease in question that the complaint is about, no, I did not.

**Q Do you recall making entrance to the property to do any repairs or observations since 2023 -- sorry -- since 2013?**

A In the past ten years? Between 2013 and May 31st of 2023?

**Q Yes.**

A Within those ten years, I would be surprised if I didn't have to go in and do a repair, but I don't specifically recall one.

**Q Okay. And that was going to be my next question. You don't recall it? Okay. My next then is do you have any memory, up until the date of these photographs, of the condition of the property between 2013 and 2023?**

A Very little.
**Q Okay.**
A I -- I really gave it a lot of thought of how much I had been down there, and it's just not often.
**Q Were you present when the photographs were taken in this set?**
A Yes.
**Q I think you talked like you did. It sounded like you did, but I didn't want to guess. Okay. That's helpful.**
A You can even see me in one of them --
**Q Is your --**
A -- from the drone.
**Q Oh.**
A I'm standing right there.
**Q What's the number on the bottom of that page?**
A Oh, gosh. I can't tell you.
**Q Something small?**
A Right there. Black on black. It's impossible.
MS. WOLINSKY: 588.
THE WITNESS: You're good.
//

BY MR. ROBISON:

**Q Okay. I don't know how necessary this is, but point out to me again where you can see yourself standing.**

A On the side of that truck with the drone photographer.

**Q Okay.**

A I'm the little dot there.

**Q I'm glad you know that's you, because I could not tell that that was even a person.**

**If you'll skip forward a couple pages to the next photograph that doesn't have the showroom space.**

A Uh-huh.

**Q What are we looking at here?**

A That's Corley Johnson's office. And out the door you can see part of the warehouse.

**Q This looks like it's BWS 597. The next photograph has a motorcycle in it. What area are we looking at here?**

A This is the -- this is probably a significant one because it shows the damage to the roll-up door. When I came to look, they had it rolled up. And later it was -- it was not locked. It was off the -- I just couldn't -- I didn't tell

that it was broken.

**Q Is it broken in this photograph?**

A Yes.

**Q And are you --**

A Well, I can't -- I can't attest to the functionability of it, but you can see the damage.

**Q Is it -- let me ask you a slightly different question then. Is it damaged in some way in this photograph?**

A Yes.

**Q Do you know whether the door functioned to roll up and down?**

A No. I -- when we went through the walkthrough with Peter, I noticed it was off the tracks and wouldn't close.

**Q Okay. The next photograph looks like some of the same area from the inside point of view.**

A Okay. Well, it's obviously on the tracks in this picture. Damaged, but still on the tracks.

**Q Do you know whose motorcycle that is?**

A I do not.

**Q And did we say already which building we're looking at?**

A Number 1 in the warehouse portion.

**Q Does this door that we're looking at on page BWS 599 face the rear of the building?**

A No. It faces the Paper Mill Drive.

**Q Okay. So this is a side roll-up door?**

A Correct.

**Q What are we looking at in the next photograph? It's 600.**

A It's zoomed out a bit. You can see the heater that caught fire, but it doesn't look like it's ever caught fire. But we had to replace that.

**Q Which heater are you referring to in this photograph?**

A The one on the right. Neither one of them had -- neither one of them were in proper -- proper operating order. So we had to take both of them -- we had to abandon, cut off both of them. And one of them had a fire inside of it, and I -- I had no idea.

**Q How was it determined that a fire took place inside of it?**

A Well, we have produced pictures, but I have no idea. I don't know when it was done. I don't know how it was done. I just have the evidence. When -- I had my HVAC -- when I -- when Holtec took possession of the property, part of our

agreement was that they would pay the utilities as we previously discussed.

So by the time that -- when the gas company cut off my gas and they had their gas turned on, the pilot lights went out. So I called my HVAC man to come light the pilot lights, and that's when he noticed the fire damage.

**Q When did that occur?**

A Previously we talked about Holtec moving in I think in November of 2024.

**Q And is that the time period that the HVAC contractor would have come out to light the pilot lights?**

A Correct. It would be in that month. I'm not certain the day.

**Q But close enough. Okay. Any other things we need to note here before we move to the next photograph? Both roll-up doors are open in this photograph; is that right?**

A Correct. The roll-up door that you see by the forklift back there, that's where the loading dock is where most of the tractor-trailers would come in. And this is the view from standing at Corley's office.

**Q Okay. The next photograph, this is**

**BWS 601. What are we looking at here?**

A We're looking at shipping and receiving. That would be right next to where the forklift was in the previous picture.

**Q Okay. And the section that we're looking at in the background, is that an area of the warehouse that is behind the showroom floor?**

A Correct.

**Q All right. And is that the area that we're looking at in the next photograph, 602?**

A Correct. That's where my boat lives.

**Q I recall seeing it when we did the walkthrough. It's not pictured, obviously. Does that roll-up door still function?**

A Yes, it functions.

**Q The other two roll-up doors that we had looked at previously on photograph 600, do those roll-up doors in the warehouse function currently?**

A No. I gave you a quote -- or a bill from Access Garage Door shortly after the walkthrough just to close it and secure it. But at that time, I did not elect to fix it. They just secured it.

**Q When you say "it," which door are we talking about?**

A The one on the right.

**Q The one that faces Paper Mill Road?**

A Correct. The other one, it just takes a lot of work to get it closed and opened, but it very minimally functions.

**Q Do you know when those roll-up doors were installed?**

A I do not.

**Q Are they the same roll-up doors that were there when you used to work on the property in the '90s?**

A You know, I don't think so, but they could be. When we -- in 2012, we elected to put new siding up. And I think the doors were replaced and repaired or panels of such at that time, but I am not certain of that. That would have been Airgas's responsibility. And I don't have any knowledge of that for sure.

**Q You're now looking at a photograph of a hallway. This is BWS 603. Do you know what area of what building we are looking at?**

A This is Building Number 1, and you would be standing right in front of the women's bathroom. And the first door on the left would be inside sales. The first door on the right would be the training center.

**Q And what are we looking at in this photograph, BWS 604?**

A The outside view of those two doors facing their other property.

**Q When you say doors, these are the two roll-up doors?**

A Correct.

**Q And do you have any knowledge about the functionality of the man door or the person-size door on the rear of this property -- of this building, rather?**

A It is not functional.

**Q At the time this photograph was taken, do you know what the condition of that door was?**

A No.

**Q And prior to June 1 of 2022, do you know the condition of that door?**

A No. Prior of June 1, 2022, when we renewed the lease? No.

**Q All right. The photograph we're looking at next is BWS 605. Is this an area that you believe corresponds to the loading lot?**

A Yes. I think so.

**Q Okay. I'm glad you answered yes because that's what I understood best. And if you**

**said no, I would have been truly confused. Okay. Anything else we need to note in this or the following picture about the rear of Building 1?**

A The only thing that I see that bothers me or comes to mind at all is you can see that there is a window unit there that was taken in the move-out. They left a big hole there.

**Q Is that window unit to the right of the left side roll-up door?**

A Correct.

**Q In one of these photographs you can see an additional door to the left of the roll-up door.**

A Correct.

**Q Do you know if that door was functioning in spring of 2023?**

A Unfortunately, I did not do any kind of walkthrough between the holdover tenancy and the new lease. I did a walk-around. I met with the vice president. We walked around, but we did not -- we walked around the parking area and the paved lot and that, but -- and we were in the showroom. I -- I have been in the showroom, you know, several times to pick up some helium or some gloves or that, but I never go outside of that room.

And when I met with Clay Maverick (sic) -- I say his name wrong. I can't say it right. But we were outside the majority of the time, but that's the closest thing I came to a walkthrough or a walk-around. And I did not check the functionality of any of their doors other than the front door I walked in.

**Q Okay. You mentioned the vice president. Is that Clay?**

A Yes. Merrick.

**Q I was going to ask if it was Clay Merrick.**

A Yes.

**Q I think it might be spelled M-E-R-R-I-C-K.**

A Yes. For some reason, my dyslexia, you know...

**Q Okay. So we're looking at the rear of Building 1 in those photographs. The next one that I see I believe is Building 2 or the repair shop. Can you tell me if I'm wrong?**

A That is correct. That is Building 2, the repair shop.

**Q What kind of a roof does this building have?**

A A metal roof.
**Q Is it panel, standing seam, what kind of roof, do you know?**
A That is one of the repairs that I made between the -- you know, you asked me if I had made any repairs between '13. I got up there in -- I didn't do it, but I had a company re-screw that down. There was a little bit of water leakage due to screws vibrating. And so I had the -- I had the roof re-screwed to stop those leaks.
**Q Is that the sort of thing that just comes loose over time as they vibrate in the wind?**
A (Nods head.)
**Q Is that yes?**
A Yes.
**Q Is there anything else you would point out to me before we look at other photographs from Building 2?**
A Majority of -- there is a lot of -- a lot of parking damage done in that area.
**Q There are some other photographs of Building 2, but I don't know if they show the parking area. Would you describe for us what area that you were referring to when you say parking damage?**
A No. The only thing that I can see is

in this one picture in front of the bay door. And you would have to zoom in on it to see it or be there in person, but there are very large tire tracks from big trucks.

**Q That is BWS 607. We've got a couple more photographs of Building 2.**

A One thing to mention is this is a picture of broken -- you can only see the shadow of it, but that's a broken-down truck that was there that we discussed earlier that was not moved that, you know, they left there. I guess you could see it in the aerial pictures as well.

**Q And that was removed after the 31st?**

A Correct.

**Q Did they tow it away somewhere?**

A I don't know. They just asked me to open the gate.

**Q Somebody towed it somewhere?**

A Correct.

**Q It's not still there, I guess is what I'm asking?**

A Correct. Oh, and on 609, that's the oil drum all the way to the left.

**Q Is that the reddish rounded metal shape?**

A Well, I call it an oval, a rusty oval.

**Q At the far right-hand side of the photograph?**

A Correct.

**Q And you have told us that that is still there?**

A Correct.

**Q Okay. Is any of this other equipment visible still there?**

A Minor like inside, the desk and chair, the buckets, pallets -- various pallets scattered about. There is just junk.

**Q Are any of these welding machines that you see in this picture still there or are they gone?**

A They are gone.

**Q Is the next photograph also of Building 2?**

A Correct.

**Q Okay. Is there anything you want to point out to us in this photograph before I move on?**

A Only that this was probably one of the least-cleaned areas. When you repair a welder, you test it. And when you weld inside, it puts off a gas and a black dust.

And so, again, I really thought that

that was something that they would address cleaning. And it -- you know, they did promise to have a janitorial service, but it's difficult in that situation, but I did notice that that was a very dirty area.

**Q Am I correct that the next photograph, which is 611, is kind of a smaller area of what we just saw?**

A Correct.

**Q Are these the entryways to an office and another space?**

A Correct. That's their parts storage.

**Q Is the parts storage what we can see in 612?**

A Correct.

**Q Okay. I didn't see the Gas House in any of these photographs taken in the spring of 2023. Do you know if the Gas House was photographed separately?**

A These were for promotional purposes, not purposes for damage. In my experience of walking through this area, either the damage had not occurred or I did -- or it was covered. So I did not notice before they moved out, but there were pictures taken in spring of '23 by Peter and myself --

**Q Did --**

A -- on May 31st.

**Q Okay. Did you turn over all photographs that you took on that date or any other date to your lawyer to produce to us?**

A I did.

**Q Okay.**

A If you look at 583, that is a picture of the outside of the Gas House. So you can see certain damages, but, you know, I just thought the door opened. It was spring. I didn't know the door didn't close. It closed when I worked there.

**Q And when you say on 583 that there is damage, is that the -- you're referring to the bay door that's opened?**

A Correct.

**Q Do you know if the bay door -- the roll-up door was functioning on the Gas House in spring of 2023?**

A After they left and I inspected the property is when I found out that the bay door was damaged and didn't close.

**Q And would that have been May 31st or a day after May 31st of 2023?**

A Correct.

**Q When these photographs were being taken some weeks or months prior, do you have any knowledge about whether this door that we're seeing in page BWS 583 was a functioning roll-up door?**

A Can you say that? When?

**Q Sure. Whenever these photographs were taken --**

A Yes.

**Q -- when the Bradford pears were blooming, do you know if the roll-up door on the Gas House was functioning?**

A No.

**Q You just don't know?**

A I do not know. I assumed it was because you can see inside. You can see the equipment and cylinders inside. So, of course, I would've assumed that it was secure, but I did not try it. It's a -- it's a chain hoist thing, so I have no idea.

MR. ROBISON: That's the first set of photographs that we have looked at. I'm going to hand you another set of photographs. They may be the ones that you referred to just now, but you can tell me if I'm wrong.

For the record, I did not put these in the

order they appear. They were provided to us in this order.

Also, some of them are higher quality than others. This is as they came to us.

Okay. Let's go ahead and mark this as Exhibit 15 because we are going to refer to it.

THE COURT REPORTER: Seventeen.

MR. ROBISON: Seventeen. I'm sorry.

(The photographs, as referred to above, were marked and subsequently attached hereto as Exhibit No. 17.)

BY MR. ROBISON:

**Q We have a lovely photo to start us off with. Can you tell me what you see in this photograph?**

A Yes. This is a urinal that the handle doesn't work and it runs constantly.

**Q What building are we looking at?**

A We are looking at the men's restroom in Building Number 1.

**Q I did not recall seeing any bathroom photographs from the set that were taken in the spring of 2023. And I understand why for promotional purposes you wouldn't necessarily highlight a restroom.**

A Correct.

**Q Were any photographs taken of the restrooms that you know?**

A No. I'm certain we didn't go in.

**Q The photograph that we have here then, the first page of Exhibit 17, this is BWS 89. You described for us there is a handle that causes water to run?**

A Correct. And I noticed that with the walkthrough immediately May 31st. Obviously, I had no prior knowledge of how a urinal worked at all.

**Q You weren't hanging out in the men's room is what you're saying?**

A No.

**Q And then who are we -- who is depicted in this photograph? There is somebody's arm and --**

A A plumber.

**Q And what's --**

A Choo Choo -- Choo Choo Plumbing or Choo Choo Plumbing.

**Q Choo Choo as in Chattanooga Choo Choo?**

A Uh-huh.

**Q Is that yes?**

A Yes.

**Q And what -- what is his name, if you**

**know?**

A I do not know the name of the man in the photo, but I only know Hunter is one of the workers; and the guy that I call, his name is Phillip.

**Q And I was going to ask you that. Is this a service that you have called in the past for various properties?**

A Yes. Yes. They know me well.

**Q We'll keep moving through these photographs like we have in the past. The next photograph, what are we looking at? And if you can tell me which room it is and in which building, please do.**

A It's the same exact bathroom right next to the urinal in Building Number 1, the men's bathroom. And much to my surprise, there was a bucket under the sink to catch the leaks of the drain.

**Q How many bathrooms are in Building 1?**

A Four.

**Q You said this is a men's room, and so I gather there is also a ladies' room?**

A Yes. I'm very familiar with that.

**Q Is that one -- are those both located**

**relatively close to the showroom floor?**

A Yes.

**Q Okay. Where are the other two bathrooms located?**

A In the warehouse.

**Q I think we're going to see photographs of them, but I wanted to put that on the record first.**

A Yes.

**Q And stop me if you need to point something out in particular or there is something else we haven't discussed, but I don't want to take too long on any of these if the picture says what it says.**

**The next one, which is BWS 91?**

A Is a zoom-in of this bathroom or this under-sink. And it's where the -- we call it a p-trap -- in the drain line was rusted out. And when you washed your hands, the water just fell into the bucket.

**Q I may not ask you about this for every single thing we see in the photograph, but was this -- did you go ahead and repair this?**

A No, I did not. I cut the water off. I cut the water back on, fixed the toilet and fixed

the other toilet, but I don't -- I did not -- did I give you that invoice? I did it when Holtec moved in. So I -- you may have it, but you may not.

**Q Okay.**

A But, yes, they are fixed now. The toilet has a new handle and the p-trap has a new line.

**Q Okay.**

A Next.

**Q That's under the same sink as the previous photograph?**

A Correct.

**Q The next one, what space are we looking at?**

A Just for the record, we did not take pictures of the women's bathroom because it was lovely. However, after -- probably after my first water bill is when I noticed that the toilet was running, and I fixed that as well.

**Q And which toilet?**

A The women's bathroom in Building Number 1. In Building Number 1 in the warehouse bathrooms, there were two right next to each other. And this is the far corner. This is the second bathroom you come to in the hallway. There is a

small hallway and the doors are on the left. This would be the second door on the left. And originally this was put in as a shower. And I can't tell you what year, but I know it's been like this -- door shut, dysfunctional -- since, you know, before -- probably before 2013.

**Q Is the next photograph nearby? Are we talking about the same --**

A Same bathroom. And like I said, door closed. These things have not been turned on.

**Q Was there water service running to this sink and this commode?**

A Yes, but it was cut off at the -- underneath the sink.

**Q Okay.**

A Also, I don't have pictures of the other bathroom because it functioned and was fine.

**Q Okay.**

A I mean, it was outdated and, you know, should have been repaired, but that's all right.

**Q The faucets worked, the toilet ran fine? Or did it?**

A The faucets were old and they sprayed out when you turned them on. And, yes, the toilet functioned.


Case 1:24-cv-00029-CHS Document 89-1 Filed 11/04/26 Page 142 of 238
PageID #: 1080

**Q The next photograph I'm looking at, which is BWS 94, can you tell me which bathroom we're looking at now?**

A We're in Building Number 4, the only bathroom in Building Number 4.

**Q And do you have any understanding about water service running to Building Number 4?**

A In great detail.

**Q In whatever detail you feel is necessary, tell me what you know about the water service to Building Number 4.**

A It is there and it is alive and functioning to this day right now. Last winter I was -- I always heard that the water was shut off to that building. And when I worked there, the bathroom worked. So I can't attest to how the water got shut off. I'm guessing it was probably a freezing issue, because the first winter I was there, right around Christmas we had a terrible freeze.

**Q And I'm sorry to jump in. Which year when you say the first year I was there?**

A The first year I took possession. So that would be in 2023, December-ish.

**Q Am I right that this would be the 22nd or the 23rd of December -- sorry -- the 23rd or the**

**24th of December?**

A Sounds like you're acquainted with the freeze.

**Q I think we all know it, yes.**

A So I came to water gushing out of this bathroom. So the --

**Q And where? When you say gushing out, where was it coming from?**

A It was coming from a pipe right next to the bathroom which -- so instead of turning the water service off to the building, what they did is they turned it off to -- they didn't turn it off. They just put a cap on it right there at the bathroom.

So when it froze, it blew the cap out, and I capped the -- I capped it back. And I don't think there is any record of that that I -- that I submitted at all, but there was water here. And I have no idea who cut it off and capped it or what the circumstances were.

**Q Do you know when it would have been cut and capped?**

A No, I do not.

**Q Currently as we sit here, it's still cut and capped? You recapped it?**

A Correct.

**Q There was some cold temperatures in January of 2024, maybe not as cold as that Christmas Eve cold spell. Any problems with the water at this property on -- in January of last year?**

A Well, fortunately -- or unfortunately -- they left a big tire and wheel in there. And so I used it to -- along with some insulation that was lying around, and I made a box to cover it out of that wheel. It's not just a tire. It was something that you would put onto a car. You know, it was all together. And so I used it along with some other insulation. So I haven't had it freeze since.

**Q Okay. Good to hear. Anything else we should look at or you want to tell me about in this photograph BWS 94?**

A I wish I could read that sign because it's so ironic. It's safety starts with a clean bathroom or something like that. I don't know what it says. But basically when the window -- I'm assuming and I probably shouldn't do that. But they had some casualty there where windows were broken and air -- and the heater was no longer something. And so that's why you can't have a bathroom unless you

have a heated space. And you can't have a heated space if all the windows were broken -- or not all, but several. So I --

**Q Do you know when the last time this bathroom was used as a functioning bathroom?**

A I know it was in '96. That's all I can tell you.

**Q Okay. That's the last time you know of it?**

A Correct. I would -- I wouldn't have any access to that area or have a need to go back there. It was a surprise to me.

**Q In the next photograph BWS 95, there is a -- what looks like a locker. Are we looking at the same page?**

A Yes.

**Q What should I be aware of in this photograph?**

A Well, I know that this was there when they got the lease, but in the terms of the sale and in the terms of the lease, I was under the impression that it needed to be cleaned out at least -- at the very least. And so this is more evidence of furniture, supplies, clothing, shoes, you know, that was left on the premises.

**Q Is the locker that we're looking at, do you know if it is attached to the wall or installed or was it free-standing?**

A It's free-standing with legs.

**Q The next photograph, what are we looking at here?**

A Again, something that, it was my understanding, should have been thrown away if it wasn't functioning, just -- I know it is installed, but, you know, I think that I'm not trying to get into interpretation of the lease. I don't know if I'm going to get in trouble with this, but it was my understanding that it should have been removed, replaced, cleaned, repaired, or thrown away.

**Q We haven't actually said on the record what it is that we're looking at. Could you tell me what it is in this photograph?**

A It's a water heater in the same bathroom. All -- the last four pictures or so have been in the same room.

**Q And these are all in the Gas House or Building 4?**

A Correct.

**Q And it looks older to me, but can you confirm whether this was a functioning hot water**

**heater or not?**

A Yes, it was a functioning hot water heater.

**Q It was functioning?**

A So -- and my only experience with this bathroom is when I worked there, and it was functioning when I worked there.

**Q Is this the same water heater that was present in the building when you worked there in 1996?**

A More than likely, yes.

**Q Do you know if it is functioning now?**

A No, it is not.

**Q Okay. That's what I had intended to ask earlier, and I'm sorry to get -- but thank you for the clarification. What are we looking at in photograph 97?**

A This is Building Number 2, the only bathroom in Building Number 2. And honestly, I don't recall if there was VCT on this or not. But underneath the sink is a not-functioning hot water heater and an extremely disgusting bathroom.

**Q I think I know the answer to this question, but lawyers have to ask. What does VCT stand for?**

A Vinyl composite tile.

**Q And in this photograph there is a sink and a toilet or commode visible; is that right?**

A Correct.

**Q Did the water function for both of those fixtures?**

A Correct.

**Q You mentioned the hot water heater. That's visible below the sink; is that right?**

A Correct.

**Q And you told me that that was not functioning?**

A Correct.

**Q Do you know when that hot water heater was installed?**

A No, I do not.

**Q Do you know if it's electric or gas?**

A No, I do not. I can examine the picture and we could probably tell.

**Q If you're able to tell me, go ahead and tell me. If not, I won't make you guess.**

A Well, I'm just looking at the lower left-hand corner and that's an outlet and there is something plugged into it. So I'm going to assume it's electric. Plus, most small tank hot waters are

electric, so I'm -- I'm concluding.

**Q Do you know if this is one of the hot water heaters that Mr. Corley Johnson testified he had installed prior to turning the property back over to BWS?**

A I do not.

**Q Is there anything else in this photograph that we need to look at before we move to the next one?**

A It's minor, but there was a leak in the supply line in that toilet. So, you know, that's minor, but it's just -- just another thing that was never fixed.

**Q Is the flooring that we see in this photograph the VCT, the tile that you referred to?**

A I don't remember, and I can't tell from the picture because of the dirt or whatever else is there.

**Q Unfortunately, it's not the brightest image either.**

A Yes.

**Q Was there a light fixture in this space?**

A Yes. You can't see it, but there is a drop tile, and I think it just had a drop-in in it.

**Q What are we looking at in photograph BWS 98 and where is it in which building?**

A This is right outside the bathroom we just looked at. And it is a parts washing sink, and it runs constantly with no shutoff valve.

**Q Does it still run if water --**

A Yes.

**Q -- service was --**

A If water service was to it, yes, it would.

**Q Before I ask you about the photograph at BWS 99, the previous photographs that we have been looking at, who took those photographs?**

A If they are the ones I produced, I took them, but I know that there is a set during our walkthrough. I didn't take very many pictures because Peter said he would take care of it and submit those, you know, to Airgas.

So, like, Peter and I both were disgusted. And when he handed me that letter, he was like, yeah, I'm not signing it. I don't think you ought to either, because it's totally -- this is trashed and we're going to take care of it. And I'll take pictures to get it all, you know, taken care of.

**Q We mentioned that a little bit**

**earlier. And we haven't gotten to it yet, but you provided some of that same information to us in the written discovery responses, so I'm aware of that interaction with Mr. Van Slyke.**

**What else, if anything, can you remember of what he said about the condition of the premises on the walkthrough on May 31st?**

A He was disgusted and embarrassed as was I. And, I mean, all we could do was just gasp. I don't think he knew that the walls were torn up like they were and that there were holes not only in the interior walls, but the exterior walls as well. I think that there was a lot of damage. He was very surprised to -- I mean, we both were. I'm not speaking for him by any means.

But the rodents and the trash from the rodents and the smell of it was just -- it was a big surprise -- a big surprise it was left that way. Because there were little creamers -- did I show them to you in the walkthrough? Because in one of the bathrooms -- I didn't clean it up, but in that back one I told you that was shut all the time. But they were taking creamers from the break room, the rats were, and hoarding them and drinking them. They were little -- all in the showroom. You know, I looked at

these pictures. Look how beautiful the showroom looks. I can't believe it looked like it did when we came back.

**Q And by creamers, you mean those little creamer cups --**

A Correct.

**Q -- that are like a single dose or serving of creamer?**

A Correct.

**Q The record doesn't have the benefit of having gone to the property like you and I do.**

A He was apologetic. He told me that we're going to get the rest of this stuff moved. Like in this BWS 99, that stack of pallets, that was in the pictures in Exhibit 14, you know, just never touched.

**Q I'm going to ask you about that. And I am looking at BWS 99 that's part of Exhibit 17. And I'm also looking at BWS 582 that's part of Exhibit 14. And they sure look like the same photograph. One is a higher resolution than the other. Like, the clouds are in the same position.**

A Well, if I could find it.

**Q I think it's the fourth page.**

A Oh, I was looking way far back.

**Q Because this is a deposition and I can only ask you questions, let me just ask you this. Do those look like they are the same photograph?**

A Yes.

**Q Then with respect to BWS 99, is it your belief that that would have been a picture taken prior to the turnover of the property and not on the May 31st date?**

A By looking at these pictures -- and I do believe I took this with my cell phone standing right next to her taking this. They do very much so look like they were on the same date.

**Q If you would keep those both in front of you.**

A Okay.

**Q And for Exhibit 17, go forward one page; and Exhibit 14, go backward one page.**

A Okay.

**Q Are we also looking at BWS 100 and BWS 581?**

A Yes.

**Q Okay. Do these appear to you to be different photographs taken of the same location and the same time?**

A Yes.

**Q Okay. The clouds are in the same spot, right?**

A Correct.

**Q But you're standing next to the photographer?**

A Correct.

**Q What was the name of the photographer?**

A Haley. I would have to -- I didn't -- I didn't produce any of that since that was my expense. You know, I didn't -- I didn't produce any of that, and I haven't seen her since then or used her since then.

**Q Was there a service or a name that her business went by?**

A It's her name photography. It's Haley-somebody Photography. And I certainly can get you that information.

**Q Okay. I don't know if we're going to need to refer back to Exhibit 14, but I'm still on Exhibit 17 and I'm going forward one more page. And if you could tell me what it is that we're looking here on page BWS 101.**

A Just the condition of the -- of the parking lot.

**Q And can you tell me where this focus**

**area is located in the parking lot?**

A No. Honestly, I could guess, but that wouldn't be good. I would guess it's in front of that door, but I -- there is no way to tell.

**Q And you're referring to the roll-up door on the repair shop or Building 2?**

A Correct.

**Q The next page, which is BWS 102, is it a similar area? I think this one is back out enough where you can tell us where it is; is that right?**

A Yes.

**Q What area are we looking at here?**

A Part of that -- where they loaded the palletized -- you know, they parked all the palletized cylinders down through there. So just loading area.

**Q What is this little structure here in the back in the top left?**

A That's the propane tank fill.

**Q Has that been part of the structure since when you worked there?**

A No. That was added, and I don't know if it was by Airgas or BOC. I'm not sure. Propane is not really a welding gas, so we really never sold it.

**Q Do you have any knowledge as to when the portions of this paving that we're looking at were paved?**

A 2005. June 2005.

**Q Do you see a smoother section on the left-hand side that's near the structure I asked you about?**

A I do.

**Q Do you have any knowledge as to whether that section was paved more recently?**

A As I testified to earlier, all I know is what I signed. And carefully reading this, it does not specify areas. I thought that it was to the entirety of what you saw paved was my understanding of what I was getting. Even if we did -- redid a spot for the 2600 in Exhibit 12 -- no, no, no. Where did I get this? Fifteen. Oh, the second -- Exhibit 16, in the second paving that was done in February, to my knowledge those are the only two things that I have got paved.

So I see what you're saying. Some of it looks rougher than others, but you have to understand if you have got small pallets here with a, you know, truck parked here, then you're going to have more damage where the trucks go or pull down and

back up, you know, that kind of stuff.

But to answer your question, 11/28 of 2005 and 2/15 of 2006 are the only paving that I had a part of or knew about.

**Q Okay. That's helpful. And just for the record, you were looking at a couple different documents there as you were thinking about it. One of them was Exhibit 15, the invoice from Weeks -- or a quote from Weeks Paving. Then you also looked at 16 which were the checks with payments to Weeks Paving.**

A And I really did look back to -- you know, to 20 years ago, but those files are gone. I don't have those invoices. I printed this off my computer. This was a fax, back when we faxed, that I found randomly when I was going through. I tried to go through everything that I could find to see if I could find anything relevant. And so I found this fax, but this was -- was just printed off the computer as a check that was written. You know, you can keep your history. My history goes back to 1997 on the computer, but my paper files do not.

**Q So 16 was something you printed off from the computer. Exhibit 15 was a fax that you received?**

A Correct.

**Q Do you have any understanding as to whether Airgas paved the section of the pavement that we see on the left at its own expense at some point after Weeks Paving paved in 2005?**

A I don't have any knowledge or notification.

**Q The next paragraph is dark -- I'm sorry -- photograph is dark. It's BWS 103. If you can, can you tell me where this is and what we're looking at?**

A This is Building Number 1 in the warehouse portion behind the showroom. That's the bay door, the roll-up door that goes to the back of the property on the right. And on the left is the non-functional door that's off its hinges. And I took that picture just to show the amount of light coming in.

**Q Is the next page, which is BWS 104, a photograph of the exterior of that door?**

A Yes.

**Q And you said the door is off its hinges; is that right?**

A The frame may be bent instead of the hinges. I am not a mechanic in that way.

**Q Are you telling me today that it is in need of some repair?**

A No. I would say it is in need of total replacement.

**Q Repair or replacement?**

A Repair to the frame. From the outdoor picture, you can tell it's been hit by a -- well, hit by something. It could have been a truck. But there is a little white in the lower center. You can -- this picture is not great quality, but you can tell by looking at it it's damaged.

**Q Did you take these photographs on your phone?**

A I did.

**Q They seem to be a lower quality. Were they texted at some point or how is it they ended up in the resolution they are?**

A Well, believe it or not --

**Q And let me ask you. Let me say this. And I don't want to know about your communications with your counsel, so let me just change my question and ask you this: Are there anywhere higher-resolution versions of these photographs like on your phone still, for example?**

A I'm certain there are, yes. And I --

**Q I'm not going to ask about your personal accounts or whatever, but just to know what exist or doesn't exist, does your phone have a service where it backs up Google Drive, iCloud, similar services like that where they might exist somewhere in a full resolution?**

A Yes.

**Q I am aware that sometimes people will send photographs to each other sometimes via text which reduces the resolution of the fidelity of the photograph, but I don't want to know if you sent anything to your counsel, because we don't get to find out about that, appropriately so.**

**The next photograph looks like an interior. Do you know where this photograph is taken? And it's BWS 105.**

A This photo is taken -- let me just check real quick if I can look back on these to --

**Q Sure.**

A I think that it is the door beside the roll-up bay door that -- in Building Number 1, the large warehouse section that faces Paper Mill.

**Q And what -- does this photograph here BWS 105, what does it show to us?**

A It shows it's not been opened in a

very long time. And I -- I can't get it open. So it's not functional. It's on its hinges.

**Q Do you know if it is reparable? Have you had -- well, let me ask you this: Have you had anybody take a look at it to see if it can be repaired or replaced?**

A I have not. However, with my property management knowledge, I would venture to say that for probably around a hundred dollars we could replace the mechanics of the lock and door, and I would say that it could be repaired. A little oil.

**Q There is another photograph of what looks like might be a different door on BWS 100. What are we looking at there?**

A That's in Building Number 1 in the large warehouse area right beside the bay door that -- on the loading dock that goes -- faces the rear of the building.

**Q I recall there being two roll-up doors there. Is the loading dock the one on the left if you're viewing the building from the rear?**

A Correct.

**Q Okay.**

A And this door, the handle doesn't function, but there is a lock down there that --

that -- bolted on, but I -- it -- I can function. It can use...

**Q The next photograph looks like one of the roll-up doors that we talked about.**

A Okay. This -- first of all, this BWS 107 is the same door as BWS 105, the one here.

**Q Okay.**

A But the purpose of this picture was to show that the door is off its tracks. If you look in the center, the top center, you can see that there is a rolling mechanism that is not in the track. The second one down is. The next one down is not.

**Q The next photograph, BWS 108, tell me if I'm wrong, but it looks like this might be the evidence of rodents that you mentioned earlier.**

A Uh-huh. Rodents and roaches.

**Q What are we looking at in BWS 109?**

A This is Building Number 2, the repair shop office.

**Q And when was this photograph taken and who took it?**

A I took it. And it was taken in -- probably in June or July. It's still there just like right now.

**Q You anticipated my next question.**

**These items are still present?**

A Correct.

**Q Photograph BWS 110, are these the creamer cups that you mentioned?**

A Yes.

**Q And where in the building or buildings is this photograph taken?**

A First of all, they were everywhere. This is the ones that were in the back bathroom of the warehouse.

**Q Is the back bathroom the one that had not been used as a restroom for some time?**

A Yes. Very foolishly. Again, I didn't take the pictures of the showroom that Peter did, but he has pictures of a lot more of these.

THE WITNESS: Have we received those?

MS. WOLINSKY: We'll talk about that later.

BY MR. ROBISON:

**Q The unfortunate thing about depositions is that you need to answer questions, but you don't get to ask very many --**

A I'm sorry.

**Q -- unless you need a clarification, in which case please do ask me.**

**In BWS 111, what are we looking at?**
A Building Number 4.
**Q All right. We've talked about that as the Gas House.**
A Uh-huh.
**Q And what's in this picture?**
A Broken windows. And, again, if I could see it in better resolution, I could tell you.
**Q I understand. I -- it's a little frustrating.**
A I think it's -- I think it's described the next page a little bit better.
**Q The photograph that we're looking at is a photograph of the floor; is that right?**
A Correct. With broken glass.
**Q Okay. And there is some glass there that came from a window?**
A Correct.
**Q So the next photograph, which is BWS 112, is this the same area?**
A Correct.
**Q Is it?**
A It's the same room, yes. There is green paint to one section and then it's white. Or one wall is white. This is -- this is the office

portion and this is -- the office and the bathroom are all -- so this is probably in the pumping room, and this is probably in the office.

**Q So BWS 112 is the office; BWS 111 is the pumping room?**

A It was the pumping room when it was BWS Properties -- I mean, Brooks Welding Supply.

**Q Okay. They are different rooms is what you're telling me?**

A Correct.

**Q Okay. I just had questions about the concrete flooring in one versus what looks like tile or grid in the other.**

A I was probably in the doorway on -- there is a doorway that goes in the back. So there is an entranceway and then a doorway out, and I was probably standing right in that doorway.

**Q Again, I'm not trying to put words in your mouth or whatever, but is there a masonry issue in this photograph 112?**

A That's what -- that's where the HVAC unit was removed.

**Q We're going to get into it in a moment, but there was some line items in a quote or a bid that you got from T.U. Parks Construction that**

**involved masonry patching or masonry. Is this the area we're talking about?**

A Yes, to my knowledge.

**Q Do you recall any other missing block, brick, or other masonry work?**

A Excluding the asphalt, no.

**Q Okay. Thank you for the clarification. Do you believe the brick or cinder block would be used for the asphalt?**

A I -- I'm not sure.

**Q Okay. Fair enough. Are we done then with 112? You've turned to the next page. BWS 113, what are we looking at here?**

A Same building, but a different pump room. Just -- and I don't -- I noticed in these pictures that they did pump. They had a bulk tank. So they -- these are all insulated lines that they have just abandoned and left.

**Q When you say insulated lines, is that the white-colored piping that we see in this photograph?**

A Correct.

**Q You have a little bit of a background information that lawyers might not or anybody else reading this transcript might not, so I'm just trying**

**to ask the obvious questions.**

**All right. Picture identified BWS 114, I think you mentioned some of this earlier. Is this what you were referring to when you were talking about drywall damage?**

A Correct.

**Q Can you tell us which room this is and confirm that my understanding that it's Building 1 is correct?**

A Correct. We're back in Building 1 in the inside sales department.

**Q Was there some sort of built-in or installed desk in this area?**

A Yes. It was the picture that I had mentioned. I'm not real familiar with the order of these. That would be the same as BWS 594, the upside-down one. Correct. That would be the same where there was an installed door that they had -- I mean, an installed desk that they had taken out.

**Q All right. And BWS -- for the record, BWS 114 is the same general space as BWS 594?**

A Correct.

**Q The window that's visible on the left-hand side of 594 is the same window out into the showroom floor that is visible in 114?**

A Correct.

**Q Okay. That's very helpful. Thank you. And so this desk that we see in the bottom left-hand corner of 594 has been removed in 114?**

A Correct.

**Q Who took this photograph and when?**

A I took it shortly after the move-out.

**Q There is damage to the drywall that you have identified; is that correct?**

A Exposed two-by-fours. And there is also damage to the VCT tile.

**Q Is the damage to VCT tile visible in photograph 594?**

A It is not.

**Q Is there a wear pattern underneath the chair that's underneath the clock?**

A Somehow with the chair on top of it, it is not quite as visible as it is in BWS 114.

**Q Now, I know photographers are good at cropping things out that they don't want to necessarily show. The wear pattern that's visible in the center of 114, is that visible? Is that in the field of view in 594?**

A No.

**Q Is there anything else in paragraph --**

**in photograph 114 in terms of damage or things that need to be repaired that we haven't talked about already?**

A You know, again, I expected there not to be cables dangling from the walls. There is not only damage to the drywall on the right side, but there is -- looks like there is a hole in the wall and damage on the left side and underneath that window. So I didn't want it to seem like there was a small amount of damage. It's pretty much trashed.

**Q This reddish brown item or panel, do you know what this is?**

A It's very heavy. It's a very heavy piece of wood.

**Q Is it still there?**

A Yes.

**Q And I provided these photographs to you in the same order they were provided to us. I know we're jumping around again. It looks like we're back outside. Is that the Gas House, Building 4?**

A That is correct.

**Q So this is BWS 115. I see a broken window pane here; is that right?**

A Correct.

**Q These windows that we're looking at,**

**they look like they are three-by-three with a total of nine panes?**

A Sounds about right. I don't know the specific dimensions.

**Q Well, I'm talking about the numbers. There are --**

A There are three, uh-huh. Three-by-three, not three feet by three feet. Okay.

**Q Yes. The -- one window has nine pieces of glass in it?**

A Yes, sir.

**Q And it looks like the bottom right pane of glass has been broken; is that correct?**

A Correct.

**Q Do you know if this corresponds to any of the interior photographs we were looking at earlier?**

A No. It would be in the same room as 111, but there is no picture in 111 as the -- it's the same -- the picture of the interior of this, but there is no picture of the window from the inside.

**Q Do you know who took this photograph and when it was taken?**

A It was taken by me and it was shortly after the removal.

**Q Okay.**

A Are you moving on or can I say --

**Q Go ahead. Please, if there is something else to mention here, tell me. Let me know.**

A Well, all this brown nastiness underneath the light, the light stays on at night for security purposes. And it -- it has attracted so much there that if you look at the Scenic City Pressure Washing bill, you'll see they had to go over it twice and they charged me accordingly, and that's the reason. If this had been hosed off regularly, it wouldn't have been an issue.

**Q And that was because of the insects attracted to the light, if you know?**

A I -- yes. I think -- there is more than dead insects on there. So I'm sure that the dead insects attract some lovely bacteria. But anyway, it's all washed up now.

**Q The next photograph is BWS 116. We're back inside. And please tell me if I'm wrong, but it looks like we're back in one of the office spaces of Building 1.**

A Yes. Due to the upper -- I don't know. I think this is Corley's -- yeah, it is. This

is Corley Johnson's office. You can see in the upper left-hand the shades, the windows. That's the only reason that I can identify it.

**Q And what damage or grounds for the claims that BWS has is depicted in this photograph?**

A The -- the floor. Apparently according to the man that came with T.U. Parks to look at the vinyl tile repair -- VCT as we have referred to it -- said that you can't fix when you don't clean under a chair and you're a heavy man. It grinds down the VCT and causes damage that can't be cleaned. So that is -- that's one of the main things.

There is also -- I don't know. There is a lot of wires and -- that you can't see. You can see one of them, but there is a big 'ole bunch of them there.

**Q So we have got damage to the tile and some wires that are loose or not how they are supposed to be?**

A Correct.

**Q Any other damage in this room that we can see in this photograph?**

A Well, again, going from this to this, you would think that they may have swept.

**Q And when you say this to this, what was the photograph number that you were just looking at?**

THE WITNESS: Can you? I can't find it. It's black on black.

MS. WOLINSKY: Five-nine-seven.

BY MR. ROBISON:

**Q So is 597 depicting Corley Johnson's office the same as BWS 116?**

A Correct. It's the same area. But I think that that really explains some damage of what I was expecting versus what I got. Because if you just look at Corley Johnson's office, it's lovely. And then it's trashed at the clean-out.

**Q Did you look behind his desk to underneath his chair when the photographs were taken in the spring of '23?**

A No.

**Q And did you ever look to see underneath the desk before June 1st of 2022?**

A At the close of the lease.

**Q Of the 2013 lease with its extensions, yes.**

A No. And I'm just trying to think of the last time I was even in that office. And it's

not a place that I had any business to be.

**Q You never had like a sit-down meeting with anybody there at any point?**

A Oh, I -- I met Brian Christopher there a lot. And I probably -- I think I went and saw Corley about something in Corley's time there. Brian Christopher was the manager -- two managers before Corley, I think. I can't remember where Scott was, if Scott was before Brian or after Brian. But I did not deal very much with managers. I dealt with Dawn. You know, I communicated with her and I -- and in quite of our correspondence, she would copy the manager, but the manager really didn't have a lot of communication with me.

**Q You mentioned a Scott just now. Do you recall a last name for Scott?**

A Oh, gosh. I should know. No, I don't recall off the top of my head.

**Q Are we done looking at 116? Do we need to look at any other damage or grounds for claims in this one?**

A Again, it was not left in clean condition or sanitary condition. There is major repair to the floor. And according to the VCT man, it had not been maintained as spelled out in the

lease.

**Q Do you have any knowledge -- and really this is on behalf of either you individually or BWS -- as to the cleaning services that Airgas contracted with?**

A I am not.

**Q BWS 117, is that what you're looking at?**

A Yes.

**Q What are we looking at here? If you can tell me what room it is in Building 1, that would help.**

A This is the conference room. It's different than the training room. And I don't think we took a picture of it probably because, you know, we just were in and out so fast. But I wanted to show the condition of the floor. It looked like there was something spilled in the back corner. Same thing with the chairs around the table, damage to the VCT.

There because of the conference they had -- well, even it doesn't matter. They had lines going across above the ceiling tiles, computer lines or camera lines that all went back to Corley's office or the mechanical office right next to Corley's

office. And they were distributed to every room. So I think -- I'm assuming that's where the damage to all the ceiling tiles came as they were removing lines or such. I don't know.

**Q We may look at some ceiling tiles in the future, but tell me, since you have brought it up, what damage was present with the ceiling tiles on May 31st of 2023.**

A They were in very bad condition.

**Q And can you be more specific in terms of what was bad about them, what areas, to the best of your knowledge?**

A It's too vast to go through, but basically the showroom looked great in the pictures. But then when we came back, there was some that were broken and some that were out of the track. And then down the hallway, there was condensation dripping. I don't know what dripped up there. I don't know what it could have possibly been. There was no water damage like it was a roof leak, but there is some wetness on the ceiling tiles above in the hallway.

The office on the second -- the second door on your left, the grid had just about fallen completely in. The training center in the back left-hand corner was -- the tiles were down there.

Corley's office didn't have ceiling tiles, but pretty much anywhere there were ceiling tiles, they were either broken, stained, or out of the track or missing completely.

**Q I was about to ask you that. Were there a number of ceiling tiles that were missing that would need to be replaced?**

A Well, the thing about a ceiling tile is you'll never find one to match unless you buy it in the same lot. So it would have to be done by room. There might be some salvageable ones that you could move from one room to finish another room, but you can't do a room with two different color ceiling tiles.

And I think that the track was damaged as well. I'm calling it a track. I don't know, but it's the grid -- I think grid is the name of the -- the right name. But pretty much one end of the office to the other, anywhere that they had run lines above, was extremely damaged.

**Q When we keep going through these photographs, if you -- we come across some more that show that, will you highlight it out to me? I'm sure you will.**

A Sure.

**Q Next page is BWS 118. Tell me what we're looking at here if you would.**
A I don't have a -- I don't think there was a -- I don't remember a picture of it here, but it's in the -- it's very similar to 594. It's on the other side of the partition and the damage was very similar as happened to this desk.
**Q This desk in 594?**
A Yes. The desk on one side of the partition we had a good picture of. The one on the other side we did not.
**Q There is some kind of wood framing in the picture at BWS 118.**
A Correct.
**Q Is that still present?**
A Correct. Yes.
**Q Are there wires here that are present or hanging or not how they are supposed to be?**
A Correct. This picture also shows the disgusting condition of the floors and the damage to the tile.
**Q Is there anything else visible? So tile, wires, and the framing, and obviously the connections with the drywall. Is there anything else visible here? And I'm asking because I can't quite**

**tell with the resolution of the photograph.**

A Where they took the desk off has not only damage to the sheetrock, but you've got lots of exposed two-by-fours. It looks like a trim piece is broken. Very dirty. Also between the two windows there is holes in the wall there too.

Oh, this is a perfect testament to what I was just saying. You can see it better in 594, but do you see in 118 this coming down from the ceiling? That's what I'm talking about. You can see it here and here where they have I don't know how many wires coming out of the ceiling. Well, it requires you to climb up there to do that. So that is what damaged -- I'm -- that's just my observation of how the tiles were damaged. So just pointing that out to you as part of ceiling damage.

**Q And is that due to your observations? You weren't present for any of the -- anything involving the ceiling tile being moved or damaged, were you?**

A When I was a teenager, I had to crawl up there and pull lines. So I'm -- I know how to do it, and I know -- I know what happens when you do it. So it is my perception with experience.

**Q Were you present when any of the**

**ceiling tiles were moved or damaged?**

A No, I was not.

**Q Were you present when any of the moving activities were taking place?**

A No, I was not.

**Q BWS 119 looks an awful lot like a previous photograph to me. It looks like it also might correspond to BWS 114. Very similar photographs if not the same. Would you just take a look at both of them and let me know if we're looking at the same area?**

A We're looking at the same area. Yeah, same picture.

**Q Is there anything new that we need to see on this photograph before I move on? I don't want to duplicate things.**

A Again, you can see wires hanging from both sides of that -- where that desk was, but that's all. That's all you can -- yeah, same picture.

**Q If you look to the next photograph, which I think is BWS 120 --**

A That's just a close-up view of that corner.

**Q Okay. That's what I was going to ask. This is the same corner in BWS 119?**

A Yes.

**Q Is this damage to the drywall that we see here?**

A Yes. You couldn't see it very well in 119, so I zoomed in and got a little closer on 120.

**Q And if you look at the next photograph, it's BWS 121. What area are we looking at here?**

A If you look at BWS 118, it would be an extension from -- here from the far right to the door. You can see a little bit of the wood in the left and you can see a little bit of the trim that was different or broken. So it just shows how it messed up all -- all three walls, not just the corner.

**Q Is this more of a space that is partially hidden by the partition in photograph BWS 594?**

A Yes. And you can -- this must have been after I cleaned, but you can still see the damage to the VCT tile there as well.

**Q Do you know what date it would have been taken?**

A I do not. It would probably be post the yaneth (phonetically) cleaning.

**Q BWS 122?**

A Can we look at 122 and 123 together?

**Q Sure.**

A One-twenty-two is -- first of all, this is on the opposite side of the wall we just discussed. And you can see the window where -- where the triangle two-by-four corner. So we're on the other side of that wall. And 122 was a close-up of 123, and it's just showing the extent of damage to that drywall.

**Q And I'm not trying to put words in your mouth, but are there a number of holes visible in both of these photographs at BWS 122 and 123?**

A A surprising and most damaging. It's not something that could be easily repaired.

**Q Does that correspond to the area visible in photographs BWS 591 with the board of --**

A Yes.

**Q -- different welding helmets?**

A Yes. May I see that again, please?

**Q Sure. I can hand you mine or you can look at yours, 591.**

A Well, no. It would be this area. The welding helmets were on a rack that protected that wall. It's this wall. It's the very center of 591.

**Q Thank you. And I didn't mean to mislead. I thought we were talking about a different space. Okay. And the white-trimmed door is visible on the left in photograph BWS 123?**

A Correct.

**Q Well, I guess there is white-trimmed doors on both sides, but you have corrected me that it's in the middle of photograph 591?**

A Correct.

**Q Okay. Thank you. It looks like there is some sort of plastic shelving or boxes of some sort that are in the photograph of B-591?**

A I don't know if I can get to 591. I'm in the showroom, but just at the wrong -- is it towards the --

**Q It's right before we go to the break room or the training room, rather.**

A I passed it.

**Q Did you find it?**

A I did.

**Q And so you have helped correct my mistake that we were looking at the center area in that photograph.**

A The center of the photo, correct. Another note for 591 is you can see that the ceiling

tiles are in great condition in this picture, but after the TV is uninstalled -- and those are all broken. And I don't know that we saw a picture of those in this packet, in this -- in Exhibit 17. I think that there is a lot of lacking ceiling tile evidence, but, again, I know Peter has those. And it's still in that condition today.

**Q Of the photographs that we have looked at that were produced by BWS in its original production, I think we only saw the one photograph that had ceiling tile visible, 117. I might have you take a look at BWS 118. It does have some ceiling tile visible in the background to the windows of this -- looking out into the former showroom space.**

A Uh-huh.

**Q Is there anything to call to our attention there with respect to the ceiling tile that you can see?**

A The ceiling tile damage was done where the TVs are. And, unfortunately, I don't have that picture.

**Q Okay.**

A I could -- I don't have it. One thing that I would like to point out in 118 is the amount of lights in the showroom that are nonfunctional.

You know, they are light fixtures that should be maintained.

**Q Do you know if those lighting fixtures are fluorescent, LED, or what kind of fixture they are?**

A They are fluorescent. You say that in Exhibit 17 -- wait a minute -- yeah, Exhibit 17, that there were no pictures of ceiling tile damage. Well, I mean, that ceiling. But in Exhibit 14, you can see -- you know, you can see a bit of it.

**Q Of the damage?**

A Yes.

**Q Which photograph in Exhibit 14 are you looking at?**

A Well, there is several that depict the damage, but in 590 -- and you can -- I wish I had compared -- taken comparison pictures, but you can look to the upper left-hand corner and see the track that has been -- or the grid that has been damaged.

You can see -- there is another dysfunctional light. Those fluorescent lights, the ballasts go out. And so you have to replace those quite often. And I didn't test the ballast. It could be just nobody had any lights.

You can also see the same room in 592.

You can see the electrical damage in 595 of the showroom and 596, I'm sure. Electrical damage in 597.

**Q When you say electrical damage, what are you referring to?**

A I'm referring electrical because T.U. Parks had bid it out to different subs. And so their electrical subcontractor, that would correspond with their quote to go and fix these fluorescent lights.

**Q So when you say electrical damage, you're talking about the lighting panels that are out?**

A Right. Whether it's a ballast or not or a dysfunctional -- you know, those fluorescent lights just don't last forever.

**Q And we're not making a distinction of the cause of the light going out --**

A Correct.

**Q -- we're just talking about light panels that are out?**

A Correct. There is ceiling tile damage on 603 and there is lots of damage on 612.

**Q For the damage to ceiling tile that we have seen as part of the photographs in Collective Exhibit 14, do you know when that damage occurred?**

A Could you -- could you say that again?

**Q For the -- you pointed out some ceiling damage -- some ceiling tile damage in the photographs in Exhibit 14. And I asked you, do you know when that damage occurred?**

A No, I do not.

**Q Do you know whether it occurred prior to June 1 of 2022?**

A Well, as I just told you a minute ago, there was a lot of -- where you could see on 14 that they were there, and then you could see now they are not. And I apologize if I did not correspond every picture in Exhibit 14.

And, again, not to repeat myself a hundred times, but Peter said we're going to take care of this, I'm going to take these pictures. So I didn't click. And really most of these pictures I -- I definitely could look them up and tell you a time stamp on all of them. That's available at Google and I can provide that however is necessary. But you can tell prior to the move-out that the ceiling tiles were in good -- or workable.

Like, if you look at the picture of the -- several of the pictures of the training center room, and then you look at it now, you can see quite

a difference. Same as in the area where they removed the TVs. Same as in the area where they removed, you know, specific damage. I think it's my perception, again, that the damage was done installing them, but there was a lot of damage done un-installing them.

**Q For the ceiling tile damage that we were looking at in Exhibit 14, do you know when the damage that was visible in the spring of 2023 occurred?**

A No, I do not.

**Q I guess same question for some of the other damage, not just ceiling tile. Whether it's tile damage, interior, or, you know, broken windows, do you know when any of those damages occurred? Is there any, you know, email or notice or evidence about when things happened?**

A No, there is not.

**Q Okay. So, you know, the photographs that we have in Exhibit 14 are kind of like our best snapshot of what it was like prior to the move-out; is that fair?**

A Correct.

**Q And for the damage that's visible at that point, can you identify any information for me that would help us pin down when that damage**

**occurred?**

A Well, again, even though I walked into the showroom several times, I did not go to the back. I didn't even go to the bathroom, you know. I didn't -- I didn't walk down the hallway. I mean, different managers have had different policies. But due to OSHA standards, you have to be known and sign in and all this. And it was made such a big deal about, that I didn't -- I didn't go back there.

**Q I'll kind of go back to the question because I think you answered to me, but sometimes we need an answer. So in terms of damage that was present in spring of 2023, before the move-out ever took place, I had asked you if you had any information that would help us pin down when that might have taken place. Is the answer to that no?**

A Correct.

**Q Okay. And I don't mean to sort of beat the dead horse. It's just our job here to find out the extent of what BWS knows and doesn't know. I know that you weren't on site all the time.**

**You had mentioned T.U. Parks, and that's actually the next document I wanted to put in front of you. Because when we looked at the damage, the next thing to take a look at would be repairs or**

**the cost of repair or replacement; is that right?**

A Yes.

MR. ROBISON: Does anybody need a break before we look at that document?

THE WITNESS: I'm fine. Are you okay?

BY MR. ROBISON:

**Q I'm going to hand you a document that's actually slightly different from the T.U. Parks Construction document that you gave to us in discovery. That one was just a little lower definition. The document I'm handing to you appears to be the same document, but we received it directly from T.U. Parks Construction via subpoena. So I'm going to look at this because it's a heck of a lot easier to read if that's okay with you, because we already struggled with numbers on our pages before.**

**And if you want to take a look and see which pages -- you know what? I think I may have been wrong. This has your Bates number on it, so this is -- this is the version you gave us and this must be the legible one. There was a less-legible one attached to like a complaint or something that was hard to read. So this did come from you.**

**You told me earlier that you're not an**

**engineer, you're not a contractor, are you?**

A No, not at all.

**Q Now, you do some property management, so you're not completely ignorant of what some of these things are, but I'm not going to ask you to be a contractor. You don't have a GC license, do you?**

A No.

**Q Well, neither do I. So this is two lay people talking about something. If you know something, let me know. If you don't know, just let me know that as well.**

A Okay.

**Q And, again, this is a document that you did not create; is that right?**

A That is correct.

MR. ROBISON: We're going to mark this as the next numbered exhibit. Let's go ahead and mark it now.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 18.)

BY MR. ROBISON:

**Q Ms. Nevans, can you tell me what led to this document being created?**

MS. WOLINSKY: To the extent it has

anything to do with attorney-client communication, I'll object.

BY MR. ROBISON:

**Q I definitely don't want to know that. Let me ask you this: Did you provide some information to somebody at T.U. Parks Construction that resulted in this preliminary budget breakdown being created?**

A Certainly.

**Q Okay. Who did you work with at T.U. Parks Construction?**

A Jason Hickey.

**Q Okay. I think you might have mentioned his first name earlier. So Jason Hickey. What is his role at T.U. Parks?**

A He is management. I don't -- I don't know. I mean, he is the one that came out and put the quote together.

**Q In the written discovery responses, I think you mentioned that you hadn't used T.U. Parks Construction before.**

A That is correct.

**Q Okay. But you were aware that Airgas had used Parks Construction previously?**

A As they -- during June of 2023, they

were just finishing Airgas's job on Access Road. So they were very familiar with everyone there. The management of Airgas was very familiar with the T.U. Parks. And so in order to save time, I went with their contractor. That's Airgas's contractor.

**Q And this Exhibit 18 that we're looking at has two pages. Can you confirm that yours has two as well before I ask you about it?**

A I can. That is correct.

**Q Now, we're going to get into building numbers. The front page says Buildings -- well, 700 Manufacturers Road, Buildings 1 and 2. Do you see that?**

A Correct.

**Q Okay. So the second page says 700 Manufacturers Road, Building 3.**

A Correct.

**Q Do you have any understanding as to whether that actually corresponds to Building 4 or the Gas House?**

A Yes. Because we're not doing any work on Building 3, they skipped Building 3, thus the confusion of building numbers.

**Q Okay. So as long as we keep that in mind, we keep that straight, we're good.**

A Right. We can cross it out and put 4 if you would like.

**Q I'm going to ask you first about the first page, and then we'll get to the second page.**

MR. ROBISON: Off the record.

(Off-record discussion.)

BY MR. ROBISON:

**Q There are a number of line items in this preliminary budget breakdown for Buildings 1 and 2. And that corresponds to the large main building and the repair shop; am I right about that?**

A Correct.

**Q I'm going to ask you about a couple of the line items. If you know information about it, let me know. If you don't, let me know that as well.**

A Okay.

**Q I'm actually going to jump down to 22 to begin. That has a plumbing package. Do you see that line item?**

A I do.

**Q Are you aware of what information was provided to Parks Construction that would allow them to estimate a plumbing package? Like, do you know what that involves or what information about plumbing was provided to them?**

A Well, again, I'm not a lawyer and not trying to interpret anything, but --

MS. WOLINSKY: If we're getting ready to talk about something that relates to attorney-client and lease stuff, just don't even reference it.

BY MR. ROBISON:

**Q By all means, please don't tell me about that.**

A Well, let me just say I referenced what -- I referenced what I believe to be Airgas's responsibility and walked through with T.U. Parks accordingly.

**Q When you say T.U. Parks, was that Mr. Jeremy Hickey?**

A Jason Hickey, yes.

**Q Jason Hickey. I'm sorry. We had talked about bathrooms earlier and bathroom fixtures and like a wash sink. Were those all items that you pointed out to Mr. Hickey?**

A Yes. All six bathrooms.

**Q And what was to be done with all six bathrooms to your understanding?**

A To repair or replace broken fixtures.

**Q Which bathrooms had fixtures that**

**needed to be replaced or repaired?**

A All of them. Even the nicest one, which is the women's bathroom, the toilet ran. You know, an easy fix, but it still was part of this package.

**Q Did that plumbing package also include the bathroom in the warehouse that we haven't seen pictures of that you said was functional but dated or had some -- they were not new fixtures?**

A Correct.

**Q So all those fixtures and all those bathrooms would be replaced or repaired? Which was it?**

A Whatever was necessary. There was -- there were a few that needed to be replaced. And most every -- you know, all the rest repaired.

**Q Do you know if the plumbing package included hot water heaters?**

A I would assume. There is no breakdown, but I would assume so.

**Q Do you know one way or the other?**

A No, I do not.

**Q Do you know anything else about what is included in the plumbing package that would help us understand that line item?**

A Just -- just like I said, repair and replacement of six bathrooms. Just to get six bathrooms up to working function.

**Q When you said six bathrooms, is it four in the main building, one in the repair shop or Building 2, and one in Building 4 or the Gas House?**

A That is correct.

**Q Okay. So I guess when we're looking at this plumbing package, we're only talking about five bathrooms; is that fair? Because we're excluding the one from the Gas House?**

A I wasn't excluding it, no.

**Q Okay.**

A Oh, wait. Yeah. It's on here, too. Plumbing and mechanical was 3,989.

**Q I didn't want to say that, but that's -- okay. That's what I was getting at.**

A Yes. It's labeled -- it's labeled clearly that it's just those five bathrooms. Forgive me.

**Q I'm going to again be moving through these different line items. If you could go up to line item 20, it's painting in Building 1.**

A Uh-huh.

**Q Is that a --**

A Yes.

**Q What information was provided to Parks Construction to create that line item for $27,862 for painting in Building 1?**

A Well, this is more than painting. The drywall had to be replaced in places and repaired in others with days in between. Because the damage was so extent, there would be days in between of drying and sanding, re -- you know, so any time that you're dealing with sheetrock, it's -- but that's -- you didn't ask me why. I just -- am I answering your question correctly?

**Q Well, I had asked what -- what information was provided to Parks Construction to come up with that line item? And I think you've told me that it was more than painting and you described some things.**

A Yes.

**Q Was there any other information or damages or needs that you believe are included in that painting line item?**

A More damages?

**Q Well, I -- if there -- if there is any more information, please let me know what is included in that line item based on information you provided**

**to Parks Construction.**

A Well, there was a lot of talk about we can't just fix this section. We've got to fix the room. Plus, as you can notice in the showroom, there is vinyl stickers that say Airgas and have words and colors. Those would have to be removed and repainted over. The bathrooms in -- or the whole -- a majority of the painting in Building Number 2 would be on cinder block, which you use a completely different -- you can't use a regular interior sheetrock paint.

So we discussed the different kinds of paint and how it would be impossible to paint -- to fix a piece of sheetrock or to replace a piece of sheetrock and just paint that piece of sheetrock. So we discussed painting the whole hallway or painting this. And there weren't -- there were a few rooms that didn't have to be painted. It was normal wear and tear and we skipped over those rooms.

**Q Line items 13 and 14 involve acoustical ceiling tile at Building 1 and Building 2. Is that for a complete replacement, if you know?**

A I do not know.

**Q Okay. The next items -- oh, sorry. Go ahead.**

A I think we did discuss what I had just

said earlier about you can't replace one tile, but I think the grid could be repaired but the tile would need to match. So we talked about that. I'm not exactly sure what the scope of work is.

**Q The next line items at 15 through 19 seem to involve flooring. They say things like strip and wax existing VCT, Building 1. Do you see that one?**

A I do.

**Q There is another line item for Building 2 and there is a rubber base. Is that kind of like the floorboards or the trim that goes around the bottom?**

A Yes.

**Q What is the line item for epoxy floor at showroom?**

A I think I pointed it out to you in our walkthrough that in order to move a cylinder that's not on a pallet, you kick it -- you lean it over and you kick it and it rolls, and you just let it roll in your hand while you kick. And it leaves quite a trail.

And there is no pictures of it that I see, but the epoxy paint is just peeled up in the trail. Now, there is a sign on the door that says do

not bring cylinders into showroom, but apparently that did not stop several people, even if they used it to get to the warehouse. Because we use nitrogen for our -- or we did -- Brooks Welding Supply used tanks of nitrogen for our drill -- our gun drills, pneumatic drills that we used to put welding machines together and such. So there is cylinder use back in the warehouse. But a lot of damage to the epoxy floor rolling cylinders through there.

**Q What is the flooring in the showroom?**

A Epoxy paint.

**Q There is a description here on the notes that says deduct $7,801 to use LVT in lieu of the epoxy paint.**

A He was just giving us an option.

**Q Okay. Did any of the photographs in either Exhibit 14 or 17 show damage to the flooring in the showroom?**

A No, not that I could see. It's just really hard to tell from the pictures. But I know I pointed it out to you, and it's relevant damage.

**Q Line item 23 says, window unit in office.**

A Correct.

**Q What does that refer to?**

A I pointed it out in the pictures when we went through Exhibit 14. And I think that it's evident when you look at this and then you look at Exhibit 17 -- when you look at Exhibit 14 and then you look at Exhibit 17 -- that a lot of the damage -- I -- can you repeat your question?

**Q Sure. What is the window unit referred to in line item 23?**

A It is a window unit in the shipping office, and it's gone. And they left a window -- I mean, they left a hole.

**Q When you say window unit, do you mean an HVAC unit of some sort?**

A Correct. Would you like me to find the page number? You can see it in 604 and in 605.

**Q So that would be an office at the back of the warehouse?**

A Correct. It's a cubicle. It just gives you a little nice refreshing place in the hot summer to go.

**Q Line item 24 says electrical package. Do you have any knowledge as to what's included in an electrical package in this budget from T.U. Parks Construction?**

A To fix all the lights that we

discussed.

**Q So that's to replace the either bulbs or ballast or whatever is necessary for the --**

A Correct.

**Q -- lighting? Does it just involve lighting?**

A To my knowledge, nothing comes to mind that is excluded from -- or that -- you know, nothing comes to mind other than lighting.

**Q Still looking at page 1 of Exhibit 18, which is for Buildings 1 and 2, there are line items at items 1 and then further down below the total budget estimate that include management and supervision, contingency, contractor fee.**

**Do you have any knowledge about what the local practice is in the Chattanooga area about contingency fees, management fees, and things of that nature for contractors?**

A To my knowledge and experience, it's been around sixteen to twenty percent. And it used to be ten when we did the earlier, but it's really gone up. To speak to that, that's why I chose their contractor because they are familiar with their management fees and they are also familiar with timelines because they had to be out by May 31st.

And they had the importance of having their building ready on a certain date as is important to me to end the holdover tenancy. And so I expected that they would -- that they would be happy to pay this rather than holdover tenancy.

**Q What is the date of this quote or budget? It looks like it's stated there on the top right-hand corner.**

A June 15th.

**Q So the information you provided to Parks Construction would have been provided prior to June 15th of 2023?**

A I could look on my calendar, but I -- if they were out on June 1st, I was interested in getting a quote immediately. You asked me that before and I forgot, but I do know that -- that I wanted to get a repair quote immediately.

**Q Line item 9 is miscellaneous carpentry work. Do you know what carpentry work was included in that bid?**

A I'm guessing that it had to do with the exposed two-by-fours and the -- possibly what we had talked about before of straightening a frame before you can hang a door, just -- you know, I don't have the list of things, no.

**Q Do you know if drywall repairing or patching is included in line item 9, miscellaneous carpentry work?**

A First of all, I didn't create this document, and I feel a bit uncomfortable answering that. But I would guess that hanging a piece of drywall would be miscellaneous carpentry. Painting it would be -- or, you know, I know that there is a lot of repair before you paint. I don't know that line between what's miscellaneous carpentry and what is painting, but it all has to be done together.

**Q I want to ask you some of the same questions with respect to the budget for what we understand to be the Gas House or Building 4 --**

A Correct.

**Q -- which was identified as Building 3 here, understandably so. Line item 12 is my first question. There is an item there for 12 new store front windows. Is that to replace all the windows in the Gas House?**

A I think so. I don't think there is any that are not broken.

**Q Was there ever a budget put together to replace individual panes in the windows since the larger windows had multiple panes in them in the Gas**

**House?**

A There was discussion and it was determined that they were not worth fixing.

**Q I skipped over the roll-up doors in Building 1. It looks like the roll-up or garage door may be referred to Building 1 or Building 2. I can't tell. Do you have any knowledge about which roll-up doors are included in this budget on page 1 of Exhibit 18?**

A Can you give me a line item, please?

**Q Sure. It looks like it is 11.**

A Yes. It was to replace one garage door, the one that we have discussed was off the tracks.

**Q And is that the one facing Paper Mill Road?**

A Correct.

**Q Was repairing that garage door not an option?**

A I was not privy to that conversation. I was -- I did not meet with Access Garage nor was I there when they were there.

**Q Staying on that same topic but now with the Gas House or Building 4, there was a rolling sheet garage door line item at line 11.**

A Correct. That's the one that we had previously discussed that was open during the pictures with the valuables behind it that I assumed worked properly. That's the same door.

**Q And there are seven doors identified -- seven doors, frames, and hardware. My question here is, are there seven doors on the Gas House?**

A One, two, three, four, five, six, seven, yeah.

**Q I was thinking through my mind where they were.**

A I can tell you if we want to spend time knowing.

**Q Is there a line item here to close off the open bay of the Gas House?**

A That's the roll-up door. That's the roll-up door that is the rolling sheet garage door.

**Q Is that rolling sheet garage door the one facing the rear of the property?**

A Yes.

**Q What do you call the opening that's closer to the front of the property that doesn't have a door to it that's just open?**

A They were going to secure that. That

would be one of the doors. And then also there is another door in that room as well. And I have to keep it closed with bricks.

**Q So is closing off that large open space one of the seven doors that's included in line item 10?**

A Correct.

**Q Had that always been open since you worked in the property, that open space?**

A No, I don't think so. No.

**Q What was there before?**

A That was a pumping facility and it had a door.

**Q What kind of a door was it?**

A A rolling -- well, I think it was a rolling one, yeah. It's this same kind that was opposite of it on the front of the building.

**Q When was it removed?**

A I do not know.

**Q Was it before 2013?**

A Yes.

**Q Was it before 20 -- or 2005?**

A No, I don't think so. It could have been in 2000 -- see, what we did at BWS Properties -- I mean Brooks Welding Supply -- was we were a

distribution center for seven -- or six other stores. And so we pumped all of our gases.

But when BOC and Airgas -- because they are corporate -- large corporations, they have a distribution somewhere else. So we were -- the purpose of that room changed dramatically the sale. They could have had damage and then taken the door off at any point. But I just think it's important for you to know what we used the facility for was different.

And Building 3 used to be our cylinder repair shop, but they don't -- BOC has a corporate repair shop for that. So that's why they never used Building Number 3, barely just to store some stuff, and there was -- you know, it was normal wear and tear, no problem. But Building Number 4, they changed the use and purpose. And so doors were not their priority.

But it was a priority when we pumped. And I think that that's kind of the reason behind the changes in the doors. We had to have heat. We had to have plumbing. We had to have -- because of the use of the building.

**Q Line item 8 for the Gas House, Building 4, has a patch masonry we're missing at**

**window.**

A Uh-huh.

**Q Did we see that -- a photo of that window?**

A We did and we discussed that. Like, again, the change of use. When the heat went out or when the heat and air went out, they just removed it. It was there forever not functioning, but it was still there. But they removed it, and I have no idea when and left a bit cold there.

**Q I want to ask you about line item 13.**

A Okay.

**Q It says painting of Building 3, $46,524. Do you know what information was provided to T.U. Parks Construction to come up with that line item?**

A It does. It surprised me to see that. And I do not know. But it's painting interior and exterior, I think. And it's a special paint that's used for masonry block. And I don't know if you recall, but there is a lot of interior block walls that were required for pumping. Now, they did some pumping there on a very little scale -- a low scale. But that would be a question for Mr. Hickey.

**Q To your understanding, was the request**

**to Parks Construction to paint the inside and outside of that building?**

A That's my recollection. And I think we also discussed same as the drywall. Once you patch up some masonry and put on some brand new doors, you know, it's a necessary repair to paint it.

**Q Line item 14, we again look at a bathroom. This is the one bathroom that was -- the one of the six that wasn't included in the previous budget. This is the one we looked at for Building 4 to replace the water heater, toilet and sink.**

A Yes.

**Q And do you know if the water heater was included in the plumbing bid for the other buildings? I just did not see it identified. And we talked about it before, but it is mentioned here.**

A I think this page 1, Building 1 and 2, he has in package. There wasn't any need to -- it was a lot -- I'm sure he has some breakdown on what that package is. I don't have that information.

MS. WOLINSKY: If you get to a stopping place, can we take a short break?

MR. ROBISON: Yeah. I think now is as good as time as any.

(Short break.)

BY MR. ROBISON:

**Q We're back on the record. I'm going to try to move through things quickly. I want to ask you about discovery responses that were recently supplemented, but that basically requires me to talk about the responses that you had first. So let me first have you identify these, and then I'm going to come back to them to the extent we need to. I think we already covered most of it.**

**Could you take a look at the document I just handed you and let me know first, have you ever seen this document before?**

A Yes, I have.

**Q I'm going to jump around in topics because we're trying to be efficient here and also because you and I have talked for several hours and you have already told me a lot of these things.**

**One name that hasn't come up yet is Brett Cohen. Could you tell me who that is and what your interactions were with him?**

A Limited. He signed -- he signed several of this -- that's not Brett Cohen. Do you --

**Q And I'm not asking this as like a pop quiz, but is it your understanding that he had some involvement in some of the prior leases?**

A Correct. Yes. I -- I don't know that I have met him. I've met Bobby -- I might have met Brett Cohen back in 2005 when we were negotiating -- I don't recall. But I don't know what he -- I wouldn't know him if I saw him.

MR. ROBISON: Okay. Let's mark that as the next numbered exhibit. I think it will be --

THE COURT REPORTER: Nineteen.

MR. ROBISON: -- nineteen, yeah.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 19.)

BY MR. ROBISON:

**Q The next document I want to hand to you is Plaintiff BWS Properties' Answers to Interrogatories. Now, I believe you will have seen this before, and I'm going to ask you to go to the back and confirm your signature on the second-to-last page.**

A Yes.

**Q Okay. These were dated back in August of 2024; is that right?**

A Yes.

MR. ROBISON: Okay. Let's mark these as Exhibit 20.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 20.)

BY MR. ROBISON:

**Q I'm going to hand you another document from the same date, I believe, and certainly same time period. This is Plaintiff BWS Properties Answers to Defendant's First Request For Production. Now, this won't have your signature on it, but do you recall -- without telling me anything you said to your lawyers or your lawyers said to you -- of providing documents to them that they could then send to us and we have discussed some of them?**

A Yes.

MR. ROBISON: Let's mark that as the next numbered exhibit, 21, which brings me to the documents I want to talk with you about.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 21.)

BY MR. ROBISON:

**Q Recently, last month, your counsel was kind enough to send us some supplemental responses. And they provided us some additional information about work on the property and repairs, and those are**

**attached here in this document. Now, I don't have a signature from you, but could you look through and tell me whether to the best of your knowledge those are accurate?**

A There have been other repairs made, but probably in November. But all of these that are here are accurate, yes.

**Q Okay. And there may be some additional ones that will be -- that you could supplement later; is that right?**

A Yes.

MR. ROBISON: All right. Let's mark that as the next numbered exhibit, I think 22.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 22.)

MR. ROBISON: Now, this document that I want to mark as Exhibit 23 is Plaintiff's Supplemental Responses to Defendant's First Request For Production. Let's mark this and then I'll ask you the question about it.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 23.)

//

BY MR. ROBISON:

**Q Do you have Exhibit 23 in front of you?**

A I do.

**Q There is an additional set of documents identified for us. It looks like it's BWS 617 to 621. Do you see that there at the top of the second page? Well, it's in response to several of them.**

A Yes.

**Q I'm going to hand you that range, the additional photographs provided to us. And I may know the answer to this question, but I still have to ask it. What are we looking at in the first paragraph or the first photograph?**

A The inside electric box of the heater in Building 1 in the large warehouse section.

**Q And I'm trying not to put words in your mouth, but is this the HVAC unit that you mentioned earlier that was not functioning?**

A That is correct.

**Q And is it your understanding that there was a fire in this unit?**

A It looks that way, yes.

**Q Okay. And I'm not trying to put words**

**in your mouth. Do you have an understanding as to what this picture is depicting or what issue there was with that HVAC unit?**

A So the next picture, as horrible as it is to see, you can see some flame marks where it has discolored the metal, and that led to a fire there. I really have no knowledge other than I saw this when we were repairing as we've previously talked about.

**Q And who took these photographs?**

A Oasis Heating and Air.

**Q Do you know the name of the repair person or technician that was doing the work?**

A Brandon Collins. He is the one that came to light the pilot light as I mentioned before, and his brother Mike Collins came to replace the unit.

**Q We looked at the first two photographs in this set. What does the third photograph BWS 619 depict?**

A It shows that after the fire that they -- someone just cut the wires to disconnect it.

**Q Where are the wires cut in this picture?**

A In a supply box. You can see the duct in the upper left-hand corner that is -- it's an

exhaust duct going out and up through the roof. And you can also see the flexible wiring conduit. So that is the supply box that plugs into the actual unit. It is a gash unit, but this electricity fires up -- sparks the pilot light. And to me it depicted -- on the side of the wiring conduits coming in, they put a little Duck tape, but they left the ground and they left the other wires just exposed.

**Q The next page is BWS 620. Is this the invoice for the work done?**

A Correct.

**Q And is this a complete replacement of an HVAC unit in the warehouse?**

A No. We had to use extra wiring conduit, and there is another -- there is another invoice from Oasis that pays for the extra -- because we found this fire, it didn't just affect this wire. It affected all the way to the next box.

So we had to run a new conduit with electrical wire all the way to a safe place. And there was an additional cost to that replacement of the unit.

**Q Is that additional cost contained in this invoice?**

A No. It's a separate invoice.

**Q Okay. Is there another invoice then that we don't have possession of yet that would --**

A No, no. I'm sorry. I did not read that. I did not read that. I paid it in two payments via Venmo. And when he wrote the invoice, I Venmo'd him right when he left. And when he emailed the invoice after he got home, he went ahead and added the $220 for the burnt electrical wires.

**Q And the replacement of hanging gas heater in warehouse line item, that was to put in a new HVAC unit?**

A HVAC stands for heat and air-conditioning. This --

**Q I was just thinking about --**

A -- was purely a heater.

**Q Let me ask this. Was it just heating units in the warehouse?**

A Correct. Yes.

**Q Other than the window units that we saw earlier, the units in the warehouse were just heating units; is that correct?**

A Correct.

**Q Okay.**

A They call them furnaces, I think.

**Q And then the last photograph that we**

**have, BWS 621, what does this depict?**

A This is when we installed the new unit. We left the burned unit up in the air. And the unit we took down is out on the dock. So there is still evidence of the burned-out wire.

**Q Help me understand what you just said. Did you say that you left the burned unit up in the air?**

A Can you see it behind the orange ladder?

**Q I see that there are two heating units suspended from the ceiling or up high.**

A Correct. Suspended from the ceiling in the forefront is the brand new furnace. The one behind it was the burnt furnace. Because I would have an additional cost to remove it, I decided that I would leave it until I had a build-out to do for someone.

The extent of the damage has necessitated a complete build-out where someone could have just come into that beautiful showroom. It has to be a complete build-out. So I don't want to do anything until I have a contractor to do everything.

MR. ROBISON: Let's mark that set of photos BWS 619 to 621 as Exhibit 24.

(The photographs, as referred to above, were marked and subsequently attached hereto as Exhibit No. 24.)

BY MR. ROBISON:

**Q What efforts have you made to re-lease the space since June of 2023?**

A Several. It's been quite a full-time job. I had -- immediately I bought a LoopNet add with the pictures that we looked at, Exhibit 14. Being property management is what I do. I just went ahead and made an ad and took a whole bunch of phone calls.

There it is. This is the first -- but this is the first LoopNet ad, if I'm not mistaken. You can tell the difference between my pictures. But anyways, after a year of me trying and showing it to numerous, numerous potential tenants, I felt like I needed to get new eyes on it. So I hired Second Story, Baker Townsend, and he and his team have shown it several times.

Now, I did in the first year find a client, Commonwealth Construction, that would -- as a month-to-month tenant would put their tractor, their backhoes, and their big trucks and that. And then as soon as Baker took over, not short -- well, from June

to November -- in November he found the Holtec. And they -- like I said, it was a three-month lease. So we have continued to show it several times with those two tenants in there. You know, we have shown it several times.

**Q In the year since the end of the 2022 to 2023 lease, how many tenants did you show the property to -- prospective tenants, I should say?**

A The list is long. I'm going to say it would be close to a dozen to fourteen, something like that.

**Q Is there a list price or a price per square footage that is included in any of these listings?**

A Uh-huh.

**Q You're more familiar with these than I am. We're looking at the LoopNet advertisement that you referenced. Can you point that out to me?**

A Ten dollars a square foot. It's on BWS 574.

**Q And what was the date that this went on the market?**

A June 1st. It might have been before June 1st, to tell you the truth. It went on the market available June 1st. So it was -- it was

previous to June 1st.

**Q How does LoopNet work? Can you renew or re-up a listing if you want to continue to list it for lease?**

A So you have to buy a package of months and you can renew it, yes.

**Q Would you look on page BWS 576 for me?**

A Yes.

**Q What is the date on market date listed there?**

A 7/1/24.

**Q Was there a prior listing on LoopNet that we don't have?**

A Yes. This would be Baker's -- this would be Baker's ad. He would have started -- he would have started his new campaign on 7/1. And it's odd that it's not in here because most of the time it gives who has it listed. So I'm very curious that there is not a real estate agent attached to this ad. I've never seen an ad that doesn't have a place to call.

**Q Let me hand you a thicker stack of documents and maybe we can figure it out together.**

MS. WOLINSKY: Did this one get marked as an exhibit?

MR. ROBISON: Not yet because I think this one may go in first or a portion of this may go in first. I appreciate you keeping me honest.

BY MR. ROBISON:

**Q Now, it looks to me like the first page of this set of documents might be an email. And I can't tell where the email ends or begins to be totally honest, and so I might need your help. But this looks like it's something from LoopNet; is that correct?**

A According to the first page, it does look like it is something from LoopNet. And you can see on 548 it says, Contact Baker.

**Q And on 547, it looks like the date updated is July 9th of 2024.**

A Five-four-seven, you say?

**Q Yes.**

A Okay.

**Q Did I read that right? Is that --**

A Uh-huh.

**Q -- correct? Is that yes?**

A Yes.

**Q Okay. If you want to keep looking through this document to see whether there is a prior LoopNet or other listing that occurred before 2024.**

A Okay.

**Q Did you see any other prior dates in that document?**

A Yes, I did.

**Q Where -- was there a previous date that we should pay attention to?**

A On the first page it's Friday, October 6, 2023. Here is your weekly advertiser update. So when you click on that, it shows the current listing of the property. And because I clicked on this whenever I provided the stuff, the ad had already changed to Baker and it was updated, because it was after July 24 that I -- that I looked at this document.

But I pulled up an old email just to show that my active was listed -- my listing was active. And I can go back. I don't know why I chose October 6th, but I certainly can go back to where I paid for the ad. This is probably not the best representation that there was an ad in April or, you know, previous to June 1st of 2023, but there definitely was.

**Q It sounds like that's something that you could get your hands on if you --**

A Easily. I can get my hands on the --

I may have already submitted it, but I know I can get my hands on the -- what I paid for the Loop -- the invoice and the payment.  But it's hard because you pay it all online.  And so really you can only get the receipt from an invoice -- I mean, from an email or from your bank account.

Well, not wanting to give bank account information, going back to an email is what I thought would be the best thing.  But once it's updated, you can't go back and see it unless you printed it off at that time.  And another way is Baker may have printed my ad in order to build his.

MR. ROBISON:  Let's do this.  The email has that date of October 6th in 2023 like you said.  So let's mark that as the next numbered exhibit.  It will be 25.  And the LoopNet advertising will be Exhibit 26.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 25.)

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 26.)

THE WITNESS:  I was trying to go back.  LoopNet just wouldn't let me go to a previous.

BY MR. ROBISON:

**Q Were you involved in providing any information to Weeks Paving for a bid or a quote for the paving of the exterior asphalt area at the property after the tenancy ended, the Airgas tenancy in June of 2023?**

A When the Weeks Paving guy was there to meet Jason Hickey, there was actually several people that day. And I walked around the parking lot with him as he sprayed the damaged areas. We didn't have a conversation.

**Q Do you recall that gentleman's name?**

A No, I do not.

**Q How was it, if you know, that Weeks Paving had a square footage or yardage amount to provide a quote or bid for?**

A Can you say that one more time?

**Q How was it that Weeks Paving had a square footage or yardage amount to base a bid on?**

MS. WOLINSKY: Object to the form.

BY MR. ROBISON:

**Q Let me ask it again.**

A May I just say that Jason talked with Weeks Paving and I did not?

**Q Do you know how any area measured in**

**square footage or square yardage was provided to Weeks Paving for an estimate?**

A No, I do not.

**Q Do you know the term alligator skin or crocodile skin wear on asphalt paving?**

A No, I do not.

**Q I'm going to hand you a couple emails. And we're not going to read through each of them, but I do want to make sure that we're looking at the same things. We are back to the very tiny writing. And, again, this is blown up as big as I could. BWS provided this to us in discovery. This is, as I understand it, an email from you, Jennifer Nevans, to Dawn whom I believe to be Dawn Van Dyke.**

A Correct.

**Q And the date of this one is June 2nd of 2023.**

A Correct.

**Q And I'm not going to have you repeat or restate everything in this email, but am I generally correct that you are identifying some of the issues that we have talked about today with the property to Dawn?**

A That is correct.

**Q I wanted to ask you because we have**

**brought it up earlier and I wasn't clear whether it was actually attached. Is this the email that would have included the invoice for taxes and insurance? And if it helps, the fourth paragraph from the bottom seems to refer to something along those lines.**

A Yes. I have attached an invoice for the property tax and insurance through May '23. And the city taxes would be the same. I clearly described what the invoice was and I attached it.

**Q The attachment that we see depicted graphically on the second page of this email chain does show at the top half of what looks like an invoice.**

A Yes.

**Q Was any other page or documentation sent accompanying that invoice on June 2nd, 2023?**

A No. They had already been provided the insurance. And the -- and the city taxes had not come out yet and they already had a copy from last year.

**Q The document that was attached to this email, is it the invoice that we looked at earlier that was Exhibit 11?**

A That is correct.

MR. ROBISON: Okay. Let's mark this

as the next numbered exhibit, 27.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 27.)

BY MR. ROBISON:

**Q The next document I'm handing you is another email with small print. My apologies. It looks like it's a series of emails. And I wanted to confirm, these are from Dawn Van Dyke to you and there are two other persons on here; is that right? It looks like one of them is named Peter, and I was going to ask if you could confirm whether that was Peter Van Slyke.**

A I think.

**Q And the second and third page might be most helpful.**

A Okay. When I say who am I meeting? I'm --

**Q Yes.**

A Would you maybe attend this Friday? Who will I be meeting? Peter. Can you let Jenny know who she is meeting. Kevin Cruz and Tracy Harvey. But he -- Peter was not there. It was only Kevin Cruz and Tracy Harvey that actually showed up.

**Q Okay. That's helpful. And we asked**

**about a Kevin Cruz earlier. Does that help us confirm that was the person?**

A Correct.

MR. ROBISON: Let's mark that as Exhibit 28.

(The document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 28.)

BY MR. ROBISON:

**Q This is the same thing in a different format.**

A I provided it as well.

**Q Okay. We've talked about interior damage. We've talked about paving. We haven't talked about signage yet. Is my understanding correct that there is still signage at the property that has Airgas's name on it?**

A That is correct.

**Q What did Airgas propose to do about that signage during your post-tenancy discussions?**

A Nothing.

**Q Was there a proposal to paint over it and leave it as an option for a potential tenant to -- a subsequent tenant to use and put their own signage on?**

A I had discussions with the sign company, but at that point I was only speaking to counsel, not to Airgas.

**Q And, again, I don't want to know what you said to your counsel. Did Airgas ever propose to or give an amount to or suggest to pay for or have somebody paint over the signage and leave it in place for a future tenant to potentially use?**

A They did not.

**Q Under the lease, who was responsible for replacing HVAC systems?**

A I was. I think that there is -- if the repair was done naturally.

**Q What do you mean by natural repair?**

A Well, I'm sure that heating units and furnaces that are taken care of, cleaned and maintained, they don't break as much as ones that are neglected and abused. And neglect and abuse would cause a question of whose responsibility that would be, in my mind, in my experience as a landlord.

**Q We've looked at a couple different leases and we've made them exhibits. Which is the lease that Airgas -- BWS is suing under in this lawsuit?**

A The current lease.

**Q Okay. And I think, just to make sure our exhibits are clear, it's the most recent lease that began in 2022?**

A That is correct.

MS. WOLINSKY: Exhibit 6.

BY MR. ROBISON:

**Q And what was the commencement date of Exhibit 6, the lease in 2022?**

A June 1st, 2022.

**Q Does BWS have any knowledge as to which of the damages it is describing to the real property that occurred after the commencement date of the final lease?**

A Would you repeat that just one --

**Q Sure. Does BWS have any understanding as to when the damages that are the subject of this lawsuit occurred and which of them occurred after June 1st of 2022?**

A Well, that's a very broad question, and I have very little knowledge of when any of the damages occurred. I think that there are some common-sense things that because under the lease previous, which was Exhibit 4 -- because things were not maintained or not replaced when broken, that could aid to the damage, but I don't know when the

damage was done.

**Q For example, one of the larger line items in the repairs is the paving and exterior asphalt. Is it BWS's position that the wear in the paving occurred between June 1st of 2022 and May 31st of 2023?**

A No.

**Q If you find photographs of the property that were taken from 2013 to 2022, would you go ahead and provide those to us if for some reason you come across them? I know you have probably already looked.**

A I have and I certainly will share them if I can come across them.

**Q Let me take just one moment to make sure I didn't skip something, because I've got a lot of documents over here.**

A Yes.

**Q We talked on this briefly, but just to clarify. When there was hail damage around 2012, was Building 1 the only building affected?**

A Yes.

**Q And is that because that was the only building with skylights?**

A Yes.

**Q Were they broken out and was the water damage the big cause of the damage?**

A Correct.

**Q I don't mean to put words in your mouth. I'm just -- okay.**

**Those are all my questions. Unless -- I want you to just very briefly think as you have done occasionally today, is there any response that you need to kind of update or give me a little more information because you have thought of a person's name or it's occurred to you as we have had other conversations? I always try to give people an opportunity to do that because sometimes you think, ah, we just talked about --**

A Well, I think we've already cleared that up. You initially asked me when did I see T.U. Parks. As soon as I looked at the quote, I knew that I did it that week. I couldn't remember if it was as soon as we left or as soon as we made the complaint. Little confused on that, but we cleared that up. I don't think I have any other additions. And I can't ask questions, so that's all I have.

MR. ROBISON: Thank you, again. I know it's been a long day, but I appreciate it.

THE WITNESS: Yes. Thank you.

FURTHER THE DEPONENT SAITH NOT.

(Signature waived.)

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :
COUNTY OF HAMILTON :

I, Whitney A. Vaughn, Court Reporter and Notary Public, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. BWS PROPERTIES, LLC, By and Through Jennifer Nevans, was duly sworn by me; that pages 1 to 238, inclusive, were reduced to typewriting under my direction and supervision, and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This is the 22nd day of April, 2025.

Whitney Vaughn, TN LCR #418
Court Reporter and Notary Public
My Commission Expires 12/23/28